Peter B. Janci, OSB No. 074249
peter@crewjanci.com
Kendall M. H. Spinella, OSB No. 214446
kendall@crewjanci.com
Matan Goodblatt, OSB No. 224060
matan@crewjanci.com
Crew Janci Attorneys
9755 SW Barnes Road, Suite 430
Portland, Oregon 97225
Telephone: (503) 306-0224

Paul Galm, OSB No. 002600
paul@paulgalmlaw.com
Galm Law
50 SW Pine St., #403
Portland, OR 97204
Telephone: (503) 647-6000

*Of Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| T.A.M., J.K.B., E.C.R., J.K.C., A.M.W., R.L.M., N.T.N., A.W., B.W.H., J.D.W., and S.S.L., individuals proceeding under pseudonyms,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF OREGON, by and through the Oregon Youth Authority ~~KIMBERLY COPELAND, in her role as personal Representative for the ESTATE OF EDWARD. G. EDWARDS~~; RICHARD A. HILL; KAREN BRAZEAU; ROBERT JESTER; ~~BOBBY MINK;~~ COLLETTE M. S. PETERS; FARIBORZ PAKSERESHT; JOSEPH A. O'LEARY; GARY LAWHEAD; MIKE CONZONER; DARIN HUMPHREYS; BRIAN | Case No.  3:25-CV-01668-MC<br><br>~~FIRST~~ SECOND AMENDED COMPLAINT<br><br>Civil Rights Violations of the 8th and 14th Amendments – 42 U.S.C. § 1983; Negligence; Sexual Battery – *Respondeat Superior*; Constructive Fraud~~; Sexual Battery~~<br><br>DEMAND FOR JURY TRIAL |

PAGE 1 – ~~FIRST~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

J. FLORIP; MICHAEL RIGGAN; ISIDRO THOMPSON; DANIEL BERGER; -MARCIA ADAMS; PHILIP COX; and SUSAN BAUMGARTNER,

    Defendants.

## COMPLAINT

COMES NOW the Plaintiffs by and through their attorneys and hereby state and allege as follows:

## INTRODUCTION

1.

At all times material, Plaintiffs were male juveniles adjudicated or convicted in various counties across Oregon (including, on information and belief, in Multnomah County) and ultimately committed to the care and custody of the Oregon Youth Authority ("OYA"). OYA's stated purpose is in part to "provide youth with treatment, education, and other guidance to help them learn how to act different in the future" and "do so in safe, supportive environments that will help them become responsible, community-minded citizens."[1] OYA placed each of the Plaintiffs at the MacLaren Youth Correctional Facility in Woodburn, Oregon ("MacLaren") at some point during their confinement. While housed at MacLaren, all twelve Plaintiffs were sexually abused by Doctor Edward Gary Edwards ("Dr. Edwards"), a long-time pediatrician providing medical care to youths at MacLaren since 1977. The sexual abuse of Plaintiffs occurred roughly between approximately 2000 and 2017 and included, *inter alia*, skin-on-skin fondling and groping of Plaintiffs' testicles and penises, digital penetration, masturbation and

---

[1] About Oregon Youth Authority, https://www.oregon.gov/oya/aboutoya/pages/default.aspx (last visited Aug. 19, 2025)

PAGE 2 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

oral sex—all for Dr. Edwards' sexual gratification. Unbeknownst to Plaintiffs at the time, Dr. Edwards' sexual abuse of children at MacLaren was prevalent and well-known among the MacLaren administration and staff for decades. However, rather than report Dr. Edwards or take other action to prevent his abuse of youth in their custody, MacLaren correction officers instead ignored and, in some cases, weaponized Dr. Edwards' well-known pedophilia, threatening kids that if they did not behave, they would be sent to "Dr. Cold Fingers" as punishment.

## PARTIES

2.

Plaintiffs were at all relevant times residents of the State of Oregon and in the custody of OYA as adjudicated youths. Furthermore, all Plaintiffs are proceeding under pseudonyms because of the sensitive and embarrassing nature of the allegations contained herein. Moreover, revealing their identities as survivors of childhood sexual abuse would subject Plaintiffs and their families to humiliation, embarrassment, and emotional distress. Plaintiffs' identities will be promptly disclosed to counsel for Defendants, subject to reasonable assurances of confidentiality.

3.

Plaintiff T.A.M. is a 39-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff T.A.M. was in the legal and physical custody of OYA.

4.

Plaintiff J.K.B. is a 38-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff J.K.B. was in the legal and physical custody of OYA.

PAGE 3 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

5.

Plaintiff E.C.R. is a 39-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff E.C.R. was in the legal and physical custody of OYA.

6.

Plaintiff J.K.C. is a 39-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff J.K.C. was in the legal and physical custody of OYA.

7.

Plaintiff A.M.W. is a 37-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff A.M.W. was in the legal and physical custody of OYA.

8.

Plaintiff R.L.M. is a 35-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff R.L.M. was in the legal and physical custody of OYA.

9.

Plaintiff N.T.N. is a 26-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff N.T.N. was in the legal and physical custody of OYA.

10.

Plaintiff A.W. is a 35-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff A.W. was in the legal and physical

PAGE 4 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

custody of OYA.

11.

Plaintiff B.W.H. is a 36-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff B.W.H. was in the legal and physical custody of OYA.

12.

Plaintiff J.D.W. is a 38-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff J.D.W. was in the legal and physical custody of OYA.

13.

Plaintiff S.S.L. is a 30-year-old male resident of the State of Oregon. At all times relevant to the wrongful conduct complained of herein, Plaintiff S.S.L. was in the legal and physical custody of OYA.

14.

The OYA is a duly authorized agency of Defendant State of Oregon. OYA operates facilities across Oregon where youth offenders are housed and treated, including MacLaren. Under the Oregon Tort Claims Act, OYA is subject to liability for the torts of its officers, employees, and agents acting within the scope of their employment or duties.

15.

At all times material, Dr. Edwards was acting under color of state law. All conduct alleged below occurred within the scope of his employment with OYA or resulted from acts within the scope of that employment. Dr. Edwards died on February 19, 2025. A petition for administration of estate (the "Estate") was filed in Multnomah County on May 16, 2025, Case

PAGE 5 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

No. 25PB04480. Defendant Kimberly Copeland ("Copeland") is currently the personal representative of the Estate. Plaintiffs presented their claims to the Estate and those claims were disallowed.

16.

Defendant RICHARD HILL was the Director of OYA from July 1996 to May 2000. As the Director of OYA, he was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of the Director's employment with OYA. Defendant Hill is sued in his individual capacity.

17.

Defendant KAREN BRAZEAU was the Director of OYA from 2000 to 2004. As the Director of OYA, she was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of the Director's employment with OYA. Defendant Brazeau is sued in her individual capacity.

18.

Defendant ROBERT JESTER was the Director of OYA from 2004 to 2008. Upon information and belief, Defendant Jester was Deputy Director of OYA from approximately 2000 to 2004, he was the Area Coordinator responsible for supervising the Superintendent at MacLaren from approximately 1997 to 2000, and he was the Superintendent of MacLaren prior to 1997. As the Director of OYA In each of these roles, he was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of his the Director's employment with OYA as Director of OYA, Deputy Director of OYA, Area Coordinator, and/or Superintendent of MacLaren. Defendant Jester is sued in his individual capacity.

PAGE 6 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

~~19.~~

~~Defendant BOBBY MINK was the Director of OYA from 2008 to 2009. As the Director of OYA, he was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of the Director's employment with OYA. Defendant Mink is sued in his individual capacity.~~

~~20.~~19.

Defendant COLETTE PETERS was the Director of OYA from 2009 to 2012. As the Director of OYA, she was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of the Director's employment with OYA. Defendant Peters is sued in her individual capacity.

20~~1~~.

Defendant FARIBORZ PAKSERESHT was the Director of OYA from 2012 to 2017. As the Director of OYA, he was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of the Director's employment with OYA. Defendant Pakseresht is sued in his individual capacity.

~~22~~21.

Defendant JOSEPH A. O'LEARY was the Director of OYA from 2017 to 2025. Defendant O'Leary also served as the Deputy Director of OYA from 2012 to 2017. As the Director and Deputy Director of OYA, he was employed by OYA, a state administrative agency, and acting under color of state law. All conduct alleged below occurred within the scope of ~~the Director's~~his employment with OYA as Director and Deputy Director. Defendant O'Leary is sued in his individual capacity.

~~23~~22.

PAGE 7 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

All the individual Defendant directors listed above will be collectively referred to as "Directors."

2423.

Defendant GARY LAWHEAD was the Superintendent of MacLaren from 1997 to 2005 and again for part of 2008. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of the Superintendent's employment with OYA. Defendant Lawhead is sued in his individual capacity.

2524.

Defendant MIKE CONZONER was the Superintendent of MacLaren from 2005 to 2007. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of the Superintendent's employment with OYA. Defendant Conzoner is sued in his individual capacity.

2625.

Defendant DARIN HUMPHREYS was the Superintendent of MacLaren during part of 2007. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of the Superintendent's employment with the OYA. Defendant Humphreys is sued in his individual capacity.

2726.

Defendant BRIAN FLORIP was the Superintendent of MacLaren from 2007 to 2008. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and

PAGE 8 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

was acting under color of state law. Upon information and belief, Defendant Florip also acted as the Assistant Director of Operations for OYA and the Assistant Director of Facilities for OYA on or about 2000-2008. In these roles, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of histhe Superintendent's employment with the OYA as Superintendent of MacLaren, Assistant Director of Operations or Assistant Director of Facilities for OYA. Defendant Florip is sued in his individual capacity.

2827.

Defendant MICHAEL RIGGAN was the Superintendent of MacLaren from 2008 to 2010. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of the Superintendent's employment with the OYA. Defendant Riggan is sued in his individual capacity.

289.

Defendant ISIDRO "SID" THOMPSON was the Superintendent of MacLaren from 2010 to 2013. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of the Superintendent's employment with the OYA. Defendant Thompson is sued in his individual capacity.

3029.

Defendant DANIEL BERGER was the Superintendent of MacLaren from 2013 to 2024. As the Superintendent of MacLaren, he was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of

EXHIBIT A

the Superintendent's employment with the OYA. Defendant Berger is sued in his individual capacity.

3130.

All the individual Defendant superintendents listed above will be collectively referred to as "Superintendents."

3231.

Defendant MARCIA ADAMS was Mmedical Ddirector for OYA during part of Dr. Edwards' employmentfrom 2007 to at least 2017. As Medical Director of OYA, she was employed by OYA, a state administrative agency, and was acting under color of state law. Some or all conduct alleged below occurred within the scope of her employment with OYA. Defendant Adams is sued in her individual capacity.

///

3332.

Based on information and belief, Defendant SUSAN BAUMGARTNER was a gym teacher at MacLaren at or around 2001 through 2002. As a gym teacher at MacLaren, she was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of her employment with the OYA. Defendant Baumgartner is sued in her individual capacity.

3433.

Based on information and belief, Defendant PHILIP COX was a Health Services Administrator for OYA from approximately 2000 to 2004, a Treatment Services Administrator or Treatment Support Manager for OYA from approximately 2004 to 2006, and an Assistant Director of Program Office for OYA from approximately 2007 to 2008. In these roles, Defendant

PAGE 10 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

Cox was employed by OYA, a state administrative agency, and was acting under color of state law. All conduct alleged below occurred within the scope of his employment with the OYA. Defendant Cox is sued in his individual capacity.

¶¶34.

Defendant Directors, Superintendents, Defendant Adams, Defendant Cox, and Defendant Baumgartner are hereafter referred to collectively as "Individual Defendants."

Defendant Directors, Superintendents, Defendant Adams, and Defendant Cox are hereinafter referred to collectively as "Supervisory Defendants."

35.

Dr. Edwards and Defendant Baumgartner, as discussed below, engaged in intentional conduct resulting in one or more of the following: mental injury, rape, sexual assault, and/or sexual exploitation of Plaintiffs as those terms are defined in ORS 12.117.

**JURISDICTION**

36.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that it is a civil action arising under 42 U.S.C. § 1983 and therefore presents a federal question. This Court may assert supplemental jurisdiction over Plaintiff's state-law claims that are related to, and form part of, the same case or controversy pursuant to 28 U.S.C. § 1367.

**VENUE**

37.

Venue is proper in the United States District Court for the District of Oregon, Portland Division, pursuant to 28 U.S.C. § 1391(b)(2), because, upon information and belief, a substantial

PAGE 11 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

part of the events and/or omissions giving rise to the claims alleged herein occurred in Multnomah County, Oregon.

## FACTS

### OYA'S CULTURE OF SILENCE AROUND SEXUAL ABUSE

38.

Youth are committed to OYA's legal and physical custody by county juvenile courts. OYA serves adjudicated and convicted youth between the ages of twelve and twenty-five. OYA's youth correctional facilities (hereinafter collectively "youth correctional facilities") include Eastern Oregon Youth Correctional Facility, MacLaren Youth Correctional Facility, Oak Creek Youth Correctional Facility, Rogue Valley Youth Correctional Facility, Tillamook Youth Correctional Facility, Northern Oregon Regional Corrections, formerly North Coast Youth Correctional Facility (which is now closed), and formerly Hillcrest Youth Correctional Facility (which is now closed).

39.

"With a goal of being a national leader," OYA boasts that it quickly began implementing the standards set out by the federal 2003 Prison Rape Elimination Act ("PREA").[2] The PREA created federal standards for preventing, detecting, monitoring, and responding to sexual abuse in both adult and juvenile custody settings. On information and belief, the passage of the PREA in 2003 followed an extended period of more localized awareness (including within OYA) of a

---

[2] Oregon Youth Authority Issue Brief: Protecting Youth Offenders from Sexual Victimization (February 2011).

PAGE 12 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

sustained and systemic problem of sexual abuse of adjudicated youth in youth correctional facilities.

40.

Beginning in 2005, OYA claims that it is committed to "a zero-tolerance policy towards sexual and other threats of harm" as part of its implementation of the PREA.[3] To that end, OYA created a Professional Standards Office ("PSO") to supposedly document, track, and investigate allegations of abuse. Staff were also required to report any knowledge, suspicion, or youth reports (verbal or written) of abuse or harassment. This included establishing (a) an OYA toll-free hotline that adjudicated youth could call to report sexual abuse and (b) a PREA compliance manager for each facility. Prior to establishment of the PSO, there was little to no OYA process or policy concerning the monitoring, reporting, investigation, and tracking of sexual abuse committed by OYA personnel against juveniles in OYA's custody and control.

41.

Despite this alleged implementation, OYA has a long history of ignoring reports of staff sexually abusing youth in its facilities, and fostering an environment where unchecked sexual abuse could thrive and perpetrators and their abuse were concealed, unbeknownst to adjudicated youth. This environment stems from OYA failing to timely investigate the large backlog of reports of abuse within its facilities, failing to properly train staff, failing to report known incidents of sexual abuse to external investigative agencies, and failing to implement policies that would protect youth from sexual abuse by staff.

---

[3] *Id.*

PAGE 13 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

42.

Recently, OYA's systemic failures have been exposed through a series of lawsuits alleging unchecked sexual abuse by OYA staff and media coverage of OYA's lengthy backlog of complaints of sexual abuse that have gone uninvestigated and unaddressed for years.

## DOCTOR "COLD FINGERS" EDWARDS

43.

At all relevant times, Dr. Edwards was employed or otherwise working on behalf of OYA as a pediatrician providing medical examinations, diagnoses, and treatment of youths at MacLaren since 1977. Dr. Edwards was later named chief medical officer at MacLaren.

44.

During Dr. Edwards' employment with OYA, there were numerous red flag events that put Defendants and OYA on notice of his dangerousness to youth, including, but not limited to, the following:

(a)    Defendants received multiple complaints, grievances, letters, and reports of Dr. Edwards' inappropriate behavior from youths, families of youths and staff during Dr. Edwards' employment.

(b)    Some OYA staff and supervisors were aware of complaints about Dr. Edwards' failure to use gloves during examinations of youths' genitals and digital rectal examinations as early as the 1990s. Multiple nurses and line staff in the 1990s were aware of Dr. Edwards practice of refusing to wear gloves while touching youths' genitals and refusing to allow chaperones in his examination rooms. By the mid-1990s, Dr. Edwards was already widely referred to as "Dr. Cold Fingers" by many MacLaren staff. Still, no OYA Director, MacLaren Superintendent, or other

PAGE 14 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(b)    ~~In or around 2001, aAt least one MacLaren clinic employee initiated a formal complaint against Dr. Edwards with the Oregon Medical Board based on increasing concerns about Dr. Edwards' behavior, including his longstanding habit of not wearing gloves during testicular exams of youth.~~

(c)    Dr. Edwards was known by some MacLaren clinic nursing staff and some youth to have frequently performed genital and digital rectal exams on youth without a chaperone present during such exams.

(d)    Youth reported to nursing staff that they were uncomfortable with Dr. Edwards' practice of touching boys' genitals without wearing gloves, and at times, youth would become upset and storm out of the exam room in response to this practice as early as the late 1990s. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(e)    In or around 2001, one or more MacLaren clinic employees initiated a formal complaint against Dr. Edwards with the Oregon Medical Board based on increasing concerns about Dr. Edwards' behavior, including his longstanding habit of not wearing gloves during testicular exams of youth.[4] Superintendent Gary Lawhead

---

[4] Today, OMB warns patients that doctors performing genital/rectal exams without gloves or medical need is not only a red flag of possible sexual grooming, but a "serious example of inappropriate behavior" and should be

PAGE 15 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

was aware of this OMB investigation at the time it was occurring. Still, no OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(f)    In 2001, two youth in MacLaren reported to OYA staff member, Joni Zimmerman, that Dr. Edwards touched their genitals without gloves and threatened the youth with punishment for not cooperating with him. Staff Zimmerman reported this to Defendant Florip, who disregarded OYA policy by failing to report Dr. Edwards' conduct to law enforcement or DHS. Instead, the agency preferred to deal with a situation such as this internally. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(g)    In the early 2000s, Individual Defendants (including Gary Lawhead) were aware that Dr. Edwards' treatment of medical staff resulted in numerous hostile work environment complaints by nurses. Defendants knew of multiple reports that Dr. Edwards was physically threatening and intimidating other clinic workers, as well as engaging in violent appearing outbursts and shocking, unprofessional behavior. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards took any corrective or disciplinary action towards Dr. Edwards. Instead, Defendants (including Lawhead) reinforced that no one should disagree with Dr.

---

reported to OMB. Or. Med. Bd., *What to Expect During a Physical Exam: Patient Rights & Resources* (Oct. 2022), https://www.oregon.gov/omb/Topics-of-Interest/Documents/What%20to%20Expect%20During%20a%20Physical%20Exam.pdf.

EXHIBIT A

Edwards and that his word was final with regard to what happened in the MacLaren medical clinic.

(h)    In or around 2004, some youth at MacLaren made complaints to nursing staff that Dr. Edwards was conducting inappropriate medical exams and not using medical exam gloves. When MacLaren clinic nurse, Debbie Milne, and Program Director, George Covey, spoke to Dr. Edwards about these complaints, Dr. Edwards admitted that he did not use medical gloves when conducting testicular exams. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(i)    In May 2005, a youth in MacLaren reported to his attorney that Dr. Edwards inappropriately touched his testicles for several minutes without wearing gloves and that on several visits to Dr. Edwards for unrelated injuries (i.e. an injured toe), Dr. Edwards would nonetheless remove the youth's pants and fondle his testicles. This report was referred by the attorney to law enforcement and the Oregon Department of Human Services. A MacLaren Program Director was made aware of the pending sex abuse investigation of Dr. Edwards. Still, no OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(j)    In February 2006, another youth in MacLaren submitted a written grievance to a Program Director at MacLaren named George Covey, detailing how Dr. Edwards touched and looked at his penis without gloves for several minutes during a medical

PAGE 17 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

visit for an unrelated issue. This incident was referred to the Oregon State Police for investigation. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation nor took any disciplinary or corrective action toward Dr. Edwards.

(k)     In December 2006, OYA staff Joni Zimmerman reported to the OYA Professional Standards Office that she had a long-standing concern about Dr. Edwards' practice of performing testicular exams on male youth at MacLaren without wearing gloves. She reported that she had expressed concerns back in 2001 about Dr. Edwards' conduct based on youth reports, but she had heard similar complaints again in 2006, where youth were joking about whether Dr. Edwards' exams would qualify as sex abuse. This report was shared with Defendants Phil Cox, Brian Florip, and OYA Director Bob Jester. Still, Defendants did not report this abuse to an outside agency per OYA policy. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(l)     In January 2007, a youth reported in an OYA safety survey that in 2005 when he had visited Dr. Edwards for his intake exam at MacLaren, Dr. Edwards had reached into his sweatpants and grabbed his penis without wearing gloves, without warning, and without any medical purpose. This abuse was reported to Oregon State Police. OYA Director Bob Jester and Defendant Brian Florip were aware of these allegations. Although Defendants Jester and Florip placed Dr. Edwards on administrative leave briefly during the criminal investigation, they allowed him to return to work immediately after the criminal investigation closed. Thereafter, no

PAGE 18 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation or took any corrective or disciplinary action towards Dr. Edwards.

(m)    In February 2009, the mother of a youth at MacLaren reported to the OYA Professional Standards Office that Dr. Edwards had performed a testicular exam on her son without wearing gloves and that many other youth had experienced the same thing. MacLaren Superintendent Riggan, supervisors Cox and Palmateer, and Medical Director Adams were all informed of these allegations. Defendant Marcia Adams spoke to Dr. Edwards about these allegations and directed him to wear gloves during future genital exams. She also informed both Riggan and Cox of this requirement that Dr. Edwards wear gloves during all future testicular exams. However, neither Defendants Adams, Riggan or Cox—nor any OYA Director or other supervisor of Dr. Edwards—reported this conduct to an outside agency per OYA policy, took any action to enforce Dr. Edwards' future compliance with this directive, or took any disciplinary or corrective action towards Edwards. Furthermore, no OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards conducted any additional investigation into the allegations or interviewed other MacLaren youth regarding his conduct during medical examinations.

(n)    In October 2009, a youth at MacLaren submitted a written grievance against Dr. Edwards, stating that the doctor had slapped his buttocks, tickled him, and tried to perform a rectal exam on him without a legitimate medical reason. Individual Defendants (including Riggan, Adams, and Cox) were aware of this report. This

PAGE 19 – **FIRST** **SECOND** AMENDED COMPLAINT

EXHIBIT A

report was referred to law enforcement. Although Dr. Edwards was instructed by his supervisor Dr. Adams to ensure a nurse chaperone was in the room for all future examinations, no OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards took any action to ensure Dr. Edwards' future compliance with this directive, conducted any additional investigation, or took any disciplinary action toward Dr. Edwards.

In August 2012, a youth at MacLaren reported to the OYA Professional Standards Office that he felt violated by Dr. Edwards when Dr. Edwards examined his testicles in March 2012 without wearing gloves during a physical examination, and when Edwards touched his penis in August 2012 during an unrelated examination for back pain. Medical Director Adams asked Dr. Edwards for a report, and Dr. Edwards denied the youth's allegation that he did not use gloves, instead attacking the youth as combative and argumentative. Dr. Adams reported this information back to the PSO investigator, adding that the youth had a history of being sexually reactive. At no point did Medical Director Adams actually interview the youth. Furthermore, no OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards reported this abuse to an outside agency per OYA policy, confronted him for his continued failure to use gloves despite OYA Medical Director Dr. Adams' 2009 directive to wear gloves, discussed the allegation that he touched the youth's penis during a back examination, conducted any additional investigation, or took any disciplinary action toward Dr. Edwards.

(o) A youth reported to PSO in July 2013 that Dr. Edwards had performed unnecessary prostate checks on multiple youth. Defendants Cox, O'Leary, Pakseresht, and

PAGE 20 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Berger were informed of these allegations. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards reported this abuse to an outside agency per OYA policy, interviewed or talked to a cross-section of youth at MacLaren regarding Dr. Edwards, or took any disciplinary or corrective action toward Dr. Edwards.

(p)     In August 2013, a youth at MacLaren reported that Dr. Edwards gave him two testicular exams within one year without medical necessity. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards reported this abuse to an outside agency per OYA policy or took any disciplinary or corrective action toward Dr. Edwards. Instead, Defendant Adams downplayed the complaint, relying only on a review of the youth's medical chart by a nurse supervisor and Dr. Edwards' representations to her without further review, investigation, or interview of the youth. PSO closed the complaint as unsubstantiated.

In October 2013, a youth at MacLaren reported to the OYA Professional Standards Office that Dr. Edwards had grabbed his hips from behind while examining the youth's back without his shirt on. No OYA Director, MacLaren Superintendent, or other supervisor of Dr. Edwards took any disciplinary or corrective action toward Dr. Edwards.

(e)     In 2014, Dr. Edwards performed an eye examination of a youth at MacLaren. While the youth sat on the examination table, Dr. Edwards pressed his genitals against the youth's body on three different occasions and cupped his buttocks for at least a minute while examining his eyes. There was a nurse in the room at the time of the examination. After the exam, the youth complained to OYA staff, but

PAGE 21 – ~~FIRST~~ **SECOND** AMENDED COMPLAINT

EXHIBIT A

they laughed at him and said, "that is typical of Dr. Cold Fingers." In September 2016, the youth disclosed to a mental health provider at MacLaren, who forwarded the complaint to the PSO. The PSO asked Oregon State Police to investigate. PSO did not conduct any further independent investigation. Nobody interviewed the nurse who was present during the exam. Defendants Adams and Berger were both informed of the nature of the allegations but took no action. No OYA Director, MacLaren Superintendent or other supervisor of Dr. Edwards conducted any additional investigation, interviewed either the nurse that was present or the youth, or took any disciplinary action toward Edwards.

Despite Defendants' awareness of these complaints, violations, and red flag events dating back to 1996, including Dr. Edwards' long-standing refusal to wear gloves during exams, Dr. Edwards remained employed at OYA for an additional twenty20 years until his retirement in 2017.

45.

Dr. Edwards was the primary medical provider at MacLaren from at least the late 1990s until his retirement in 2017. Upon information and belief, Dr. Edwards was the only doctor working on site full-time at MacLaren during this time and, as such, oversaw medical care for all adjudicated or convicted youth at MacLaren, including performing intake examinations, periodic physicals, and similar examinations. In this role, Dr. Edwards had unfettered and unmonitored access to his victims.

46.

Dr. Edwards was dubbed "Dr. Cold Fingers" by some youth and staff because he was

PAGE 22 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

infamous for: routinely groping boys' genitals and penises with ungloved hands during exams for no legitimate medical reason; digital penetration of boys' anuses; stroking boys' penises until erect; masturbating boys, including in some instances to ejaculation; and, in some instances, performing oral sex on boys. Dr. Edwards sexually abused children during intake exams, follow-up physicals, and unrelated medical visits in his exam room while no nurse or chaperone was present.

///

///

47.

Dr. Edwards' abuse of boys was common knowledge amongst the OYA staff. Older adjudicated youth joked with newly arrived boys about Dr. Edwards. MacLaren staff made jokes about Dr. Edwards examining adjudicated youth without gloves. Corrections officers threatened to send juveniles to Dr. Edwards as punishment if they misbehaved. But both staff and Dr. Edwards nonetheless assured all adjudicated youth that Dr. Edwards' examinations followed normal medical standards for incarcerated youth.

48.

Multiple people reported Dr. Edwards to staff and counselors at MacLaren, but nothing was done.

49.

OYA empowered Dr. Edwards to perform the duties of a doctor, including the authority to discipline juveniles, implement physical supervision, and ensure rule enforcement. OYA knew that Dr. Edwards was in a position of authority, power, and trust over adjudicated youth, including Plaintiffs. OYA retained the right to control the means and methods used by Dr.

PAGE 23 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Edwards. It was during the exercise of these duties and authority on behalf of OYA that Dr. Edwards abused Plaintiffs.

50.

In addition, or in the alternative, OYA caused Plaintiffs to believe that OYA consented to Dr. Edwards acting on OYA's behalf. Plaintiffs reasonably relied upon this belief. Dr. Edwards' employment and service on behalf of OYA made him an agent and/or apparent agent of OYA.

///

///

**ABUSE OF T.A.M.**

51.

Plaintiffs reallege and incorporate herein paragraphs 1 through 50.

52.

Plaintiff T.A.M. is a 39-year-old male. T.A.M. was adjudicated and placed in MacLaren in or around 2002. T.A.M. was abused by Dr. Edwards ~~at least three~~two times, starting around age 16.

53.

During his intake appointment at MacLaren, Dr. Edwards made T.A.M. remove his own pants and masturbated T.A.M.'s genitals to the point of erection and eventual ejaculation. While doing so, T.A.M. noticed Dr. Edwards touched his own genitals as well.

54.

On another occasion, T.A.M. visited Dr. Edwards when he injured his ankle. However, during this visit, Dr. Edwards also removed T.A.M.'s pants, ~~masturbated~~ groped T.A.M.'s genitals and buttocks, and digitally penetrated T.A.M.'s anus without gloves, claiming that this

PAGE 24 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

was standard medical procedure. ~~T.A.M. visited Dr. Edwards at least one additional time and was similarly abused.~~

55.

After the first incident of abuse, T.A.M. attempted to disclose Dr. Edwards' abuse to a male staffer at MacLaren but was told to sit down. After the second incident of abuse, T.A.M. wrote a written grievance describing Dr. Edwards' abuse and placed it in the physical grievance box on the unit. However, he never heard any follow up from this written grievance. ~~disclosed Dr. Edwards' abuse to a female staffer two times. Both times, the staffer told T.A.M. that she was not going to do anything about it~~.

56.

During his time at MacLaren, T.A.M. repeatedly witnessed adjudicated youth discuss and joke about Dr. Edwards' genital touching in front of staffers. Despite this, T.A.M. never witnessed MacLaren staffers report Dr. Edwards' conduct or attempt to stop it.

57.

~~T.A.M. later disclosed Dr. Edwards' abuse to his therapist. On information and belief, the therapist then reported~~ T.A.M.~~'s~~ also told his probation officer generally that he had been abused at MacLaren, but no ~~disclosure to his probation officer. No~~ further action was taken to investigate or respond to T.A.M.'s claims.

58.

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, T.A.M. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment ~~of approximately $100,000~~.

PAGE 25 – ~~**FIRST**~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

59.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, T.A.M. endured significant pain, suffering, and emotional distress. T.A.M.'s ability to form relationships with others is impaired to the point that he cannot get close to people and has trouble making friends. T.A.M. has previously used narcotics as a means of coping with Dr. Edwards' abuse. He also suffers from PTSD and agoraphobia, both of which inhibit his ability to work. T.A.M.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, T.A.M. has suffered noneconomic damages of $5,000,000, the exact in an amount to be determined by a jury.

**ABUSE OF J.K.B.**

60.

Plaintiffs reallege and incorporate herein paragraphs 1 through 59.

61.

Plaintiff J.K.B. is a 38-year-old male. J.K.B. was adjudicated and first placed in MacLaren in or around 20020. He was then placed in MacLaren again in or around 20053. J.K.B. was abused by Dr. Edwards at least two times, starting around age 164.

62.

During both of his intake exams each time he was placed at MacLaren, Dr. Edwards removed J.K.B.'s pants and groped his genitals for extended periods of time without wearing gloves. Dr. Edwards claimed that his extensive genital groping was necessary to check J.K.B. for testicular cancer.

63.

J.K.B. attempted to disclose Dr. Edwards' genital touching to a MacLaren security guard.

PAGE 26 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

The security guard told him "Oh, it's just the doctor." No further action was taken.

64.

J.K.B. witnessed multiple juveniles discuss Dr. Edwards' genital touching during his time at MacLaren, referring to him as "Dr. Cold Fingers." They expressed awareness of the doctor's practice of extensive genital touching and anxiety about having to experience it themselves.

65.

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, J.K.B. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

66.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, J.K.B. endured significant pain, suffering, and emotional distress. J.K.B. has an intense dislike and fear of doctors. He refuses to let his children be examined by a doctor alone. J.K.B. is also extremely strict with how his children may interact with their friends as a form of protection against potential abuse. This has caused friction within J.K.B.'s family. J.K.B.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, J.K.B. has suffered noneconomic damages of $5,000,000, the exact in an amount to be determined by a jury.

**ABUSE OF E.C.R.**

67.

Plaintiffs reallege and incorporate herein paragraphs 1 through 66.

68.

Plaintiff E.C.R. is a 39-year-old male. E.C.R. was adjudicated and placed in MacLaren in or around 2000. E.C.R. was abused by Dr. Edwards at least once, starting around age 14. E.C.R.

PAGE 27 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

was also abused by Defendant Susan Baumgartner ("Baumgartner") around 20 times, starting around age 16.

69.

Baumgartner was a gym teacher at MacLaren. One day, she approached E.C.R. while he was changing clothes in the bathroom and began flirting with him. Baumgartner then began touching E.C.R.'s penis and eventually performed oral sex on him. Baumgartner would do this almost every time that E.C.R. attended gym class for about a month. She told E.C.R. that she was falling in love with him and that they could marry and move in together after E.C.R. was released from custody. Baumgartner repeatedly ordered E.C.R. to keep quiet about her abuse and offered him chewing tobacco as an incentive.

///

///

///

///

70.

On information and belief, Baumgartner was eventually removed from her position after two other juveniles that she was abusing got into a fight over her. On information and belief, Baumgartner married an inmate once he was released from MacLaren, and they moved to Arizona.

71.

A few months after the abuse by Baumgartner, E.C.R. attempted to disclose the abuse that he suffered and seek counseling for it. MacLaren staffers told E.C.R. to forget about the abuse because the matter had already been taken care of, and not to bring it up again.

PAGE 28 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

72.

Between 2000 and 2003, E.C.R. was also abused by Dr. Edwards on multiple occasions while at MacLaren during unnecessary physical exams that Dr. Edwards had scheduled on behalf of E.C.R. This included fondling of his genitals and digital penetration of his anus—always without gloves.

73.

As a direct and proximate cause of Defendant Baumgartner's, Dr. Edwards', and Defendant OYA's wrongful conduct, E.C.R. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment ~~of approximately $100,000~~.

74.

Directly because of Defendant Baumgartner's, Dr. Edwards', and Defendant OYA's wrongful conduct, E.C.R. endured significant pain, suffering, and emotional distress. E.C.R. began using narcotics to cope with the abuse. He instinctively distrusts everyone that he meets, impairing his ability to form relationships. E.C.R.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, E.C.R. has suffered noneconomic damages ~~of $5,000,000, the exact~~ in an amount to be determined by a jury.

**ABUSE OF J.K.C.**

75.

Plaintiffs reallege and incorporate herein paragraphs 1 through 74.

76.

Plaintiff J.K.C. is a 39-year-old male. J.K.C. was adjudicated and placed in MacLaren in or around 2001. J.K.C. was abused by Dr. Edwards at least once, starting around age 15.

77.

PAGE 29 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Dr. Edwards abused J.K.C. during his intake exam. Without gloves, Dr. Edwards removed J.K.C.'s pants and groped his genitals for an extended period.

78.

As a direct and proximate cause of Dr. Ed-wards' and Defendant OYA's wrongful conduct, J.K.C. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment ~~of approximately $100,000~~.

79.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, J.K.C. endured significant pain, suffering, and emotional distress. J.K.C. tries to actively repress his memories of his time in OYA custody to cope with what Dr. Edwards did to him. J.K.C.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, J.K.C. has suffered noneconomic damages ~~of $5,000,000, the exact~~ in an amount to be determined by a jury.

///

**ABUSE OF A.M.W.**

80.

Plaintiffs reallege and incorporate herein paragraphs 1 through 79.

81.

Plaintiff A.M.W. is a 37-year-old male. A.M.W. was ~~adjudicated~~ convicted and placed in MacLaren in or around 2003. He was then removed and later returned to MacLaren in or around 2009. A.M.W. was abused by Dr. Edwards at least four times, starting around age 15.

82.

PAGE 30 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

A.M.W. first visited Dr. Edwards to receive treatment for influenza. Rather than treat him for his influenza, Dr. Edwards insisted on performing a physical exam on A.M.W. Dr. Edwards then removed A.M.W.'s pants and began groping A.M.W.'s genitals and buttocks without gloves. A.M.W. had to visit Dr. Edwards a second time to receive medication for his influenza. Before prescribing the medication, Dr. Edwards groped and massaged A.M.W.'s shoulders for an extended period.

83.

During his second stay at MacLaren, Dr. Edwards insisted on performing another physical exam on A.M.W. despite A.M.W. having just received one at a different facility. Over A.M.W.'s protests, Dr. Edwards proceeded to remove A.M.W.'s pants and grope A.M.W.'s genitals and buttocks without gloves on for an extended period.

84.

A.M.W. later visited Dr. Edwards regarding treatment for chronic constipation. Dr. Edwards claimed it was necessary to perform a prostate exam on A.M.W in order to treat his constipation. Dr. Edwards then digitally penetrated A.M.W.'s anus for an extended period. Dr. Edwards later massaged A.M.W.'s shoulders for an extended period. Because of his fear and dislike of Dr. Edwards, A.M.W. began refusing healthcare at MacLaren to the neglect of his health.

85.

Before he was abused by Dr. Edwards, A.M.W.'s bunkmate warned him about "good old Dr. Cold Fingers" and to be prepared for a very unusual physical examination.

86.

PAGE 31 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, A.M.W. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

87.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, A.M.W. endured significant pain, suffering, and emotional distress. A.M.W. has an intense fear of male doctors and avoids interacting with doctors generally. A.M.W. struggles with intimacy, experiencing fear and discomfort when people touch him, particularly his shoulders. His psychological injuries persist to the present and are therefore permanent in nature. Consequently, A.M.W. has suffered noneconomic damages of $5,000,000, the exact in an amount to be determined by a jury.

**ABUSE OF R.L.M.**

88.

Plaintiffs reallege and incorporate herein paragraphs 1 through 87.

///

///

89.

Plaintiff R.L.M. is a 35-year-old male. R.L.M. was adjudicated and placed in MacLaren in or around 20065. R.L.M. was abused by Dr. Edwards at least two times, starting around age 165.

90.

During his intake exam, Dr. Edwards removed R.L.M.'s pants and began groping R.L.M.'s genitals without gloves for an extended period.

PAGE 32 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

91.

R.L.M. later visited Dr. Edwards for an issue with his teeth. Dr. Edwards responded by removing all of R.L.M.'s clothes and groping his genitals for an extended period without gloves. Dr. Edwards then told R.L.M. that he needed a prostate exam and digitally penetrated R.L.M.'s anus, moving his finger around until R.L.M. developed an erection.

92.

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, R.L.M. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment ~~of approximately $100,000~~.

93.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, R.L.M. endured significant pain, suffering, and emotional distress. R.L.M. struggles with trusting others and actively avoids large groups of people, which has impaired his ability to form normal relationships. He suffers from chronic anxiety and debilitating panic attacks. R.L.M. also has an intense fear of doctors and medical treatment and actively avoids them. R.L.M.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, R.L.M. has suffered noneconomic damages ~~of $5,000,000, the exact~~ in an amount to be determined by a jury.

**ABUSE OF N.T.N.**

94.

Plaintiffs reallege and incorporate herein paragraphs 1 through 93.

95.

PAGE 33 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Plaintiff N.T.N. is a 26-year-old male. N.T.N. was ~~adjudicated~~ convicted and placed in MacLaren in or around 2017. N.T.N. was abused by Dr. Edwards at least once, starting around age 17.

96.

During his intake exam, Dr. Edwards fondled N.T.N's genitals and buttocks without gloves for an extended period. Dr. Edwards told N.T.N. that he wanted to ensure that N.T.N. had a "healthy" erection while Dr. Edwards masturbated N.T.N.

97.

Prior to Dr. Edwards' abuse, MacLaren staffers and youth told N.T.N. that he could expect to be molested by Dr. Edwards. While at MacLaren, N.T.N. witnessed staffers routinely discuss and joke about Dr. Edwards' genital touching of other juveniles, calling him "Dr. Cold Fingers." Instead of investigating reports of Dr. Edwards' conduct toward other victims, staffers would discuss those reports with other juveniles in order to ridicule and humiliate the victims. The victims would then be assaulted and bullied by the other juveniles for reporting any abuse. This discouraged N.T.N. from disclosing his own experience with Dr. Edwards.

98.

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, N.T.N. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment ~~of approximately $100,000~~.

///

99.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, N.T.N. endured significant pain, suffering, and emotional distress. N.T.N. instinctively distrusts people

PAGE 34 – ~~FIRST~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

and intentionally isolates himself from others. He does not know how to interact with others and struggles to express himself. N.T.N. also has an intense dislike of doctors and actively avoids them. N.T.N.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, N.T.N. has suffered noneconomic damages ~~of $5,000,000, the exact~~ in an amount to be determined by a jury.

### ABUSE OF A.W.

100.

Plaintiffs reallege and incorporate herein paragraphs 1 through 99.

101.

Plaintiff A.W. is a 35-year-old male. A.W. was adjudicated and placed in MacLaren in or around 200~~43~~. A.W. was abused by Dr. Edwards at least once, starting around age 1~~43~~.

102.

Dr. Edwards abused A.W. during his intake exam. Without gloves, Dr. Edwards removed A.W.'s pants and groped his genitals for an extended period, so much so that A.W. got an erection, at which point Dr. Edwards began rubbing A.W.'s penis and masturbating him.

103.

A.W. witnessed other juveniles discuss and joke about Dr. Edwards' practice of genital touching during his stay at MacLaren. Prior to his intake exam, other juveniles laughed at A.W. because he had to go see "Dr. Cold Fingers."

///

104.

EXHIBIT A

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, A.W. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

106.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, A.W. endured significant pain, suffering, and emotional distress. A.W. suffers from recurrent nightmares, some related to Dr. Edwards' abuse. Medical issues and visits to the doctor's office cause A.W. to have flashbacks to Dr. Edwards' abuse. He also suffers from chronic shame and embarrassment over the abuse. A.W.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, A.W. has suffered noneconomic damages of $5,000,000, the exact in an amount to be determined by a jury.

**ABUSE OF B.W.H.**

106.

Plaintiffs reallege and incorporate herein paragraphs 1 through 105.

107.

Plaintiff B.W.H. is a 36-year-old male. B.W.H. was adjudicated and placed in MacLaren in or around 2001 or 20024. B.W.H. was abused by Dr. Edwards at least three times, starting around age 153.

108.

During his intake exam, Dr. Edwards fondled B.W.H.'s testicles and penis for an extended period without wearing gloves. While fondling B.W.H.'s genitalia, Dr. Edwards simultaneously digitally penetrated B.W.H., claiming he was performing a prostate exam.

109.

PAGE 36 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

B.W.H. went back to Dr. Edwards a few weeks later for a medication check because he was taking several medications while at MacLaren. During this visit, Dr. Edwards claimed he had to perform another prostate exam, and he told B.W.H. that, in order to perform a proper prostate exam, it was necessary for B.W.H.'s penis to be erect. Dr. Edwards proceeded to fondle B.W.H's genitals while digitally penetrating him. Dr. Edwards then performed oral sex on B.W.H. for several minutes while continuing to digitally penetrate him, claiming that it was necessary to ensure B.W.H. was properly erect.

110.

A few weeks later, B.W.H. was sent to Dr. Edwards a third time for another medication check. During this visit, Dr. Edwards insisted on performing another "prostate exam" on B.H.W. Dr. Edwards proceeded in the same way he had previously, beginning by fondling B.W.H.'s genitals, digitally penetrating him, and then proceeding to perform oral sex in an effort to arouse B.W.H. While performing oral sex, Dr. Edwards grabbed B.W.H.'s hand and tried to put it on Dr. Edwards' genitalia (over his pants). However, B.W.H. pulled his hand back, refusing to touch Dr. Edwards' genital area. Dr. Edwards threatened that if B.W.H. told anyone about the abuse, Dr. Edwards would make sure that B.W.H. was sent to the "hole" (i.e. solitary confinement) as punishment.

111.

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, B.W.H. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment ~~of approximately $100,000~~.

///

112.

PAGE 37 – ~~FIRST~~ **SECOND** AMENDED COMPLAINT

EXHIBIT A

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, B.W.H. endured significant pain, suffering, and emotional distress. The abuse has led to intimacy problems and fostered distrust in B.W.H.'s relationships. B.W.H. self-medicated with drugs as a way to cope with the trauma. B.W.H.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, B.W.H. has suffered noneconomic damages ~~of $5,000,000, the exact~~ in an amount to be determined by a jury.

**ABUSE OF J.D.W.**

113.

Plaintiffs reallege and incorporate herein paragraphs 1 through 112.

114.

Plaintiff J.D.W. is a 38-year-old male. J.D.W. was adjudicated and placed in MacLaren in or around 2005. J.D.W. was abused by Dr. Edwards at least twice, starting around age 17.

115.

J.D.W. initially visited Dr. Edwards for scalp dryness. Dr. Edwards first checked J.D.W.'s scalp but soon removed J.D.W.'s pants without explanation. He groped J.D.W.'s genitals for an extended period, including rubbing his penis in an effort to make J.D.W.'s penis erect. Once erect, Dr. Edwards said "oh you like that" in a provocative manner to J.D.W. J.D.W. visited Dr. Edwards a second time for a physical. During the physical, Dr. Edwards digitally penetrated J.D.W.'s anus while ungloved.

116.

After the first episode of abuse, J.D.W. returned to Tent D where a corrections officer asked if he was alright. J.D.W. told the corrections officer that Dr. Edwards had touched him inappropriately, but J.D.W. was immediately shut down by the guard who told him that the

PAGE 38 – ~~FIRST~~ **SECOND** AMENDED COMPLAINT

EXHIBIT A

doctor was just doing his job. The other youth on his unit joked about being inappropriately touched by Dr. Edwards and told him that it happens to everyone.

117.

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, J.D.W. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

118.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, J.D.W. endured significant pain, suffering, and emotional distress. J.D.W. has tried to block out the abuse because thinking about it makes him incredibly upset and emotional. He has avoided hospitals and medical care because of the abuse. J.D.W.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, J.D.W. has suffered noneconomic damages of $5,000,000, the in an exact amount to be determined by a jury.

**ABUSE OF S.S.L.**

119.

Plaintiffs reallege and incorporate herein paragraphs 1 through 118.

120.

Plaintiff S.S.L. is a 30-year-old male. S.S.L. was adjudicated and placed in MacLaren in or around 20121–2014. S.S.L. was abused by Dr. Edwards at least once, beginning as a teenager.

121.

Dr. Edwards abused S.S.L. during a visit by digitally penetrating S.S.L.'s anus.

///

122.

PAGE 39 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

As a direct and proximate cause of Dr. Edwards' and Defendant OYA's wrongful conduct, S.S.L. incurred and/or will incur expenses for counseling and psychiatric/psychological treatment of approximately $100,000.

123.

Directly because of Dr. Edwards' and Defendant OYA's wrongful conduct, S.S.L. endured significant pain, suffering, and emotional distress. S.S.L.'s psychological injuries persist to the present and are therefore permanent in nature. Consequently, S.S.L. has suffered noneconomic damages of $5,000,000, the exact in an amount to be determined by a jury.

**DISCOVERY OF HARM**

124.

Plaintiffs reallege and incorporate herein paragraphs 1 through 123.

125.

Each of Plaintiffs' claims set out herein are timely for one or more of the following reasons:

a. Any limitations applicable to Plaintiffs' claims were tolled based on minority;

b. Any limitations periods applicable to Plaintiffs' claims were tolled based on a disabling mental condition;

c. Any limitations periods applicable to Plaintiffs' claims were tolled by an agreement on behalf of Defendants;

d. Any limitations periods applicable to Plaintiffs' claims are equitably tolled or Defendants are otherwise equitably estopped from attacking Plaintiffs' claims on timeliness grounds (including, on information and belief, based on Defendant's fraudulent concealment);

PAGE 40 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

e.  Less than two years have elapsed since Plaintiffs discovered that the conduct by Defendants OYA, Directors, Superintendents, Defendant Adams, Defendant Cox, and/or Defendant Baumgartner was negligent or otherwise actionable;

f.  Less than two years have elapsed since Plaintiffs discovered their injuries and the causal role that OYA's, other Individual Supervisory Defendants', Baumgartner's, and Dr. Edwards' conduct played in their injuries due to a multitude of factors specific to each plaintiff, including but not limited to the following factors:

1)  Plaintiffs were misinformed that Dr. Edwards' abuse was standard medical procedure and quite normal;

2)  Plaintiffs were punished or otherwise threatened if they complained about Dr. Edwards;

3)  Plaintiffs were heavily medicated by Dr. Edwards and/or OYA staff;

4)  Plaintiffs were unaware that various other people had complained to OYA staff, superintendents, directors and the Oregon Medical Board that Dr. Edwards was abusing adjudicated youth;

5)  Plaintiffs were minors at the time of abuse and did not have the mental maturity or capacity to understand the nature of Dr. Edwards' and Defendant Baumgartner's wrongful conduct;

6)  Because of the traumatic nature of the abuse, Plaintiffs repressed or suppressed memories of the abuse as an unconscious psychological defense mechanism to protect themselves from overwhelming emotional distress and to maintain day-to-day functioning;

7)  Based on the power imbalance between Plaintiffs and OYA and its staff,

PAGE 41 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

Plaintiffs were scared to report any abuse and instead repressed or suppressed such experiences; and

8) Some or all of the Plaintiffs have struggled with mental health and/or drug abuse issues that have delayed or otherwise stymied discovery of their injuries and/or the causal connection of those injuries to Defendants;

9) Plaintiffs are under 40 years old and therefore their claims are timely under ORS 12.117.

126.

Less than two years before the date of this complaint, Plaintiffs discovered the causal connection between their abuse, the resulting injuries distinct from the abuse itself, and the responsibility of Dr. Edwards, OYA, Directors, Superintendents, Defendant Adams, Defendant Cox, and Defendant Baumgartner in causing those injuries. Plaintiffs did not discover (and could not reasonably have discovered) at an earlier time the causal connection between the abuse and the damages suffered as a result of the abuse. The psychological effects of the abuse Plaintiffs suffered prevented them from discovering the causal connection between the abuse and the damages they suffered as a result of the abuse. Plaintiffs' claims are timely pursuant to ORS 12.117.

127.

Notice of claim is not required for claims against OYA by a claimant who was under 18 years of age and in OYA custody when the acts or omissions giving rise to the claim occurred. To the extent notice of claim was required against any Defendant under ORS 30.275, Plaintiffs timely provide such notice by the filing of this lawsuit.

**SUPERVISORY LIABILITY**

PAGE 42 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

128.

Plaintiffs reallege and incorporate herein paragraphs 1 through 127.

129.

Directors, Superintendents, Defendant Cox, and Defendant Adams were employed by the OYA at the time that Dr. Edwards sexually abused Plaintiffs. Defendant Brazeau and Defendant Lawhead were employed by OYA at the time that Baumgartner was sexually abusing E.C.R. All were aware of OYA's long history of turning a blind eye to reports of staff sexually abusing youths at its facilities, including reports specifically about Dr. Edwards. All failed in their respective supervisory roles to prevent the sexual abuse of Plaintiffs, including the following failures:

a. Failing to investigate reports of abuse properly or at all;

b. Failing to refer known incidents to outside investigative agencies;

c. Failing to install sufficient security and monitoring equipment, including cameras, at MacLaren, to deter the abuse of minors;

d. Failing to properly implement, monitor, and sustain PREA standards, including timely appointment of PREA Compliance Manger and ensuring adherence at MacLaren and all other facilities to the rules and guidelines set out by PREA and implemented by the OYA;

e. Failing to implement policies and procedures to adequately vet job applicants, particularly for those positions requiring one-on-one interaction with juveniles, for a history of or proclivity to child sex abuse;

f. Failing to take proper action against Dr. Edwards and/or Defendant Baumgartner in response to prior complaints and continued violations;

PAGE 43 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

g.  Failing to ensure a second medical provider, such as a nurse, was in the exam room during all medical examinations;

h.  Failing to train OYA's employees to recognize and properly respond to warning signs and dangers of child abuse and to report all signs or disclosures of sexual abuse;

i.  Failing to inform OYA Directors, MacLaren Superintendents, and other supervisors of Dr. Edwards about his long history of similar youth complaints against him;

h.j. Failing to adequately supervise, monitor, and discipline Dr. Edwards; and

i.k. Facilitating a general culture in which the abuse of juveniles was accepted.

### 130.

The State of Oregon and OYA are entrusted with the rehabilitation of children adjudged delinquent. When the State imprisons these vulnerable children in detention facilities and thereby removes them from their families and their communities, the State removes their opportunities for self-protection, and the State is instead entrusted with caring for and protecting these completely dependent youth.

### 131.

Given the vulnerability of the juvenile population housed at OYA facilities, the OYA's history of a sustained and systemic problem of youth in its custody being targeted for sexual assault, and the widespread knowledge among MacLaren staff of Dr. Edwards' predatory nature, a supervisor exercising a reasonable amount of care would have recognized and responded to the predatory threat that Dr. Edwards represented to Plaintiffs.

### 132.

By failing to ensure that the policies enacted by his their own agency to prevent, investigate, and respond to sexual abuse were followed or enforced, and by ignoring credible

PAGE 44 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

information that staff—including "Dr. Cold Fingers"—were engaging in sexual abuse of youth, ~~Directors and Defendant Adams~~Supervisory Defendants consciously disregarded widespread sexual abuse of youth at OYA facilities, thus creating the conditions that allowed Dr. Edwards and Defendant Baumgartner to sexually abuse Plaintiffs. This behavior evinced a deliberate indifference to Plaintiffs' right to be free from coerced sexual contact.

133.

By failing to ensure that OYA's policies to prevent, investigate, and respond to sexual abuse were followed or enforced at MacLaren, and by ignoring credible information that "Dr. Cold Fingers" was engaging in coercive sexual relationships with youth, Defendant Superintendents consciously disregarded widespread sexual abuse of youth at MacLaren, thus creating the conditions that allowed Dr. Edwards and Defendant Baumgartner to sexually abuse Plaintiffs. This behavior evinced a deliberate indifference to Plaintiffs' right to be free from coerced sexual contact.

## FIRST CLAIM FOR RELIEF

### Negligence Under OTCA

### (Against State of Oregon)

134.

Plaintiffs reallege and incorporate herein paragraphs 1 through 133.

135.

By taking custody of Plaintiffs and acting *in loco parentis* towards them during the period of their confinement, the State entered into a special relationship with Plaintiffs. At all material times, Defendants were in a special relationship with Plaintiffs by virtue of their statutory obligations to children in their care generally and to Plaintiffs specifically. As their legal and

PAGE 45 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

physical guardian and custodian, Defendants owed Plaintiffs a heightened duty of care to provide a safe environment and protect them from abuse and injury while in OYA's care.

136.

Defendants' conduct and care were unreasonably below the applicable standard of care and negligently and unreasonably created a foreseeable risk of harm to Plaintiffs in one or more of the following particulars:

a. In allowing for extended and unmonitored individual interactions between Dr. Edwards and youth;

b. In failing to notice, investigate, or intervene to protect Plaintiffs from Dr. Edwards' inappropriate and sexual conduct towards Plaintiffs;

c. In failing to properly supervise Dr. Edwards;

d. In failing to properly heed, investigate, or otherwise take any action in response to reports of inappropriate conduct and sexual abuse by Dr. Edwards;

e. In failing to report or refer reports of inappropriate conduct and sexual abuse by Dr. Edwards to external investigative agencies; and

f. In failing to properly vet, hire, train, and retain qualified personnel, including medical providers.

137.

Defendant OYA's negligence rose to the level of recklessness because its agents acted (or failed to act) with knowledge (or *reason to know*) of facts which would lead a reasonable person to realize that their conduct not only created an unreasonable risk of harm to Plaintiffs but also involved a high degree of probability that substantial harm would result.

¶¶138.

PAGE 46 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Defendant OYA's negligence and/or recklessness caused Plaintiffs injuries and damages set out herein. As a result of OYA's negligence and/or recklessness as alleged above, Plaintiffs suffered the harm and damages alleged herein.

///

///

### SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Civil Rights Violation

### (Substantive Due Process – Violation of the 14th Amendment—Supervisory Liability and Failure to Protect Adjudicated Youth)

### (Against All Supervisory Individual Defendants)

138139.

Plaintiffs reallege and incorporate herein paragraphs 1 through 137138.

139140.

Dr. Edwards and Defendant Baumgartner were working within the course and scope of their employment at the OYA when they engaged in the wrongful conduct alleged above. Dr. Edwards and Defendant Baumgartner were acting under the color of state law.

140141.

Plaintiffs were confined in OYA facilities as adjudicated youths at the time they were abused by Dr. Edwards and/or Defendant Baumgartner as alleged above.

141142.

Dr. Edwards and Defendant Baumgartner touched Plaintiffs in a sexual manner without legitimate penological or medical justification or purpose. Dr. Edwards touched Plaintiffs in a sexual manner that was not reasonably related to any legitimate government objective.

PAGE 47 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

142143.

Dr. Edwards and Defendant Baumgartner acted for their own sexual gratification.

143144.

Dr. Edwards' and Defendant Baumgartner's repeated sexual abuse of Plaintiffs constituted a substantial departure from professional judgment, practice, or standards.

///

144145.

Dr. Edwards and Defendant Baumgartner failed to provide for Plaintiffs' reasonable safety while confined in OYA facilities by repeatedly engaging in coerced sexual conduct with Plaintiffs.

145146.

The Supervisory Defendants acted under color of state law.

147.

The acts of the Supervisory Defendants' subordinate, Dr. Edwards, deprived the Plaintiffs of particular rights under the Fourteenth Amendment to the United States Constitution.

148.

The Supervisory Defendants acted, or failed to act, in a manner that was deliberately indifferent to Plaintiffs' Fourteenth Amendment rights.

149.

The Supervisory Defendants knowingly refused to terminate a series of acts by Dr. Edwards that the Supervisory Defendants knew or reasonably should have known would cause Dr. Edwards to deprive Plaintiffs of these rights;

150.

PAGE 48 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

The Supervisory Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by Dr. Edwards of the rights of others.

151.

The Supervisory Defendants' conduct was so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused the ultimate injury.

152.

Through the failures outlined above, the Supervisory Defendants ~~Directors, Superintendents, and Defendant Adams~~ created the conditions at MacLaren under which Dr. Edwards' and Defendant Baumgartner's sexual contact with Plaintiffs was possible.

~~146.~~153.

Those conditions put Plaintiffs at substantial risk of suffering serious harm, namely, the risk that Plaintiffs would be sexually abused by OYA staff or employees, including OYA medical providers.

~~147.~~154.

The ~~Directors, Superintendents, and Defendant Adams~~Supervisory Defendants failed to take reasonable available measures to abate the risk that Plaintiffs would be sexually abused by OYA staff, employees and OYA medical providers while confined at MacLaren.

~~148.~~155.

The Supervisory Defendants ~~Directors', Superintendents', and Defendant Adams'~~ in failing to act to protect Plaintiffs from sexual abuse by Dr. Edwards and Defendant Baumgartner, failed to provide for Plaintiffs' reasonable safety.

///

///

PAGE 49 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

///

### ~~149.~~156.

The Supervisory Defendants ~~Directors', Superintendents', and Defendant Adams'~~ failure to take reasonable available measures, as alleged above, constituted a substantial departure from professional judgment, practice, or standards.

### ~~150.~~157.

In so doing, given the history at OYA, the Supervisory Defendants ~~Directors, Superintendents, and Defendant Adams~~ evinced deliberate indifference to Plaintiffs' right to be free from coerced sexual contact with Dr. Edwards and Defendant Baumgartner.

### ~~151.~~158.

Supervisory Defendants did not take reasonable, appropriate, and legally mandated steps to stop sexual abuse from occurring.

### ~~152.~~159.

Supervisory ~~Individual~~ Defendants' violations of Plaintiffs' civil rights set out above caused Plaintiffs injuries and damages set out herein. As a result, Plaintiffs suffered the harm and damages alleged herein.

### ~~153.~~160.

Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

### 161.

Supervisory and Individual Defendants' actions and omissions were undertaken with reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of Plaintiffs. Plaintiffs are therefore entitled to

PAGE 50 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

punitive damages against Supervisory and Individual Defendants in an amount to be determined by a jury.

\#\#

\#\#

\#\#

\#\#

\#\#

## THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Civil Rights Violation

### (Supervisory Liability and Failure to Protect Convicted Youth— 8th Amendment Violation)

### (Against All ~~Directors, Superintendents, and Defendant Adams~~Supervisory Defendants)

~~154~~162.

Plaintiffs reallege and incorporate herein paragraphs 1 through ~~153~~161.

~~155~~163.

Dr. Edwards was working within the course and scope of his employment at the OYA when he engaged in the wrongful conduct alleged above.

~~156~~164.

Dr. Edwards and Defendant Baumgartner were working as employees of a youth correctional facility.

~~157~~165.

Dr. Edwards and Defendant Baumgartner were acting under color of state law.

~~158~~166.

PAGE 51 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Plaintiffs were confined to OYA youth correctional facilities at the time they were abused as alleged herein.

159167.

Dr. Edwards touched Plaintiffs in a sexual manner without penological or medical justification or purpose. Dr. Edwards acted for his own sexual gratification or for the purpose of humiliating, degrading, or demeaning Plaintiffs. His misconduct placed Plaintiffs in danger and represented a substantial departure from professional judgment, practice, or standards.

171168.

Dr. Edwards' use of excessive and unnecessary sexual force against Plaintiffs proximately caused their injuries.

///

160169.

Defendant Baumgartner touched E.C.R. in a sexual manner without penological justification or purpose. Defendant Baumgartner acted for her own sexual gratification. Her misconduct placed E.C.R. in danger and represented a substantial departure from professional judgment, practice, or standards.

161170.

The Supervisory Defendants acted under color of state law.

196171.

The acts of the Supervisory Defendants' subordinate, Dr. Edwards, deprived the Plaintiffs of particular rights under the Eighth Amendment to the United States Constitution.

197172.

PAGE 52 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

The Supervisory Defendants acted, or failed to act, in a manner that was deliberately indifferent to Plaintiffs' Eighth Amendment rights.

173.

The Supervisory Defendants knowingly refused to terminate a series of acts by Dr. Edwards, that the Supervisory Defendants knew or reasonably should have known would cause Dr. Edwards to deprive the plaintiffs of these rights.

174.

The Supervisory Defendants engaged in conduct that showed a reckless or callous indifference to the deprivation by Dr. Edwards of the rights of others.

175.

The Supervisory Defendants' conduct was so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused the ultimate injury.

176.

Through the failures outlined herein, the ~~Directors, Superintendents, and Defendant Adams~~ Supervisory Defendants created the conditions at MacLaren under which Dr. Edwards' and Defendant Baumgartner's sexual contact with Plaintiffs was possible. Those conditions, as well as the failures outlined herein, put Plaintiffs at substantial risk of suffering serious harm, namely, the risk that Plaintiffs would be sexually abused by OYA staff or employees, including Dr. Edwards and Defendant Baumgartner.

~~162.~~177.

The Supervisory Defendants ~~Directors, Superintendents, and Defendant Adams~~ also failed to take reasonable available measures to abate the risk that Plaintiffs would be sexually abused by Dr. Edwards, despite the prevalent knowledge among staff, directors, superintendents

PAGE 53 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

and other supervisors that Dr. Edwards was sexually abusing incarcerated youths, further exposing Plaintiffs to the substantial risk of serious harm, namely repeated sexual abuse.

~~163~~178.

The Supervisory Defendants' ~~Directors', Superintendents', and Defendant Adams'~~ failure to protect inmates from sexual abuse constituted a substantial departure from professional judgment, practice and standards and evinced a deliberate indifference to the safety and well-being of Plaintiffs. This failure was a proximate cause of Plaintiffs' injuries.

~~164~~179.

Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

180.

Supervisory and Individual Defendants' actions and omissions were undertaken with reckless and outrageous indifference to a highly unreasonable risk of harm and with a conscious indifference to the health, safety, and welfare of Plaintiffs. Plaintiffs are therefore entitled to punitive damages against Supervisory and Individual Defendants in an amount to be determined by a jury.

**FOURTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Civil Rights Violation**

**(~~Excessive Force~~Substantive Due Process – Violation of 148th Amendment)**

**(~~Against the Estate and~~ By E.C.R. against Defendant Baumgartner)**

~~165~~181.

Plaintiff realleges and incorporates herein paragraphs 1 through ~~164~~180.

PAGE 54 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

166182.

~~Dr. Edwards and~~ Defendant Baumgartner ~~were~~ was working within the course and scope of ~~their~~ her employment at the OYA when ~~they~~ she engaged in the wrongful conduct alleged above.

167183.

~~Dr. Edwards and~~ Defendant Baumgartner ~~were~~ was working as an employee of a youth correctional facility.

168184.

~~Dr. Edwards~~ Defendant Baumgartner ~~were~~ was acting under color of state law.

~~169.~~

~~Dr. Edwards touched Plaintiffs in a sexual manner without penological or medical justification or purpose.~~

~~170.~~

~~Dr. Edwards acted for his own sexual gratification, or for the purpose of humiliating, degrading, or demeaning Plaintiffs.~~

~~171.~~

~~Dr. Edwards' use of excessive and unnecessary sexual force against Plaintiffs proximately caused their injuries.~~

172185.

Defendant Baumgartner touched Plaintiff E.C.R. in a sexual manner without penological justification and for the purpose of humiliating, degrading, or demeaning E.C.R.

173186.

PAGE 55 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

Defendant Baumgartner acted for her own sexual gratification and with malicious and sadistic intent.

174187.

Defendant Baumgartner's use of excessive and unnecessary sexual force against Plaintiff E.C.R. proximately caused his injuries.

175188.

Pursuant to 42 U.S.C. § 1988, Plaintiff E.C.R. is entitled to recover reasonable and necessary attorney fees and costs incurred in the prosecution of this action.

**FIFTH CLAIM FOR RELIEF**

**Sexual Battery of Child – *Respondeat Superior* – under OTCA**

**(Against Defendant OYA)**

176189.

Plaintiffs reallege and incorporate herein paragraphs 1 through 175188.

177190.

While acting in the course and scope of his agency for Defendant OYA, Dr. Edwards engaged in harmful and offensive touching of Plaintiffs to which Plaintiffs did not or could not consent, including groping Plaintiffs' genitals, masturbating certain Plaintiffs, and digitally penetrating certain Plaintiffs, as set out more specifically above.

178191.

Acts within the course and scope of Dr. Edwards' agency with Defendant OYA led to or resulted in the sexual batteries of Plaintiffs.

179192.

PAGE 56 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

As a direct result of Dr. Edwards' sexual batteries, Plaintiffs have incurred economic and noneconomic damages as set out more fully above. Defendant OYA is vicariously liable for the sexual batteries of Dr. Edwards. Therefore, Plaintiffs are entitled to compensatory damages from Defendant OYA in an amount to be determined by a jury.

**SIXTH CLAIM FOR RELIEF**

**Constructive Fraud**

**(Against Defendant OYA)**

~~180~~193.

Plaintiffs reallege and incorporate herein paragraphs 1 through ~~179~~192.

~~181~~194.

By holding Dr. Edwards out as an agent of OYA, and by allowing him to undertake the medical care of adjudicated youth at MacLaren and Hillcrest, such as Plaintiffs, OYA entered into a confidential, fiduciary, and special relationship with Plaintiffs.

~~182~~195.

By virtue of its confidential, fiduciary and special relationship with Plaintiffs, OYA owed Plaintiffs a duty to:

(a) Investigate or otherwise confirm or deny prior claims, reports or complaints of sexual abuse against Dr. Edwards;

(b) Reveal such facts to Plaintiffs and the community at large;

(c) Refuse to place Dr. Edwards in positions of trust and authority within OYA's institutions;

(d) Refuse to hold out Dr. Edwards to the community, parents and adjudicated youth, including Plaintiffs, as being in good standing and trustworthy;

PAGE 57 – ~~FIRST~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

(e) Prevent Dr. Edwards from maintaining his position as a physician and authority

figure; and

(f) Disclose to Plaintiffs and the public the wrongful, tortious, and sexually abusive

acts that Dr. Edwards had engaged in with patients.

183196.

OYA's breach of its fiduciary duties included:

(a) Not conducting reasonable investigations into Dr. Edwards' conduct;

(b) Not issuing warnings about Dr. Edwards;

(c) Permitting Dr. Edwards to routinely conduct exams without chaperones;

(d) Permitting OYA staff to weaponize Dr. Edwards and punish adjudicated

youth, including Plaintiffs, if they complained about Dr. Edwards' conduct;

(e) Improperly manipulating adjudicated youth who spoke up about Dr. Edwards in

order to convince adjudicated youth that Dr. Edwards was not doing anything

inappropriate;

(f) Failing to adopt and/or enforce a policy to prevent Dr. Edwards from routinely

having patients in his unsupervised presence and control;

(g) Failing to make adequate reports of allegations of Dr. Edwards' abuse of youth prior

to or during his employment and/or agency at OYA; and

(h) Assigning, and continuing to assign, Dr. Edwards to duties which placed him

in positions of authority and trust over other adjudicated youth, positions in which

Dr. Edwards could easily isolate and sexually abuse his patients.

184.197.

At the time that OYA engaged in such suppression and concealment of these acts, such

PAGE 58 – FIRST SECOND AMENDED COMPLAINT

EXHIBIT A

acts were done in part to induce Plaintiffs to forbear on their rights.

### ~~185~~198.

OYA's misconduct did reasonably induce Plaintiffs to forbear on Plaintiffs' rights.

### ~~186~~199.

The misrepresentations, suppressions and concealment of facts by OYA were intended to, and were likely to, mislead Plaintiffs and others to believe that OYA had no knowledge of any complaints or reports against Dr. Edwards, or that there were no other reports or complaints of sexual misconduct against Dr. Edwards and that there was no need for OYA to take further actions or precautions.

### ~~187~~200.

The misrepresentations, suppressions, and concealment of facts by OYA were likely to mislead Plaintiffs to believe that OYA had no knowledge of the fact that Dr. Edwards was sexually abusing adjudicated youth.

### ~~188~~201.

OYA suppressed and concealed the true facts regarding Dr. Edwards with the purpose of:

(a) preventing Plaintiffs and others, from learning that Dr. Edwards had been and was continuing to sexually abuse patients;

(b) preventing further reports or complaints about Dr. Edwards' conduct;

(c) preventing discovery of OYA's own role in causing Plaintiffs' injuries;

(d) protecting and avoiding damage to the reputation of OYA; and

(e) shielding OYA from incurring civil liability for Dr. Edwards' misconduct.

### ~~189.~~202.

PAGE 59 – ~~FIRST~~ **SECOND** AMENDED COMPLAINT

EXHIBIT A

Plaintiffs were misled and defrauded by OYA's suppressions and concealment of facts, and in reliance thereon, were induced to act or induced not to act, exactly as intended by OYA. Specifically, Plaintiffs were induced to believe that OYA had not received prior allegations, reports, or complaints of sexual abuse against Dr. Edwards; that his conduct fell within the normal standard of care within the medical community; and that he was safe to be around patients. By giving Dr. Edwards the position of physician at MacLaren, OYA impliedly represented that Dr. Edwards was safe and morally fit to give medical care.

190203.

When OYA made these affirmative or implied representations and nondisclosures of material facts, OYA knew or should have known that the facts were otherwise. OYA knowingly and intentionally suppressed the material facts that Dr. Edwards had previously sexually abused patients, including Plaintiffs. OYA knew or should have known of conduct by Dr. Edwards which placed OYA on notice that Dr. Edwards had previously sexually abused adjudicated youth and continued to do so.

191204.

Because of Plaintiffs' young age, and because of the status of Dr. Edwards as an authority figure within MacLaren, Plaintiffs were vulnerable to Dr. Edwards.

192205.

Plaintiffs justifiably relied upon OYA for information relating to sexual misconduct of Dr. Edwards.

193206.

As a result of the above-described conduct, Plaintiffs did not discover the causal link between OYA's fraudulent conduct as outlined above and the sexual abuse they suffered at the

PAGE 60 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

hands of Dr. Edwards. In addition, when Plaintiffs finally discovered OYA's fraudulent behavior, Plaintiffs experienced - and continue to experience - recurrences of the injuries previously described herein, including extreme and severe mental anguish and emotional distress that Plaintiffs had been the victim of OYA's fraudulent behavior; that Plaintiffs had not been able to help other adjudicated youth avoid being sexually abused because of OYA's fraudulent conduct; and that Plaintiffs had not been able to receive timely medical treatment needed to deal with the problems Plaintiffs suffered and continue to suffer as a result of the sexual abuse.

~~194~~207.

As a direct result of OYA's fraudulent conduct, Plaintiffs have incurred economic and noneconomic damages as set out more fully above.

## SEVENTH CLAIM FOR RELIEF

~~**Battery (Direct)**~~

~~**(Against Defendant Estate)**~~

~~195.~~

~~Plaintiff realleges and incorporates herein paragraphs 1 through 164.~~

~~166.~~

~~195.~~

~~Plaintiffs reallege and incorporate herein paragraphs 1 through 194.~~

~~///~~

~~196.~~

~~Dr. Edwards engaged in harmful and offensive touching of Plaintiffs to which Plaintiffs did not or could not consent, including groping Plaintiffs' genitals, masturbating of certain~~

PAGE 61 – ~~**FIRST**~~ **SECOND** **AMENDED COMPLAINT**

EXHIBIT A

Plaintiffs, digitally penetrating certain Plaintiffs, and subjecting certain Plaintiffs to oral sex (collectively, "the sexual abuse"), as set out more specifically above.

197.

As a direct result of the battery of Plaintiffs perpetrated by Dr. Edwards as set out above, Plaintiffs have incurred economic and noneconomic damages as set out more fully above. Therefore, Plaintiffs are entitled to compensatory damages in an amount to be determined by a jury.

**EIGHTH CLAIM FOR RELIEF**

**Battery (Direct) under OTCA**

**(Against Defendant OYA)**

198208.

Plaintiffs reallege and incorporate herein paragraphs 1 through 197207.

199209.

While acting in the course and scope of his agency for Defendant OYA, Dr. Edwards engaged in harmful and offensive touching of Plaintiffs to which Plaintiffs did not or could not consent, including groping Plaintiffs' genitals, masturbating of certain Plaintiffs, digitally penetrating certain Plaintiffs, and subjecting certain Plaintiffs to oral sex (collectively, "the sexual abuse"), as set out more specifically above.

///

///

200210.

Prior to the last incident of abuse suffered by each Plaintiff, Dr. Edwards' sustained pattern of sexual abuse of numerous adjudicated youths had been repeatedly reported to (and

PAGE 62 – ~~FIRST~~ SECOND AMENDED COMPLAINT

EXHIBIT A

otherwise came to the attention of) OYA staff and supervisors for years. ~~Dr. Edwards' sexual abuse of adjudicated youth was so well known, such that staff, supervisors and youth alike referred to him as "Dr. Cold Fingers."~~ The extensive information known to OYA about Dr. Edwards' ongoing and continued sexual abuse of adjudicated by youth is hereinafter referred to as the "Repeated Notice."

~~201~~211.

OYA had the authority to control Dr. Edwards and protect Plaintiffs. However, despite the Repeated Notice about Dr. Edwards, OYA refused to take preventative or corrective action to control Dr. Edwards or protect Plaintiffs. OYA purposefully chose not to investigate reports of sexual abuse by Dr. Edwards and purposefully did not put in place any safety protections against the sexual abuse by Dr. Edwards that OYA knew had occurred in the past and would continue to occur if OYA did not intervene. OYA also ignored the repeated requests of adjudicated youth (including Plaintiffs) for help from OYA—refusing to offer Plaintiffs any support, solutions, protections, or any assistance of any kind with regards to the sexual abuse by Dr. Edwards. Instead, OYA knowingly allowed Dr. Edwards' pattern of sexual abuse of adjudicated youth to continue. In some instances, OYA would weaponize Dr. Edwards' conduct by punishing (or threatening to punish) boys (including Plaintiffs) by sending them to Dr. Edwards where OYA knew such sexual abuse would continue. In so doing, OYA continued to expose adjudicated youth, including Plaintiffs, to interactions with Dr. Edwards knowing that these interactions would result in sexual abuse. OYA thereby gave substantial assistance or encouragement to Dr. Edwards to perpetuate the sexual abuse of adjudicated youth, including Plaintiffs.

~~202~~212.

PAGE 63 – ~~FIRST~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

In acting as set out in paragraphs ~~1 through 173~~ above, OYA was aware of, allowed, and condoned sexual abuse of Plaintiffs by Dr. Edwards. In so doing, OYA acted with intent to cause further harmful or offensive touching or an apprehension among Plaintiffs that harmful or offensive touching would occur. In the alternative, OYA acted with substantial certainty that Plaintiffs would be subjected to harmful or offensive touching (or apprehension of harmful or offensive touching) by not only failing to investigate these reports of assault or battery, but failing to offer Plaintiffs any support, solutions, protections, or any assistance of any kind—and in some instances threatening Plaintiffs that they would be sent back to Dr. Edwards as punishment.

~~203~~213.

As a result of OYA's conduct as set out in paragraphs ~~1 through 174~~ above, Plaintiffs were in fact subjected to Dr. Edwards' harmful and offensive touching in the form of sexual abuse as set out above. At the time of the sexual abuse of Plaintiffs, there was a special relationship between OYA and Plaintiffs (as minors in the legal and physical custody of OYA and towards whom OYA acted in loco parentis). At the time of the sexual abuse of Plaintiffs, there was also a special relationship between OYA and its agent, Dr. Edwards.

~~204~~214.

As a direct result of the battery of Plaintiffs caused by OYA as set out above, Plaintiffs have incurred economic and noneconomic damages as set out more fully above. Therefore, Plaintiffs are entitled to compensatory damages from Defendant OYA in an amount to be determined by a jury.

**NOTICE OF POTENTIAL CONSTITUTIONAL QUESTION**

~~205~~215.

PAGE 64 – ~~FIRST~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

As to any claim for relief, to the extent that any of the Defendants seek to reduce any compensatory damage verdict in favor of Plaintiffs on the basis of statutory damages limits from former ORS 30.270 (repealed in 2009), Plaintiffs aver~~s~~ that such damages limits are constitutionally inadequate as applied to this case.

## PRAYER FOR RELIEF

**WHEREFORE**, each Plaintiff prays for judgment against Defendants as follows:

1. On the First Claim for Relief for Negligence:

    a. Economic damages ~~in the amount of $100,000 per Plaintiff~~<u>for each Plaintiff in an amount to be determined by a jury</u>;

    b. Noneconomic damages <u>for each Plaintiff in an amount to be determined by a jury;</u>~~in the amount of $5,000,000 per Plaintiff;~~

    c. Costs and disbursements incurred herein; and

    d. Any other relief the Court deems necessary.

2. On the Second Claim for Relief for Civil Rights Violation – 14th Amendment Due Process:

    a. Economic damages <u>for each Plaintiff in an amount to be determined by a jury;</u>~~in the amount of $100,000 per Plaintiff;~~

    b. Noneconomic damages <u>for each Plaintiff in an amount to be determined by a jury;</u>~~in the amount of $5,000,000 per Plaintiff;~~

    c. <u>Punitive damages against Supervisory and Individual Defendants in an amount to be determined by a jury;</u>

    ~~c.~~<u>d.</u>Attorney fees incurred herein pursuant to 42 U.S.C. § 1988;

    ~~d.~~<u>e.</u>Costs and disbursements incurred herein; and

PAGE 65 – ~~**FIRST**~~ <u>**SECOND**</u> **AMENDED COMPLAINT**

EXHIBIT A

e.f. Any other relief that the Court deems necessary.

3.  On the Third Claim for Relief for Civil Rights Violation – 8th Amendment Cruel and Unusual Punishment (Supervisory Liability and Failure to Protect):

    a.  Economic damages for each Plaintiff in an amount to be determined by a jury; in the amount of $100,000 per Plaintiff;

    b.  Noneconomic damages for each Plaintiff in an amount to be determined by a jury; in the amount of $5,000,000 per Plaintiff;

    b.c. Punitive damages against Supervisory and Individual Defendants in an amount to be determined by a jury;

    c.d. Attorney fees incurred herein pursuant to 42 U.S.C. § 1988;

    d.e. Costs and disbursements incurred herein; and

    e.f. Any other relief that the Court deems necessary.

4.  On the Fourth Claim for Relief for Civil Rights Violations – 8th Amendment Cruel and Unusual Punishment (Excessive Force): Substantive Due Process – Violation of 14th Amendment)

    a.  Economic damages in the amount of $100,000 for E.C.R. in an amount to be determined by a jury;

    b.  Noneconomic damages in the amount of $5,000,000 for E.C.R. in an amount to be determined by a jury;

    c.  Attorney fees incurred herein pursuant to 42 U.S.C. § 1988;

    d.  Costs and disbursements incurred herein; and

    e.  Any other relief that the Court deems necessary.

5.  On the Fifth Claim for Relief for Sexual Battery of a Child – *Respondeat Superior*:

PAGE 66 – **FIRST SECOND AMENDED COMPLAINT**

EXHIBIT A

    a.   Economic damages for each Plaintiff in an amount to be determined by a jury; ~~in the amount of $100,000 per Plaintiff;~~

    b.   Noneconomic damages for each Plaintiff in an amount to be determined by a jury; ~~in the amount of $5,000,000 per Plaintiff;~~

    c.   Costs and disbursements incurred herein; and

    d.   Any other relief the Court deems necessary.

6.   On the Sixth Claim for Relief for Constructive Fraud:

    a.   Economic damages for each Plaintiff in an amount to be determined by a jury; ~~in the amount of $100,000 per Plaintiff;~~

    b.   Noneconomic damages for each Plaintiff in an amount to be determined by a jury; ~~in the amount of $5,000,000 per Plaintiff;~~

    c.   Costs and disbursements incurred herein; and

    d.   Any other relief the Court deems necessary.

~~7.~~ ~~7.~~ On the Seventh Claim for Relief for ~~Battery (Direct) under OTCA:~~

~~8.   Economic damages in the amount of $100,000 per Plaintiff;~~

~~9.   Noneconomic damages in the amount of $5,000,000 per Plaintiff;~~

~~10. Costs and disbursements incurred herein; and~~

~~11.~~7.    ~~Any other relief the Court deems necessary.~~

~~12.~~8.    ~~On the Eighth Claim for Relief for~~ Battery (Direct) under OTCA:

    a.   Economic damages for each Plaintiff in an amount to be determined by a jury; ~~in the amount of $100,000 per Plaintiff;~~

    b.   Noneconomic damages for each Plaintiff in an amount to be determined by a jury; ~~in the amount of $5,000,000 per Plaintiff;~~

PAGE 67 – ~~**FIRST**~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A

c.  Costs and disbursements incurred herein; and

d.  Any other relief the Court deems necessary.

DATED: ~~January 15~~, 2026.

Portland, Oregon

CREW JANCI ATTORNEYS

/s/ Peter Janci
Peter Janci, OSB No. 074249
Kendall M. H. Spinella, OSB No. 214446
Matan Goodblatt, OSB No. 224060
CREW JANCI ATTORNEYS
9755 SW Barnes Road, Suite 430
Portland, OR 97225
Tel: 503-306-0224
peter@crewjanci.com
kendall@crewjanci.com
matan@crewjanci.com
*Of Attorneys for Plaintiffs*

/s/ Paul C. Galm
Paul C. Galm, OSB No. 002600
GALM LAW
50 SW Pine Street, #403
Portland, OR  97204
Tel: 503-641-6000
paul@paulgalmlaw.com
*Of Attorneys for Plaintiffs*

PAGE 68 – ~~**FIRST**~~ **SECOND AMENDED COMPLAINT**

EXHIBIT A