Peter B. Janci, OSB No. 074249
peter@crewjanci.com
Kendall M. H. Spinella, OSB No. 214446
kendall@crewjanci.com
Crew Janci Attorneys
9755 SW Barnes Road, Suite 430
Portland, OR 97225
Telephone: (503) 306-0224

Paul Galm, OSB No. 002600
paul@paulgalmlaw.com
Galm Law
50 SW Pine Street, Suite 403
Portland, OR 97204
Telephone: (503) 641-6000

*Of Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| T.Z., D.Z., G.T., D.M., C.A., J.O., S.W., and T.W., proceeding under pseudonyms,<br><br>  Plaintiffs,<br><br>  v.<br><br>STATE OF OREGON, by and through the Oregon Youth Authority; ROBERT JESTER; BOBBY MINK; COLETTE PETERS; DIRECTORS #4-8; GARY LAWHEAD; MIKE CONZONER; DARIN HUMPHREYS; SID THOMPSON; and SUPERINTENDENTS #5-8,<br><br>  Defendants. | Case No. 3:25-CV-01122-MC<br><br><br>**DECLARATION OF JEFFREY LYNN ANDERSON** |

PAGE 1 – **DECLARATION OF JEFFREY LYNN ANDERSON**

EXHIBIT 35
PTF_TAM_PROD004816

I, Jeffrey Lynn Anderson, hereby declare as follows:

1. I started working for Oregon Youth Authority as a registered nurse at MacLaren Youth Correctional Facility's clinic in about 1992. I continued working at MacLaren until approximately 1997. I started out at the MacLaren clinic as a weekend nurse working part-time and doing double shifts. Within five or six months, I moved to full-time and worked swing shifts. My duties included lab work, radiology, immunizations, assessing injuries and mental-health issues, seeing youth at sick call, and prepping and dispensing medications.

2. Dr. Edwards worked part-time while I was employed at the clinic. He would come in around 8:00 a.m. and leave about 11:30 a.m., unless something happened to hold him over. During those hours, Dr. Edwards performed physicals and medical exams. Dr. Edwards typically saw between nine and 15 patients each day. Dr. Edwards did not have chaperones in the room while he was with youths.

3. During my tenure at MacLaren, I overheard youth refer to Dr. Edwards by the nickname "Dr. Tickles." From what I overheard and observed from the surrounding context, I understood youth would call Dr. Edwards by the nickname "Dr. Tickles" because he would never wear gloves during testicular exams of youth. Fellow MacLaren nurse Marla Jones and I filed a couple complaints with Dr. Edwards directly about his practice of conducting testicular exams without gloves because some of the youth were molested as younger children and some were sex offenders, so it was a sensitive issue. Many youth felt uncomfortable with this practice by Dr. Edwards. When I worked day shifts, I observed kids out in the waiting room crying their eyes out because Dr. Edwards refused to do their exams with gloves on. These youth were in tears over this because they wanted the medical care, but they did not want to submit to Dr. Edwards touching their genitals without gloves. I grew frustrated seeing this because it was all so unnecessary and driven by Dr. Edwards' refusal to follow standard gloving practices.

PAGE 2 – **DECLARATION OF JEFFREY LYNN ANDERSON**

EXHIBIT 35
PTF_TAM_PROD004817

4.      Youth also filed grievances with the state regarding Dr. Edwards' ungloved exams. When youths filed grievances regarding Dr. Edwards, OYA management always received copies. Ultimately, I became aware of hundreds of grievances against Dr. Edwards that were submitted to OYA leadership. I was also aware of several instances where OYA management addressed with Dr. Edwards his underlying behaviors that were the subject of these grievances. Despite these grievances, Dr. Edward refused to change.

5.      Marla Jones, Brenda Freddi, and I became concerned because we kept seeing these grievances come across our desks and nothing seemed to change. It was kind of disturbing. We tried to talk to Dr. Edwards about it, but Dr. Edwards told us that wearing gloves didn't allow for finger sensitivity when conducting genital exams. So, we asked him if he could just wear gloves for the kids who were abused and who are asking you to wear gloves. Dr. Edwards refused.

6.      I also had other concerns about Dr. Edwards' practice of medicine at MacLaren. During my tenure, I observed several instances where Dr. Edwards failed to timely address the medical needs of youth. For example, one youth had a torn ACL, and Dr. Edwards refused to refer him to orthopedics even though it was clear the kid needed surgery. Instead, Dr. Edwards just put him in a straight brace (maintaining the status quo for an extended period of time without treating the underlying condition). This youth was ultimately paroled still needing surgery, and his parents were left to deal with it.

7.      In another case, there was a youth who was a Jehovah's Witness and therefore could not receive  blood products under his religious beliefs. He had a nodule on his spine. I referred him to Dr. Edwards several times and so did other nurses. It did not appear that Dr. Edwards treated him appropriately. He tried to aspirate fluid out of a suspected cyst, and he couldn't get any fluid out of it. At that point, Dr. Edwards should have referred the youth to an

PAGE 3 – **DECLARATION OF JEFFREY LYNN ANDERSON**

EXHIBIT 35
PTF_TAM_PROD004818

outside doctor. Finally, after a year and a half of inaction by Dr. Edwards, the youth saw a specialist. It turned out the youth had an osteoblastoma—a rare, non-cancerous bone-forming tumor that causes pain, swelling, and tenderness, particularly in the spine. The delay in appropriate medical care not only caused extended pain and suffering for the youth, but allowed the condition to progress and made treatment of his condition by the specialists more challenging.

8.    There was another youth who had a hot appendix. It was the weekend, and I wanted to immediately send the youth to a hospital for treatment. I called Dr. Edwards, which was protocol. Dr. Edwards told me to keep the youth in the clinic and put him on bedrest until Monday. Concerned about Dr. Edward's apathy towards what I believed was a dangerous condition, I decided to send the student out to a hospital for treatment anyway. I learned that, upon arrival, the youth went into emergency surgery and had his appendix removed. Later, the youth's parents sued the state for malpractice by Dr. Edwards. The State settled that case.

9.    During my time at MacLaren, there were numerous events and patterns that led me to believe that Dr. Edwards should not have been practicing medicine at MacLaren. I grew frustrated by the lack of response to my efforts to draw attention to Dr. Edward's concerning behaviors.

10.    I loved my job at MacLaren and I loved working with kids. However, I grew increasingly frustrated with Dr. Edwards and reached a point where I could no longer put up with Dr. Edwards' behavior. I eventually became so concerned about Dr. Edwards' behavior that I also initiated a complaint against him with the Oregon Medical Board. Other MacLaren clinic staff joined in this complaint, including registered nurse Marla Jones and office administrator Brenda Freddi. The complaint to the Oregon Medical Board focused on Dr. Edwards' longstanding habit of not wearing gloves during testicular exams of youth, as well as instances of

PAGE 4 – **DECLARATION OF JEFFREY LYNN ANDERSON**

EXHIBIT 35
PTF_TAM_PROD004819

lax care for youth (discussed more below). We included copies of grievances and chart notes and other documentation in hopes that the Oregon Medical Board would investigate and take action against Dr. Edwards.

11. Following our initiation of the complaint with the Oregon Medical Board, a young, inexperienced investigator was assigned to the case on behalf of the Board. This investigator did not conduct a thorough investigation. Rather than thoroughly examining and following up on all of the information we provided, this investigator ended up reviewing a limited set of information from select charts that had been cherry picked and mocked up by the charge nurse, Mel Herd. (Mel Herd and Dr. Edwards had worked together for years, and Mel was protective of Dr. Edwards, as they were friends.) As I learned details about the information that Mr. Herd was directing the OMB investigator to focus on, I observed that Herd was basically deleting some of Dr. Edwards' malpractice.

12. Despite the many grievances against Dr. Edwards, OYA never fired or disciplined Dr. Edwards because he was the chief medical officer for juveniles, and he was inexpensive, despite extensive evidence of malpractice or malfeasance. My observation from working closely with Dr. Edwards was that he was intentionally indifferent to about the concerns of his minor patients at MacLaren. The situation with Dr. Edwards was bad enough that three state employees—Marla Jones, Brenda Freddi and I—put our jobs and careers at risk to report him to the Oregon Medical Board. Still, nothing was done.

13. I and at least one of the individuals who participated in submitting the complaint about Dr. Edwards to the Oregon Medical Board faced retaliation from Dr. Edwards and the Oregon Youth Authority. Brenda Freddi was reassigned to another area after she joined in filing the complaint about Dr. Edwards. I faced disciplinary retaliation from OYA and an investigation by the Board of Nursing while working in the clinic. Dr. Edwards and OYA

PAGE 5 – **DECLARATION OF JEFFREY LYNN ANDERSON**

EXHIBIT 35
PTF_TAM_PROD004820

also tried other ways to force me to leave my employment at MacLaren because I was a whistleblower.

14. I ultimately resigned from MacLaren to accept a position in the clinic of the Oregon State Correctional Institution (OSCI), where I worked for seven years. I am now retired.

I HEREBY DECLARE THAT THE ABOVE STATEMENTS ARE TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND I UNDERSTAND THAT THEY ARE MADE FOR USE AS EVIDENCE IN COURT AND ARE SUBJECT TO PENALTY FOR PERJURY.

12/2/2025

Dated this ____ day of _____, 2025.

Signed by:

5EBF8B800F8543F...

Jeffrey L. Anderson

PAGE 6 – **DECLARATION OF JEFFREY LYNN ANDERSON**

EXHIBIT 35
PTF_TAM_PROD004821