Peter B. Janci, OSB No. 074249
peter@crewjanci.com
Kendall M. H. Spinella, OSB No. 214446
kendall@crewjanci.com
Matan Goodblatt, OSB No. 224060
matan@crewjanci.com
Crew Janci Attorneys
9755 SW Barnes Road, Suite 430
Portland, OR 97225
Telephone: (503) 306-0224

Paul Galm, OSB No. 002600
paul@paulgalmlaw.com
Galm Law
50 SW Pine St., #403
Portland, OR 97204
Telephone: (503) 641-6000

*Of Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **T.A.M., J.K.B., E.C.R., J.K.C., A.M.W., R.L.M., N.T.N., A.W., B.W.H., J.D.W.,** and **S.S.L.,** individuals proceeding under pseudonyms,<br><br>Plaintiffs,<br><br>v.<br><br>**STATE OF OREGON**, by and through the Oregon Youth Authority; **RICHARD A. HILL; KAREN BRAZEAU; ROBERT JESTER; COLETTE M. S. PETERS; FARIBORZ PAKSERESHT; JOSEPH A. O'LEARY; GARY LAWHEAD; MIKE CONZONER; DARIN HUMPHREYS; BRIAN J. FLORIP; MICHAEL RIGGAN; ISIDRO THOMPSON; DANIEL** | Case No. 3:25-CV-01668-MC<br><br>**PLAINTIFFS' RESPONSE TO STATE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

**BERGER; MARCIA ADAMS; PHILIP COX;** and **SUSAN BAUMGARTNER,**

Defendants.

Defendants.

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......... 3
**TABLE OF AUTHORITIES** .......... 6
**INTRODUCTION** .......... 10
**SUMMARY JUDGMENT STANDARD** .......... 13
**FACTUAL BACKGROUND** .......... 14
**I. THE STRUCTURE OF DR. EDWARDS' SUPERVISION** .......... 15
**A. Before 2007, Dr. Edwards Reported Through the Program Director to the Superintendent.** .......... 15
**B. After 2007, Supervision of Dr. Edwards Was Shared.** .......... 16
**II. THE CONDUCT AND THE CONDITIONS THAT ENABLED DR. EDWARDS ABUSE OF YOUTH AT MACLAREN** .......... 17
**III. OYA'S NOTICE: THE CHRONOLOGY OF COMPLAINTS** .......... 19
**A. The 1990s and December 2001: "Common Knowledge," Nurse Reports and the Zimmerman Report.** .......... 19
**B. 2001–2004: The Oregon Medical Board Investigation, Lawhead's Unsolicited Letter of Support, and the 2004 Meeting with Edwards.** .......... 21
**C. 2005 And 2006: Two Outside Reports of Sexual Abuse, No Internal Response.** .......... 22
**D. February–March 2007: "J.S." Reports Sexual Abuse by Dr. Edwards.** .......... 23
**E. 2009: The "L.G." Complaint, Directives from Dr. Adams, and the "C.E." Complaint.** .......... 25
**F. 2012–2013: Three More Complaints and Evidence that OYA's Directives Were Never Implemented.** .......... 28
**G. 2014–2017: The Complaints Continue.** .......... 30
**IV. OYA'S STATED STANDARDS—AND ITS DEPARTURES FROM THEM** .......... 31
**V. FACTS REGARDING THE INDIVIDUAL DEFENDANTS MOVING FOR DISMISSAL OF CIVIL RIGHTS CLAIMS** .......... 32
**A. Darrin Humphreys.** .......... 32
**B. Isidro Thompson and Daniel Berger.** .......... 33
**C. Philip Cox.** .......... 34
**VI. ADDITIONAL FACTS BEARING ON CONCEALMENT AND ESTOPPEL** .......... 35
**MEMORANDUM** .......... 37
**I. PLAINTIFF J.K.C.'S CLAIMS ARE TIMELY** .......... 37
**A. Plaintiff's Federal Civil Rights Claims Are Timely.** .......... 37
***i. Overview of Federal and State Law Implications in Determining Timeliness of Civil Rights Claims.*** .......... 38

*a. Accrual of Civil Rights Claims (Generally) Requires a Plaintiff to Discover the Causal Role the Defendant Played in His Constitutional Injury.* .................................... 39

*b. Controlling Ninth Circuit Precedent is Clear That the Timing of the Accrual Civil Rights Claims Arising from Custodial Sexual Abuse Is Inherently More Complicated.* .. 44

***ii. Application of the Tests for Accrual from Controlling Precedent to the Evidence Here Demonstrates Genuine Issues of Fact Exist as to the Timeliness of Plaintiff J.K.C'.s Claims.*** .......................................................................................................... 46

*a. J.K.C. was Abused as an Isolated Teen at MacLaren with No Opportunity to Discover Defendants' Causal Role in His Abuse.* .......................................................... 47

*b. While J.K.C. Was at Maclaren, the Facts Establishing Defendants' Culpability Sat Exclusively in the State's Control.* ................................................................................ 48

*c. J.K.C. Did Not Perceive—And Could Not Reasonably Have Perceived—Any Individual Defendant's Causal Role.* ........................................................................ 50

*d. Defendants' Reliance on J.K.C.'s 2020 Testimony Proves the Wrong Proposition*. 52

*e. Reasonable Diligence Would Not Have Revealed to J.K.C. What the Defendants Kept Concealed.* .......................................................................................................... 55

*1. J.K.C. Was Never Given Any Means of Reporting or Inquiring*.......................... 57

*2. The Records That Would Have Revealed OYA's Notice Were Confidential.* ....... 57

*3. OYA's Own Supervisors Were Not Aware of Their Colleagues (Now Co-Defendants') Prior Knowledge of Abuse Complaints About Dr. Edwards (Or Their Responses)*.............................................................................................................. 59

***iii. In the Alternative, the Limitations Period Is Equitably Tolled and Defendants Are Estopped from Asserting the Statute of Limitations.*** ........................................................ 60

*a. Equitable Tolling.* ........................................................................................................ 61

*b. Equitable Estoppel.* ...................................................................................................... 66

**B. Plaintiff J.K.C.'s Seventh Claim for Relief Is Timely.** ............................................. 68

**II. PLAINTIFFS HAVE MET THEIR BURDEN FOR FEDERAL CLAIMS AGAINST INDIVIDUAL DEFENDANTS (HUMPHREYS, THOMPSON, BERGER, AND COX)** ... 70

**A. Legal Standard.** .......................................................................................................... 70

***i. Supervisory Liability.*** ................................................................................................. 71

***ii. Failure to Protect.*** ...................................................................................................... 73

*a. 8th Amendment.* ........................................................................................................... 73

*b. 14th Amendment.* ......................................................................................................... 74

**B. Application.** .............................................................................................................. 74

***i. Defendant Richard Hill.*** ............................................................................................. 74

***ii. Defendant Darrin Humphreys*** .................................................................................... 75

*a. Supervisory Liability* ................................................................................................... 75

***iii. Defendant Isidro Thompson.*** ........ 79
*a. Supervisory Liability* ........ 79
*b. Failure to Protect* ........ 82
***iv. Defendant Daniel Berger*** ........ 84
*a. Supervisory Liability* ........ 84
*b. Failure to Protect.* ........ 86
***v. Defendant Philip Cox.*** ........ 88
*a. Supervisory Liability.* ........ 88
*b. Failure to Protect.* ........ 91
**CONCLUSION** ........ 95

**TABLE OF AUTHORITIES**

**CASES** **PAGES**

*Allen v. A.H. Robins Co., Inc.*,
752 F.2d 1365 (9th Cir. 1985) ........ 67
*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 13
*Atkins, Kroll (Guam), Ltd. v. Cabrera*,
295 F.2d 21 (9th Cir. 1961) ........ 61
*Bibeau v. Pac. Nw. Rsch. Found. Inc.*,
188 F.3d 1105 (9th Cir. 1999) ........ 39, 56
*Birch v. City of N.Y.*,
675 F. App'x 43 (2d Cir. 2017) ........ 42
*Bird v. Lewis & Clark Coll.*,
303 F.3d 1015 (9th Cir. 2002) ........ 65
*Bonneau v. Centennial Sch. Dist. No. 28J*,
666 F.3d 577 (9th Cir. 2012) ........ 38, 39, 43, 44, 46
*Buchler v. Oregon Corr. Div.*,
853 P.2d 798 (Or. 1993) ........ 65
*Castro v. Cnty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) ........ 74, 91
*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........ 13, 37, 70
*Chaney v. Fields Chevrolet*,
503 P.2d 1239 (Or. 1972) ........ 61
*Christensen v. Epley*,
585 P.2d 416 (Or. App. 1978) ........ 65
*Conway v. Pacific Univ.*,
324 Or 231, 924 P.2d 818 (1996) ........ 65
*Cortez v. Skol*,
776 F.3d 1046 (9th Cir. 2015) ........ 73, 82
*Doe v. City of Eugene,*
No. 6:15-CV-00154-JR, 2016 WL 1385450 (D. Or. Apr. 6, 2016) ........ 42
*Doe v. Cnty. of Josephine,*
No. 1:12-CV-2080-CL, 2015 WL 2412181 (D. Or. May 18, 2015) ........ 41, 50
*Doe v. Sargeant,*
No. 6:16-CV-00517-MC, 2017 WL 3495418 (D. Or. Aug. 15, 2017) ........ 41, 50
*Duncan v. Or. Youth Auth.*,
No. 05-1921-KI, 2007 WL 789433 (D. Or. Mar. 14, 2007) ........ 67
*Est. of Jackson v. City of Modesto*,
No. 1:21-CV-0415 AWI EPG, 2021 WL 4819604 (E.D. Cal. Oct. 14, 2021) ........ 42
*Farmer v. Brennan*,
511 U.S. 825 (1994) ........ 73, 74, 82
*Fazzolari v. Portland Sch. Dist. No. 1J*,
734 P.2d 1326 (1987) ........ 64
*Gregg v. Hawaii, Dep't of Pub. Safety*,
870 F.3d 883 (9th Cir. 2017) ........ 45, 52, 54

*H.A.H. v. Or. Youth Auth.*,
No. 3:25-CV-2266-MC, 2026 WL 1005350 (D. Or. Apr. 14, 2026) ...................... 42, 45, 50, 59
*Hauk v. J.P. Morgan Chase Bank USA*,
552 F.3d 1114 (9th Cir. 2009) ........................................................................ 13, 70, 88
*Health & Rehab. v. S.A.P.*,
835 So.2d 1091 (Fla. 2002) ............................................................................................ 67
*Henry A. v. Willden*,
678 F.3d 991 (9th Cir. 2012) ...................................................................................... 72, 76
*Henry v. County of Shasta*,
132 F.3d 512 (9th Cir. 1997) ........................................................................................... 19
*Horton by Horton v. City of Santa Maria*,
915 F.3d 592 (9th Cir. 2019) ........................................................................................... 74
*Hyde v. City of Willcox*,
23 F.4th 863 (9th Cir. 2022) ............................................................................................ 72
*J.M. v. Or. Youth Auth.*,
No. 3:25-CV-1866-MC, 2026 WL 1005097 (D. Or. Apr. 14, 2026) ................................Passim
*J.M. v. Oregon Youth Authority*,
434 P.3d 402 (Or. 2019) ...............................................................................................Passim
*K.J. v. Oregon*,
No. 6:25-CV-1973-MC, 2026 WL 1006010 (D. Or. Apr. 14, 2026) ................................ 42, 45
*L.W. v. Grubbs*,
92 F.3d 894 (9th Cir. 1996) ....................................................................................... 72, 73
*Lukovsky v. City & Cnty. of San Francisco*,
535 F.3d 1044 (9th Cir. 2008) .......................................................................................... 43
*Lyden v. Goldberg*,
490 P.2d 181 (Or. 1971) ................................................................................................... 67
*Martinelli v. Bridgeport Roman Cath., Dio.*, 196 F.3d 409 (2nd Cir. 1999) ........................................................................ 66
*MAT, Inc. v. Am. Tower Asset Sub, LLC*,
493 P.3d 14 (Or. App. 2021) ............................................................................................ 66
*Matheny v. Clackamas Cnty.*,
No. 3:10-CV-1574-BR, 2012 WL 171015 (D. Or. Jan. 20, 2012) ......................................... 42
*Moore v. Portland Public Schools*,
537 P.3d 544 (Or. 2023) ................................................................................................... 69
*Moret v. Garrett,*
No. 21-35886, 2023 WL 4703226 (9th Cir. July 24, 2023) .............................................. 41
*Moret v. Millsap,*
No. 3:18-CV-00096-MK, 2021 WL 4786834 (D. Or. July 26, 2021)............................... 41, 50
*Mt. Hood Stages, Inc. v. Greyhound Corp.*,
555 F.2d 687 (9th Cir. 1977) ........................................................................................... 64
*Nat'l Union Fire Ins. v. Argonaut Ins.*,
701 F.2d 95 (9th Cir. 1983) ............................................................................................. 60
*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
210 F.3d 1099 (9th Cir. 2000) .......................................................................................... 37
*O'Connor v. Boeing N. Am., Inc.*,
311 F.3d 1139 (9th Cir. 2002) ..................................................................................... 56, 60

*Philpott v. A.H. Robbins Co., Inc.*,
710 F.2d 1422 (9th Cir. 1983) .......... 66, 68
*Pinaud v. County of Suffolk*,
52 F.3d 1139 (2d Cir. 1995) .......... 42
*R.G. v. Koller*,
415 F Supp 2d 1129 (D Haw 2006) .......... 71
*Rutledge v. Boston Woven Hose & Rubber Co*.,
576 F.2d 248 (9th Cir. 1978) .......... 61, 62
*S.K. v. Oregon*,
No. 6:25-CV-939-MC, 2026 WL 1005372 (D. Or. Apr. 14, 2026) .......... 42, 45
*Simmons v. United States*,
805 F.2d 1363 (9th Cir. 1986) .......... 44, 45, 54, 55, 60
*Smith v. Washington*,
No. 05-CV-6301-BR, 2009 WL 10280594 (D. Or. Feb. 5, 2009) .......... 41
*St. Clair v. Cnty. of Okanogan*,
154 F.4th 1154 (9th Cir. 2025) .......... Passim
*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) .......... 71, 72
*Stranahan v. Fred Meyer, Inc.*,
153 Or. App. 442, 958 P.2d 854 (1997) .......... 19
*T.F. v. Oregon*,
No. 6:25-CV-2166-MC, 2026 WL 1006018 (D. Or. Apr. 14, 2026) .......... 42, 45
*T.R. v. Boy Scouts of America and City of The Dalles*,
181 P.3d 758 (Or. 2008) .......... Passim
*Tamas v. Dep't of Soc. & Health Servs.*,
630 F.3d 833 (9th Cir. 2010) .......... 72, 76
*Torch v. Windsor Surry Co.*,
No. 3:17-CV-00918-AA, 2019 WL 6709379 (D. Or. Dec. 9, 2019) .......... 66
*United States v. Bibo-Rodriguez*,
922 F.2d 1398 (9th Cir. 1991) .......... 19
*United States v. Kubrick*,
444 U.S. 111 (1979) .......... 60
*Vasquez v. Davis*,
882 F.3d 1270 (10th Cir. 2018) .......... 41
*Volk v. D.A. Davidson & Co.*,
816 F.2d 1406 (9th Cir. 1987) .......... 56
*Watkins v. City of Oakland*,
145 F.3d 1087 (9th Cir.1998) .......... 72
*Wilson v. Hays*,
228 F. Supp. 3d 1100 (S.D. Cal. 2017) .......... 38, 61
*Wong as Tr. of Anaplex Corp. Emp. Stock Ownership Plan v. Flynn-Kerper*,
999 F.3d 1205 (9th Cir. 2021) .......... 60

**STATUTES**

ORS 12.117 .......... 38, 39
ORS 420A.010 .......... 65, 66

**RULES**

Fed. R. Civ. P. 56(c) .......... 13, 75
Federal Rule of Evidence 404(b)(2) .......... 18

**OTHER AUTHORITIES**

Allan E. Korpela, *Fiduciary or Confidential Relationship as Affecting Estoppel to Plead Statute of Limitations*,
45 A.L.R. 3d 630 (Originally published 1972) .......... 68
Alan Rosenfeld, *The Statute of Limitations Barrier in Childhood Sexual Abuse Cases: The Equitable Estoppel Remedy*,
12 Harv. Women's L.J. 206 (1989) .......... 67

## INTRODUCTION

Plaintiffs were minor boys in the custody of the State of Oregon who were placed at MacLaren Youth Correctional Facility at various times between 1999 and 2017. As teenage boys removed from their parents, families, and friends, they were entirely reliant on OYA to meet their basic needs and provide for their safety. OYA admits that its top responsibility was to provide for their safety.

Although OYA had a "zero tolerance policy" for sexual abuse of youth by OYA staff—and although all OYA staff were mandatory reporters of child sexual abuse—OYA chose not to follow those rules when it came to MacLaren's pediatrician, Dr. Edward Gary Edwards. Widely known among youth and some staff as "Dr. Cold Fingers," between the late 1990s and 2015, Dr. Edwards was repeatedly reported to OYA leadership for touching youth's genitals without gloves, with unnecessary frequency, in manners that were not consistent with medical procedures, and where underlying complaints did not require genital exams. In 2009, Dr. Edwards admitted to OYA leaders that he had been touching boys' genitals without gloves "for over 30 years." Exhibit 1 to Declaration of Peter B. Janci in Support of Plaintiffs' Response to State Defendants' Motion for Partial Summary Judgment (hereinafter, "Janci Decl."). Dr. Edwards was also reported for (and he admitted to at least one colleague that he) anally penetrated boys with his fingers—again, without wearing gloves. Again, such conduct was not medically necessary.

Still, despite at least 16 different written reports[1] of sexual misconduct against Dr. Edwards across more than 20 years, OYA did not terminate or even discipline Dr. Edwards. Nor

[1] This is the number of ***written reports*** that have been retained by OYA and sent to Plaintiffs in discovery. Multiple former OYA staff have testified that they received grievances and complaints from many youth in the 1990s and early 2000s. *See* Exhibit 2 to Janci Decl., Declaration of Tim Harding, ¶ 6; Exhibit 3 to Janci Decl., Declaration of Darrell Strand, ¶ 5; Exhibit 4 to Janci Decl., Declaration of James Farmer, ¶ 14; Exhibit 5 to Janci Decl., Declaration

did OYA restrict his access to youth. Even when OYA was faced with incontrovertible evidence that Dr. Edwards was actively resisting and disobeying later directives that he wear gloves and have a chaperone in the room for genital and anal exams, OYA chalked youth's continuing complaints of sexual abuse up to "performance issues" that it viewed as so minor as not to fully investigate. In fact, OYA never even bothered to mention these "performance issues" in any of Dr. Edwards' performance evaluations. *See* Exhibit 8 to Janci Decl., 30(b)(6) Deposition of Labarre-Bates (hereinafter "Exhibit 8, Labarre-Bates 30(b)(6) Dep."), 206:11–207:21. OYA largely attributed the youth complaints of abuse by Dr. Edwards to a "rumor mill and gossip amongst the youth." *See* Exhibit 7 to Janci Decl.

OYA has admitted that it never substantiated complaints by youth against Dr. Edwards and always "gave Dr. Edwards the benefit of the doubt each time his account contradicted the complaining youth's account." *See* Exhibit 9 to Janci Decl., 30(b)(6) Deposition of Jeske (hereinafter "Exhibit 9, Jeske 30(b)(6) Dep."), 193:10–22; 229:19–24. Meanwhile, OYA ignored or destroyed grievances submitted by youth. *See e.g.* Exhibit 10 to Janci Decl., Deposition of T.A.M., 56:11–57:4, 116:12–117:10, 323:19–324:7 (T.A.M. filled out and submitted a "kite" reporting the abuse and "nothing happened"); Exhibit 11 to Janci Decl., Deposition of A.M.W., 100:17–22, 132:16–19 (A.M.W. witnessed staff throw away youth grievances); Exhibit 12 to Janci Decl., Deposition of R.L.M., 175:5–8 (R.L.M. witnessed other youth "make formal complaints and it went absolutely nowhere," and youth were punished for making those complaints). OYA staff told youth to "suck it up," (Exhibit 11 to Janci Decl., Deposition of

---

of Jeffrey Lynn Anderson, ¶¶ 3–4. OYA admitted that written youth grievance forms from 1999–2017 would have been destroyed according to their retention policy after three years unless it was otherwise escalated to management through an SIR [Sensitive Incident Report], a DIR [Director's Incident Report], or a child abuse report was made. *See* Exhibit 6 to Janci Decl., 30(b)(6) Deposition of Deborah Martin (hereinafter "Exhibit 6, Martin 30(b)(6) Dep."), 79:5–22. This is also consistent with the testimony of several Plaintiffs that youth grievance forms were often ignored, not escalated through the proper channels, or destroyed. *See infra* page 11.

A.M.W., 103:7–10), that Dr. Edwards was a "good man and a good doctor," that it was all "part of the [medical] process," (*Id.* at 103:17–24), and would even threaten to send youth to the CIU, MacLaren's solitary confinement unit, if they continued to complain. Exhibit 13 to Janci Decl., Deposition of E.C.R., 129:5–14.

And so, for decades, every youth who arrived at MacLaren was required to have a medical intake exam with Dr. Edwards—usually alone, behind closed doors, and without any warning of the danger they faced.

Now, the State of Oregon and named OYA leaders who supervised Dr. Edwards are moving the court for summary judgment against certain Plaintiffs' claims and arguing that Plaintiffs (vulnerable youth in the State's custody) should have known earlier what the State Defendants themselves ignored, denied and concealed—that Dr. Edwards was a sexual predator. State Defendants argue that they are too late.[2] In other words, OYA is publicly pronouncing that Plaintiffs' "personal stories . . . are heartbreaking" and that it "takes very real courage for victims and witnesses to come forward to describe their experiences, even years after the alleged abuses took place" and that "the Department of Justice has a responsibility to process these cases with care and humanity."[3] Meanwhile, State Defendants are quietly attacking Plaintiffs' claims and asking the Court to throw them out.

Moreover, in Defendants' motion, certain former OYA leaders who have been named as Defendants also disclaim any responsibility for supervising Dr. Edwards, despite that, for some, OYA's own records and testimony expressly identify them as Dr. Edwards' "supervisor."

---

[2] Plaintiffs were all under 40 years old at the time of filing and their claims would all be unquestionably timely if they had been abused in any private medical setting under Oregon's special civil statute of limitations for child abuse in ORS 12.117.

[3] Exhibit 14 to Janci Decl., "*Abuse ran rampant at Oregon Youth Authority facility, former staff say,*" Statesman Journal, (08/25/26).

As set out below, extensive evidence obtained in this case supports a finding that Plaintiffs' claims are timely and that the Defendants are properly included in these cases. Genuine issues of material fact exist that should be determined by a jury at trial starting November 2nd. Defendants' Partial Motion for Summary Judgment should be denied.

## **SUMMARY JUDGMENT STANDARD**

Defendants are only entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing whether a genuine issue of material fact exists, the Court "must view the evidence and all inferences therefrom in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations." *Hauk v. J.P. Morgan Chase Bank USA*, 552 F.3d 1114, 1117-18 (9th Cir. 2009). The Court must "determine whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact"). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson* at 255.

Here, Defendants fail to meet the standard for summary judgment under FRCP 56, and the Motion must be denied as a result.

## FACTUAL BACKGROUND

OYA became a separate agency in 1996. Exhibit 9, Jeske 30(b)(6) Dep., 26:5–11. MacLaren Youth Correctional Facility ("MacLaren") is the State's largest close-custody facility for boys and young men. OYA's corporate position is that "keeping youth safe was every staff member's responsibility," *id.* at 19:14–16, and that every individual on its organizational charts "had the responsibility for the safety of the youth in [OYA] custody." *See* Exhibit 15 to Janci Decl., 30(b)(6) Deposition of Cox (hereinafter, "Exhibit 15, Cox 30(b)(6) Dep."), 32:6–13. This included a responsibility to protect youth from sexual abuse by staff that extended to MacLaren Superintendents and agency Directors. Exhibit 16 to Janci Decl., Deposition of Defendant Gary Lawhead (hereinafter, "Exhibit 16, Lawhead Dep."), 46:9–15; Exhibit 17 to Janci Decl., Deposition of Defendant Michael Riggan (hereinafter, "Exhibit 17, Riggan Dep."), 89:7–11; Exhibit 18 to Janci Decl., Deposition of Defendant Robert Jester (hereinafter "Exhibit 18, Jester Dep."), 43:5–14 (former agency director testifying that "the buck stops at the top, so I assumed responsibility for everything that occurred with the agency").

Edward Gary Edwards, M.D., began working at MacLaren under OYA's predecessor agency in approximately 1977 and remained in the same physician position at MacLaren until 2017—roughly 40 years in total. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 125:12–15, 127:6–10. OYA has no information about the circumstances of his hiring or any vetting that preceded it. *Id.* 125:20-126:4. Dr. Edwards was one of the agency's only full-time-employee physicians. Exhibit 19 to Janci Decl., First Deposition of Defendant Dr. Marcia Adams (hereinafter "Exhibit 19, Adams Dep. Vol. I"), 110:1–11.

## I. THE STRUCTURE OF DR. EDWARDS' SUPERVISION

### A. Before 2007, Dr. Edwards Reported Through the Program Director to the Superintendent.

Prior to 2007, MacLaren's Superintendent (the top position at the facility level) was "where the buck stops" for "hiring, supervising, [and] monitoring the medical personnel at MacLaren"—Dr. Edwards "reported to the [MacLaren] program director and . . . through the program director to the [MacLaren] superintendent." Exhibit 15, Cox 30(b)(6) Dep., 26:18–27:14, 28:11–15. The full supervisory chain of command was as follows: "Dr. Edwards to his immediate supervisor, the program director at the MacLaren facility, then to the superintendent at the MacLaren facility, then to the assistant director at the agency and then to the director at the agency." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 132:15-22; *see also* Exhibit 16, Lawhead Dep., 135:13-20; Exhibit 20 to Janci Decl., Deposition of Defendant Philip Cox (hereinafter "Exhibit 20, Cox Dep."), 111:9–20. This structure remained until at least 2008 or 2009. Exhibit 15, Cox 30(b)(6) Dep., 52:6–10 ("[B]efore 2009, Dr. Edwards was supervised by the program director at MacLaren who was then supervised by the superintendent at MacLaren. Is that right?"— "Yes, that's correct.")

Each position in that chain of command was vested with the authority to request an investigation into staff misconduct and could "direct HR to begin a disciplinary or corrective action process[.]"Exhibit 8, Labarre-Bates 30(b)(6) Dep., 133:1–134:11. Each was "responsible for ensuring that Dr. Edwards was performing his role properly." *Id.* at 142:3–8. The decision maker on issues of staff discipline is "the supervisor or potentially someone within that supervisor's chain of command," including the superintendent, who becomes involved "when the concern is deemed egregious enough"—a category that "[t]ypically" includes sexual abuse of a youth. *Id.* at 78:23–80:2.

From 1995 until 2007, "OYA is not aware of any information indicating that anyone in Dr. Edwards' chain of command had medical training." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 142:9–21. When asked about who provided clinical supervision of medical, nursing, and psychiatric services before Dr. Adams arrived, OYA's designee answered: "No one. That's why she came." *See* Exhibit 15, Cox 30(b)(6) Dep., 38:24–39:8.

### B. After 2007, Supervision of Dr. Edwards Was Shared.

When OYA hired Dr. Adams in 2007, the expectation was that she immediately became Dr. Edwards' direct supervisor. Exhibit 8, Labarre-Bates 30(b)(6) Dep.,129:20–130:10; 137:18–138:8. However, Dr. Adams initially shared direct supervision of Dr. Edwards with the facility director until 2009. Exhibit 21 to Janci Decl., Second Deposition of Defendant Dr. Marcia Adams (hereinafter "Exhibit 21, Adams Dep. Vol. II"), 201:13–18. In 2009, OYA consolidated the agency's health services under Dr. Adams. Exhibit 15, Cox 30(b)(6) Dep., 35:9–13. However, even after that consolidation, former agency Director Robert Jester testified that responsibility for handling concerns about misconduct by employed medical staff "would be a combination of Dr. Adams and the superintendent." Exhibit 18, Jester Dep., 60:9–19. Similarly, OYA testified that "the agency's stance on PREA or any allegations of abuse [is] that it is the superintendent's responsibility to ensure that those follow-up actions occur." *See* Exhibit 9, Jeske 30(b)(6) Dep., 67:20–24. Dr. Adams described her own authority as only "partial[]" because "there was still some kind of overlap with the facility side as far as supervision," and testified she "could not impose discipline without discussing it with HR." *See* Exhibit 21, Adams Dep. Vol. II, 201:13–18, 207:2–7.

Even after Dr. Adams was hired, MacLaren's Superintendents were "typically the ones who would still receive complaints from youth or from frontline staff even if it was in regards to

a health services employee." *See* Exhibit 8, Labarre-Bates 30(b)(6) Dep.,138:18–139:14. That is consistent with the documentary evidence showing that, even after Dr. Adams' hiring, Superintendents at MacLaren received and participated in responding to youth allegations of sexual misconduct against Dr. Edwards. For example, Superintendent Riggan received the February 2009 complaint against Edwards by youth L.G. Exhibit 9, Jeske 30(b)(6) Dep., 161:1–5. The Superintendent also authored the "Director's Incident Report" on the allegations by youth C.E. against Dr. Edwards in October 2009, classifying it as "abuse or maltreatment of youth" with "high" media potential (Exhibit 17, Riggan Dep., 98:5–99:15, 103:10–21) and meeting with the complaining youth to tell him a nurse would be present for his future exams. *Id.* 118:11–119:6.

## II. THE CONDUCT AND THE CONDITIONS THAT ENABLED DR. EDWARDS ABUSE OF YOUTH AT MACLAREN

As a rule, Dr. Edwards did intake examinations on every youth that came through MacLaren, and, for many years, on every male youth that came into OYA's custody. Exhibit 22 to Janci Decl., OSP Interview of Dr. Edwards, March 12, 2007, 27:18–23. This amounted to thousands of examinations each year. *Id.* ("We see between 25,000 and 29,000 kids through the office there through the clinic a year.")

The standard intake examination at MacLaren called for a genital exam by the doctor. Exhibit 19, Adams Dep. Vol. I, 80:8–13; Exhibit 22, OSP Interview of Dr. Edwards, March 12, 2007, 7:21–11:2. These examinations occurred when youth were alone with Dr. Edwards in his own office, behind a closed door with the blinds drawn, so that "people from the outside could not see in, only if you were in the room during the exams could you see what was going on"—a

condition that persisted through 2017. *See* Exhibit 23 to Janci Decl., Deposition of Cindy Wadsworth, 34:11–18, 37:4–12.[4]

Contrary to generally accepted medical practice, throughout his tenure, Dr. Edwards brazenly fondled boys' genitals without gloves for an inordinate period of time. Exhibit 25 to Janci Decl.; Exhibit 26 to Janci Decl., Deposition of J.K.C. (hereinafter "Exhibit 26, J.K.C. Dep."), 79:7–10; Exhibit 10 to Janci Decl., Deposition of T.A.M., 84:22–85:1. And for many male youth, Dr. Edwards would conduct these so-called "testicular exams" on *every* visit. *See* Exhibit 27 to Janci Decl.. This included visits that were completely unrelated to any medical complaints that would call for a genital exam. *Id*.

Dr. Edwards also admitted to at least one fellow colleague in the medical clinic that he regularly penetrated boys' anuses with his bare fingers under the auspices of "prostate exams" so that he "could get a more accurate reading of a boy's prostate"—despite there being no legitimate medical reason to do so. Exhibit 19, Adams Dep. Vol. I, 144:21–145:18; Exhibit 28 to Janci Decl., Declaration of Dr. Orin Bolstad, ¶ 4. As discussed below, Dr. Edwards' conduct towards youth was well known to other staff and leaders at OYA—who did nothing effective to curb his abuse.

///

///

///

///

///

[4] This was also the testimony of all the Plaintiffs in this matter. *See e.g.* Exhibit 11 to Janci Decl., Deposition of A.M.W.,117:12–118:1; Exhibit 13 to Janci Decl., Deposition of E.C.R. 114:23–115:2; Exhibit 24 to Janci Decl., Deposition of B.W.H., 34:25–35:6.

## III. OYA'S NOTICE: THE CHRONOLOGY OF COMPLAINTS[5]

### A. The 1990s and December 2001: "Common Knowledge," Nurse Reports and the Zimmerman Report.

For two decades, Dr. Edwards was frequently referred to by some youth as "Dr. Cold Fingers." Unbeknownst to many youth, the nickname was also known to OYA staff, including nurses, who heard the nickname "[a]ll the time," including in the context of youth warning one another about Dr. Edwards before appointments. Exhibit 29 to Janci Decl., Deposition of Kim Berry, 86:22–88:19. Correctional staff at MacLaren "heard Dr. Gary Edwards widely referred to as 'Dr. Coldfingers' by both MacLaren youth and staff, ***beginning as early as 1993***." *See* Exhibit 2 to Janci Decl., Declaration of Tim Harding, ¶ 3 (emphasis added). Use of the nickname "Dr. Cold Fingers" for Dr. Edwards was "common knowledge among the staff." Exhibit 30 to Janci Decl., Declaration of Monica Johnson, ¶ 7. Darrell Strand, who worked at MacLaren in several roles from 1985 to 2013 or 2014, knew that "Dr. Edwards was frequently referred to by both youth and staff as 'Dr. Cold Fingers' or 'Dr. Feel Good.'" Exhibit 3 to Janci Decl., Declaration of Darrell Strand, ¶¶ 1, 4. He "understood the origin of this nickname to be from reports by youth that Dr. Edwards frequently used his ungloved hands to touch the genitals of youth during exams—even when such examinations were unrelated to the youths' medical needs." *Id.* at 4.

[5] All of these notice events (and evidence of Defendants' responses thereto) discussed herein occurred prior to the last incident of abuse alleged as among the plaintiffs remaining in this case. But even to the extent that some of these events occurred after the abuse of any particular plaintiff, they are still admissible. Federal Rule of Evidence 404(b)(2) allows admission of other acts (***including subsequent acts***) to prove "knowledge," "intent," and "absence of mistake." *See, e.g.*, *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991): *see also Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997), *as amended*, 137 F.3d 1372 (9th Cir. 1998) (holding that post-event evidence "may be highly probative" of a pre-existing policy or custom and that: "[w]hen a county continues to turn a blind eye to severe violations of inmates' constitutional rights—despite having received notice of such violations—a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference."). Post-event evidence is also relevant to Plaintiffs' claim for punitive damages. *Stranahan v. Fred Meyer, Inc.*, 153 Or. App. 442, 463, 958 P.2d 854 (1997)*, reversed on other grounds,* 331 Or. 38, 41 (2000) ("[i]n determining the ***propriety and amount of punitive damages***, a jury may consider subsequent similar misconduct on the part of a defendant").

Even Dr. Edwards' supervisors—including Cox and Dr. Adams—heard the nickname around MacLaren and understood it to mean he was not wearing gloves during genital exams. Exhibit 19, Adams Dep. Vol. I, 113:14–114:1; Exhibit 20, Cox Dep., 149:19–150:8.

In the 1990s, a MacLaren nurse reported abuse allegations and referenced the nickname "Dr. Cold Fingers" on multiple occasions to the head of security and her supervisor in the 1990s. Exhibit 31 to Janci Decl., Declaration of Edith Johnk at ¶¶ 2–4. Despite this, she never became "aware of any investigation of Dr. Edwards for any reason." *Id.* at ¶ 6.

Then, in December 2001, OYA employee Joni Zimmerman prepared a Director's Incident Report (intended for transmission to the head of the OYA) documenting that two youth complained in writing that Dr. Edwards touched their genitals without gloves; that he threatened to send one to solitary confinement if he did not submit and threatened the other with a disciplinary report; and that he did not wash his hands after touching the boys genitals. Exhibit 32 to Janci Decl. Zimmerman documented that she raised the issue with Defendant Brian Florip and learned that "the agency preferred to deal with situations such as this internally." *Id.* OYA has admitted that handling such a report internally "would be a violation of OYA policy," and there is no evidence of any report to law enforcement or DHS. Exhibit 9, Jeske 30(b)(6) Dep., 124:6–15, 127:13–128:8.

Based on Florip's instructions, Zimmerman never finished the report: "I started writing up, but never finished, because Brian [Florip] told me it was going to be dealt with." Exhibit 32 to Janci Decl. OYA can identify no record of any action taken by Florip. Exhibit 9, Jeske 30(b)(6) Dep., 117:17–118:2. No corrective action, no administrative investigation, and no administrative leave for Dr. Edwards followed. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 150:1–152:2.

**B. <u>2001–2004: The Oregon Medical Board Investigation, Lawhead's Unsolicited Letter of Support, and the 2004 Meeting with Edwards.</u>**

The Oregon Board of Medical Examiners opened an investigation into Dr. Edwards in March 2001. Exhibit 33 to Janci Decl. Its case summary from January 8, 2002, recites that the allegations included "[l]icensee allegedly conducted inappropriate genital exams on two young males, both of whom may be sexual abuse survivors," and that "[o]ther boys have objected to licensee's alleged touching of genitalia without gloves, possibly transmitting STDs and then sniffing his hand afterwards." *See* Exhibit 24 to Janci Decl. OYA was aware of the investigation—MacLaren Superintendent Gary Lawhead was copied on the Board correspondence. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 153:3–7.

In response, Superintendent Lawhead wrote to the Board on May 1, 2001, in defense of Dr. Edwards, extolling his "high level of medical care and professionalism"; the Board characterized the submission as "an unsolicited letter." Exhibit 35 to Janci Decl.; Exhibit 36 to Janci Decl.; Exhibit 37 to Janci Decl. Lawhead testified that involving himself in a licensing investigation of a staff member was not "ordinarily" part of his role, Exhibit 16, Lawhead Dep., 127:9–25, and he never spoke to any complaining youth, *id.* at 130:5–131:7. For his part, Dr. Edwards told the Board that he had never touched the genitals of one of the two complainants, that a male nurse is "usually in attendance" during genital exams, and implied, without explicitly saying it, that he wore gloves during such genital exams. Exhibit 36 to Janci Decl.

There is no evidence that OYA informed the medical board of the prior similar complaints that had been reported by OYA staffers, such as Johnk or Zimmerman. OYA conducted no investigation of its own into these youths' allegations. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 152:3–153:19. It did not conduct any parallel administrative investigation, did not

interview Dr. Edwards, did not interview the staff who had complained to the Board, took no corrective action, and never confirmed the Board's outcome with the Board. *Id.*

The issues related to Dr. Edwards' abuse of youth came to a head again relatively quickly after the OMB investigation. In approximately 2004, MacLaren program director George Covey and nursing supervisor Debbie Milne Crabtree met with Dr. Edwards about allegations of "conducting inappropriate medical exams, and not using medical exam gloves" on "other MacLaren Youth." *See* Exhibit 38 to Janci Decl. In later relaying information about that meeting to police, Nurse Supervisor Crabtree also reported that it was "***common [for Dr. Edwards] to do the 'turn your head and cough test' every visit***." *Id*. (emphasis added). OYA confirmed no investigation and no corrective action arose from these allegations. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 198:18–199:6 and 201:12–202:19.

### C. <u>2005 And 2006: Two Outside Reports of Sexual Abuse, No Internal Response.</u>

On May 18, 2005, a caller reported to the DHS child abuse hotline that a MacLaren youth (referred to herein as "C.C.") was receiving prostate or hernia checks from Dr. Edwards "every time he went in no matter what the concern," for "the past two years"; the screening narrative concludes that the youth "is ***disclosing possible sex abuse happening at MacLaren***." Exhibit 27 to Janci Decl. (emphasis added). In addition, on May 24, 2005, Amy Miller, HelpLine Coordinator, and Julie McFarlane, Senior Attorney, from the Juvenile Rights Project, Inc., wrote a letter to Marion County Child Abuse Reporting (copying Superintendent Lawhead) reporting that every clinic visit involved Dr. Edwards touching the youth's genitals and that other youth had similar concerns, and that as a result "other youth under the age of 18 at MacLaren may be at risk." *See* Exhibit 39 to Janci Decl. OSP investigated a potential charge of Sexual Abuse in the First Degree over six months, during which time Dr. Edwards was *not* placed on leave, and no

restrictions were imposed on his access to youth. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 161:23–164:23. When OSP declined to prosecute, OYA undertook no administrative investigation of its own, interviewed no other youth, and reviewed no other charts. *Id.*

Then, in February 2006, a MacLaren youth (referred to herein as "C.G.") submitted a written grievance to MacLaren Program Manager Covey describing a genital examination by Dr. Edwards with no chaperone and no gloves in which he felt sexually violated. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 164:24–165:10. OSP investigated a charge of Sexual Abuse in the Third Degree. *Id.* at 165:19–22. Again, there is no evidence that Dr. Edwards was placed on administrative leave, and OYA undertook no investigation of its own. *Id.* at 165:11–166:4.

OYA created its internal investigation unit (the "Professional Standards Office") in 2006. Exhibit 9, Jeske 30(b)(6) Dep., 31:13–22. That December, Zimmerman reported to PSO Investigator Jason Barber her "longstanding concerns" arising from youth complaints of ungloved genital touching by Dr. Edwards, and that she had raised the same concerns in 2001 with Defendant Brian Florip. Exhibit 40 to Janci Decl. The report records that Defendant Phil Cox "stated that there had actually been a complaint filed against Dr. Edwards to the [medical] board," Exhibit 9, Jeske 30(b)(6) Dep., 117:3–16, and that Defendants Phil Cox and Brian Florip would "talk to the doctor about this issue coming up again," with Cox to "document his conversation" and send PSO a copy. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 169:7–18. No corrective action followed. *Id.* at 170:21–172:6.

### D. <u>February–March 2007: "J.S." Reports Sexual Abuse by Dr. Edwards.</u>

In February 2007, former MacLaren youth (referred to herein as "J.S.") reported that during a purported medical examination Dr. Edwards was alone with him behind a closed door, told him to lie down, and "[w]ithout warning, reached his hand under his sweatpants and grabbed

his penis," ungloved; three or four youth in the intake tent then described their own experiences and referred to Dr. Edwards as "Dr. Cold Fingers." Exhibit 9, Jeske 30(b)(6) Dep., 144:17–146:3; Exhibit 41 to Janci Decl. PSO Investigator Barber recognized "a potential criminal violation"—"[p]otentially sexual abuse of a minor"—and reported to OSP. Exhibit 42 to Janci Decl., Deposition of Jason Barber (hereinafter "Exhibit 42, Barber Dep."), 128:25–129:5. Dr. Edwards was placed on administrative leave—the only time across more than 15 written youth reports and countless verbal reports over several decades at OYA. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 209:1–3; *see also id.* at 161:23–162:4, 165:11–18, 182:23–183:3, 184:24–185:5, 197:10–198:9.

However, OYA did not tell OSP about the prior allegations—not the grievances from the 1990s, the 2001 Zimmerman report, the Oregon Medical Board matter, or the 2005 hotline call and letter—although OYA has admitted that supplying that history "would be an important part of PSO's role in acting as a liaison to the Oregon State Police." Exhibit 9, Jeske 30(b)(6) Dep., 146:22–147:9, 157:5–14. Thereafter, the agency director intervened to accelerate the criminal inquiry, instructing Barber "to request and see if there's any way that OSP can expedite this investigation," and that "our director, Bob Jester, has offered to call any appropriate representative at OSP." *Id.* at 148:22–149:6; Exhibit 43 to Janci Decl. OYA admits that was an uncommon request. Exhibit 9, Jeske 30(b)(6) Dep., 151:25–152:7.

While the OSP email establishes that Florip, Jester, Cox, and Humphreys were all aware of these allegations (*see, e.g.*, Exhibit 44 to Janci Decl.), OYA conducted no administrative investigation when OSP found there was "not enough prosecutorial evidence," and Barber issued a letter calling the allegations "unsubstantiated" and stating that "no additional action will be taken at this time." Exhibit 9, Jeske 30(b)(6) Dep., 154:7–156:17. This occurred despite OYA's

clear written policy that "[i]f a criminal investigation is initiated, PSO will conduct an administrative investigation at the conclusion." Exhibit 45 to Janci Decl.

OYA leaders made no policy change and adopted no monitoring mechanism going forward. *See* Exhibit 9, Jeske 30(b)(6) Dep., 158:11–17. Despite the C.C. investigation, C.G. investigation, J.S. investigation, the OMB investigation, and two Zimmerman reports, there is no evidence that OYA undertook "any other type of larger scale investigation, chart review, anything along those lines to determine if there was a larger problem with Dr. Edwards." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 177:11–24 ("I do not recall seeing any documents in the HR side of things indicating such").

### E. <u>2009: The "L.G." Complaint, Directives from Dr. Adams, and the "C.E." Complaint.</u>

In February 2009, a youth (referred to herein as "L.G.") and his mother reported ungloved genital touching by Dr. Edwards, that other youth had similar experiences, and other youth used the phrases "the Dr. Edwards treatment" and "Dr. Cold Fingers." Exhibit 9, Jeske 30(b)(6) Dep., 160:7–18. In discussing a response to these reports, PSO investigator (and OYA's first PREA Coordinator) Monica Moran documented historical staff concerns about Dr. Edwards "dating back to 2001." Exhibit 46 to Janci Decl. Moran would later leave her role as PREA Coordinator, in part because some MacLaren leadership, including superintendent Mike Riggan, often did not believe youth complaints against staff—including allegations against Dr. Edwards. Exhibit 47 to Janci Decl., Deposition of Monica Moran, 44:21–46:3; 48:2–52:5; 74:5–21.

Recipients of Moran's email included Defendants Riggan, Adams, Cox, Palmateer, and others. *Id.* at 160:25–161:5. In response, Defendant Phil Cox directed that "[i]t is appropriate for Dr. Adams to take the lead on this"—OYA has admitted Cox was "direct[ing] Dr. Adams to conduct the investigation." Exhibit 48 to Janci Decl.; Exhibit 9, Jeske 30(b)(6) Dep., 164:12–14;

Exhibit 17, Riggan Dep.,86:9–12. OYA coded the complaint "CPT" type file (rather than "CS"), so no in-depth investigation was triggered, and Moran closed it as "a performance issue of the concern of him not wearing gloves during an exam." Exhibit 9, Jeske 30(b)(6) Dep., 161:6–21. Dr. Edwards not wearing gloves while touching boys' genitals was "substantiated." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 178:23–180:6. Still, no one reported it to law enforcement, DHS, or the Medical Board, and no one interviewed the other youth identified. Exhibit 9, Jeske 30(b)(6) Dep., 161:22–162:12.

Dr. Adams then issued two directives. She reported spending "a long time with Dr. Edwards debating the issue about him wearing gloves for testicular exams," that he "has very strong opinions on this," and that he had done "genital exams" on male youth without gloves "for over 30 years"; Adams wrote that "[f]or his protection . . . for the protection of youth and for the protection of the agency I want him to wear gloves on all genital exams." Exhibit 20, Cox Dep., 131:16–21; Exhibit 17, Riggan Dep., 92:18–93:6. Her chaperone directive was categorical—"a nurse be present in the room for all—for the whole visit," for "[e]very visit." Exhibit 19, Adams Dep. Vol. I, 159:11–15. Dr. Edwards refused; in November 2009, Dr. Adams reported to human resources that "Dr. Edwards had expressed that he is not in agreement with the plan," and that she was "concerned" and "bothered" by his resistance. Exhibit 49 to Janci Decl.

Even then, despite all the previous reports and despite Dr. Edwards' clear indications of unwillingness to change his behavior, Dr. Adams required no documentation of chaperone or glove use (Exhibit 19, Adams Dep. Vol. I, 155:15–20, 160:5–11); imposed no monitoring or audit (Exhibit 21, Adams Dep. Vol. II, 267:20–23); used no corrective action or discipline (*id.* at 262:2–16, 285:21–286:1); imposed no restriction on his participation in genital or rectal

examinations of youth (*id.* at 286:7–11); adopted no written chaperone policy before his departure (*id.* at 286:2–6); never observed an examination or audited his charts (*id.* at 284:7–25); never reported him to law enforcement, DHS, or the Medical Board (*id.* at 283:17–284:6); and documented nothing about gloves or chaperones in his performance appraisal or to her own supervisor (Exhibit 19, Adams Dep. Vol. I, 177:10–12; Exhibit 21, Adams Dep. Vol. II, 204:5–9).

Seven months later, another youth ("C.E.") filed a grievance to the superintendent stating that he "felt sexually violated," that Dr. Edwards "touched my buttocks and told me he was going to give me a proctol [sic] exam when I was there for a bruised tailbone," said "I'm going to stick my finger in your butt," and "insisted that I lay my head down and let him do it." Exhibit 17, Riggan Dep., 105:8–16; Exhibit 9, Jeske 30(b)(6) Dep., 168:9–25. Riggan's Director's Incident Report routed the matter to the agency Director and cabinet, including Defendant Peters and Defendant Pakseresht. Exhibit 9, Jeske 30(b)(6) Dep., 169:18–170:8. It was nonetheless coded "CPT" (i.e. not warranting a full investigation) and closed as "inconclusive." *Id.* at 174:6–175:6. OYA's designee confirmed that "PSO did not conduct an investigation into alleged child sexual abuse in this instance." *Id.* at 174:13–176:8. Dr. Adams' reaction at the time confirmed that her own directive from seven months earlier was already being ignored: "it should have been a given that a nurse should have been in the room from the start." Exhibit 19, Adams Dep. Vol. I, 163:5–9, 169:6–13. Superintendent Riggan assured the complaining youth a nurse would be present going forward but did not recall taking any action to ensure that occurred. Exhibit 17, Riggan Dep., 118:11–119:11.

PSO investigator Jason Barber documented the "current directive" as of 2009—that Dr. Edwards would have a "nurse present during all exams" going forward—for the stated purpose

of "protect[ing] *Mr. Edwards* from further unsubstantiated complaints." Exhibit 42, Barber Dep., 167:16–25. Barber voiced OYA's hope that eventually, as youth "move through the system . . . that rumor mill and gossip amongst the youth would eventually decrease." *Id.* at 168:12–169:2.

### F. <u>2012–2013: Three More Complaints and Evidence that OYA's Directives Were Never Implemented.</u>

In August 2012, a youth alleged Dr. Edwards touched his genitals without gloves. Exhibit 9, Jeske 30(b)(6) Dep., 180:6–12. PSO routed the complaint to Dr. Adams and copied Superintendent Thompson. *Id.* at 181:5–11. Although OYA has admitted that such an allegation "could be" child sexual abuse requiring a full investigation, here again OYA "made the determination out of the gate that that could not be a child abuse allegation"—despite then knowing of multiple youth reports of feeling sexually violated and its own prior classification of allegations against the same physician as potential child sexual abuse. *Id.* at 181:13–183:21. Dr. Adams delegated the inquiry to a nursing supervisor, who roughly forty minutes later emailed Dr. Edwards himself asking for "any information you can provide regarding this serious allegation"; no one pulled the youth's chart or interviewed witnesses first. *Id.* at 184:4–187:17. The complaint was closed "[u]nfounded, no evidence of abuse or neglect," which OYA characterized at deposition as "a performance issue with the doctor . . . not wearing gloves." *Id.* at 188:21–189:11.

Then, in July 2013, a youth complained that Dr. Edwards performed unnecessary prostate checks on numerous youths and conducted two "testicular cancer checks" on him close in time. Exhibit 9, Jeske 30(b)(6) Dep., 194:6–17. Dr. Adams asked nurse manager Cecile Mukandekwe to review the chart; Mukandekwe reported back to Adams that she did so and found no documentation of a chaperone and no indication of a testicular exam on July 22, 2013. Exhibit 50 to Janci Decl. For his part, Dr. Edwards admitted he had performed both testicular exams and

claimed he did so with a chaperone documented both times; despite the contradiction to their own chart review, PSO relied on Dr. Edwards' account. Exhibit 51 to Janci Decl. OYA took no action on the contradiction (Exhibit 9, Jeske 30(b)(6) Dep., 201:18–24) and human resources made no effort to investigate the discrepancy. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 184:15–23. Dr. Adams testified it "did not occur to me that he was lying" because "Dr. Edwards was a respected physician at MacLaren," did not alert PSO about the contradiction, and did not recall interviewing the nurses Dr. Edwards named as chaperones. Exhibit 21, Adams Dep. Vol. II, 242:13–25, 246:12–20.

About 90 days later, yet another youth complained about Dr. Edwards—this time reporting that Dr. Edwards grabbed his hips twice while they were alone. Exhibit 9, Jeske 30(b)(6) Dep., 205:2–206:12. Unlike the ungloved-genital-touching complaints, this one was coded "harassment, sexual behavior, inappropriate touching by medical staff on youth" and triggered a full investigation; OYA's designee could not explain the disparate treatment. *Id.* at 206:13–24. OYA's PSO investigator determined "that in fact no one was in the room with Dr. Edwards when the hip grabbing incidents happened"—a clear violation of the longstanding chaperone directive; yet, despite their coding the incident as involving "sexual behavior, inappropriate touching by medical staff on youth," OYA did not report the allegation to law enforcement or DHS. *Id.* at 207:18–209:13.

That same month, Dr. Adams learned her 2009 chaperone directive had never been implemented or enforced. Nurse supervisor Crabtree told Adams that she only "started the practice yesterday"—and now had "[a] nurse is sitting ***in a chair outside of his office*** at the doorway ***as he said that you agreed to that***." Exhibit 21, Adams Dep. Vol. II, 262:18–24 (emphasis added). Dr. Adams testified that was not her directive, that Dr. Edwards had told the

nursing staff she agreed to something she had not, and that she was concerned, but she did nothing about it. *Id.* at 265:6–266:10. She took no corrective action and instituted no monitoring plan. *Id.* at 262:6–16, 267:20–23, 285:21 –286:1. When asked why four years of resistance by Dr. Edwards to having another adult in the room did not cause her to consider that the youth complaints about sexual abuse might be true, she answered that "the mindset back then was that Dr. Edwards had been at the agency for years, started the agency, cared about youth, [and] got the NCCHC to accredit MacLaren." *Id.* at 268:8–17.

Weeks later, on November 25, 2013, OYA issued Dr. Edwards a final disposition advising that "[i]nvestigation and review of all information currently available to this office indicates you have followed appropriate agency policies and procedures." Exhibit 52 to Janci Decl. When asked whether that statement encompassed the chaperone directive, OYA's designee answered: "Based off of this final disposition, it appears that it was deemed that all appropriate agency policies and procedures were followed." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 197:5–197:8. No disciplinary action was taken against Dr. Edwards for failure to follow Dr. Adams' chaperone directive. *Id.* at 201:20–202:2.

### G. <u>2014–2017: The Complaints Continue.</u>

In September 2014, nurse Stacy Tolich wrote to Dr. Adams that "nurses and staff have voiced their opinions about their concerns regarding Dr. Edwards for a while to each other, but none want to share those with management." Exhibit 53 to Janci Decl. Tolich indicated she had observed concerning conduct by Dr. Edwards that the youth would likely report to PSO and wanted to talk with her about it. *Id.* Dr. Adams waited 11 days for a meeting, did nothing about Dr. Edwards' access to youth in the interim, and afterward did nothing beyond telling Tolich she could contact human resources. Exhibit 21, Adams Dep. Vol. II, 274:4–21.

In September 2016, a youth alleged that Dr. Edwards pressed his genitals against him three times and cupped his buttocks for about a minute during an eye examination, while they were alone. Exhibit 9, Jeske 30(b)(6) Dep., 210:1–6, 211:19–24. Dr. Adams agreed an eye exam would require neither. Exhibit 21, Adams Dep. Vol. II, 275:5–13. The incident was reported to Superintendent Berger and PSO investigator Bergin (among others); Bergin then wrote Berger and others proposing an OSP report "to cover our bases." *Id.* at 276:11–277:11. Dr. Adams' immediate response to Cox was: "Phil, this does not sound plausible." Exhibit 20, Cox Dep., 140:2–3. This, despite that OYA "relied on Dr. Adams as his immediate supervisor to conduct the investigation" and agreed a "fair and sufficient investigation" requires "a neutral stance." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 49:10–17, 199:7–17. Dr. Adams has admitted that she did not consider the prior allegations in concluding that the allegations were "not plausible." Exhibit 21, Adams Dep. Vol. II, 279:20–281:15. She gave no consideration to the possibility that Dr. Edwards might be targeting vulnerable youth. *Id.* at 280:17–282:6. Again, no leave or discipline was imposed, the complaint was deemed unfounded, and no corrective action instituted. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 197:10–198:17.

In 2017, when Dr. Edwards indicated his intent to voluntarily retire from his employment with the Oregon Youth Authority, Dr. Adams explored with him whether he was open to staying on longer to see the agency through the NCCHC reaccreditation process. Exhibit 21, Adams Dep. Vol. II, 290:17–291:8.

## IV. OYA'S STATED STANDARDS—AND ITS DEPARTURES FROM THEM

The result is that across 16 years and every papered complaint, OYA never disciplined Dr. Edwards. When asked to consider the whole history, OYA's official spokesperson testified as follows:

QUESTION: "[Across] the events in 2001, the Joni Zimmerman report, the hostile work environment report, the Joni Zimmerman report, the [C.G.] report, the [C.C.] report, the [L.G.] report, the [C.E.] report, or the reports in 2012 or 2013 or 2014 or 2016, ***are you aware of OYA ever subjecting Dr. Edwards to discipline?***"

ANSWER: "**I do not recall seeing disciplinary action in his file**."

Exhibit 8, Labarre-Bates 30(b)(6) Dep., 198:18–199:6. Dr. Edwards was never disciplined for touching youths' genitals without gloves, for doing so without a chaperone, for digitally penetrated boys' anuses, or for ignoring his supervisor's directives. *Id.* at 201:12–202:19. The performance appraisals were correspondingly silent; none mention any allegation of sexual misconduct, none reference the glove complaints, none reference the chaperone directive, and none reference the PSO investigations. *Id.* at 206:20–207:21. This, despite the purpose of such performance appraisals being to document "areas for improvement" so that "supervisors can track the progress over time." *Id.* at 206:11–19.

## V. FACTS REGARDING THE INDIVIDUAL DEFENDANTS MOVING FOR DISMISSAL OF CIVIL RIGHTS CLAIMS

### A. <u>Darrin Humphreys.</u>

Humphreys was MacLaren Superintendent from February 1 to June 8, 2007. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 137:3–7. The State asserts there is "no specific allegation of any report to Humphreys of conduct by Dr. Edwards." Defendants' MPSJ at 21. The record is otherwise. OYA has conceded he occupied a supervisory position; when asked whether, as superintendent "for part of 2007, in that position, he would have been in Dr. Edwards' chain of command," OYA's designee answered, "Yes." *Id.*; *accord* Exhibit 15, Cox 30(b)(6) Dep., 28:11–20, 52:6–10. The J.S. child abuse investigation fell squarely within his tenure, and the OSP email chain was circulated to Florip, Jester, Cox, ***and Humphreys***. Exhibit 9, Jeske 30(b)(6) Dep., 146:14–21. On March 19, 2007, PSO Investigator Barber "hand delivered a PSO final

disposition letter to [Darrin] Humphrey's assistant at MacLaren in order to hand to Doctor upon his return to work"—a letter related to a child sexual abuse allegation against the physician at the facility Humphreys was then running, delivered through his own office. Exhibit 42, Barber Dep., 144:9–17.

### B. <u>Isidro Thompson and Daniel Berger.</u>

Thompson was MacLaren Superintendent from March 2010 to September 2013; Berger from March 2013 to early 2025. Thompson was copied on the August 2012 complaint of ungloved genital touching, which was closed as "unfounded" as a glove "performance issue" after the only investigative step taken was an email to Dr. Edwards himself. Exhibit 9, Jeske 30(b)(6) Dep., 180:6–11, 184:4–189:11. The July and October 2013 complaints, the contemporaneous discovery that the chaperone directive had never been implemented and that Dr. Edwards had misrepresented it to nursing staff, and OYA's November 25, 2013, letter certifying that he "followed appropriate agency policies and procedures" all arose during their tenures. *Id.* at 194:6–17, 205:2–206:12; Exhibit 21, Adams Dep. Vol. II 262:18–266:14; Exhibit 52 to Janci Decl. Berger was a direct recipient of the September 2016 allegations: an OYA staffer (Gunderson) reported to him, and Bergin then wrote Berger directly proposing an OSP report "to cover ***<u>our</u>*** bases." Exhibit 21, Adams Dep. Vol. II, 276:22–277:11. The 2016 Tolich report also fell within his tenure. *See id.* at 271:6–272:14. As to the contention that the 2009 centralization of the agency's health services stripped MacLaren's superintendents of authority, OYA's director testified that responsibility for medical-staff misconduct after Dr. Adams' arrival "would be a combination of Dr. Adams and the superintendent" (Exhibit 18, Jester Dep., 60:9–19) and its corporate designee on PSO investigations testified that "it is the superintendent's

responsibility to ensure that those follow-up actions occur," (Exhibit 9, Jeske 30(b)(6) Dep., 67:20–24).

### C. Philip Cox.

Cox served as Program Coordinator (1995–1999), Health Services Administrator (1999–2007), Assistant Director of the Program Office (2007–2009), and Assistant Director for Community Resources (2009–2016). Exhibit 15, Cox 30(b)(6) Dep., 21:18–30:18. The State asserts he "never had supervisory authority over any doctors employed by the state." Yet, as Health Services Administrator, Cox admits he had "administrative responsibilities for all of" the agency's medical, mental health, dental, and addiction service areas, including hiring, contracting, policy, and training. Exhibit 20, Cox Dep., 31:11–21, 34:16–24.

OYA's own head of human resources identified him as Dr. Edwards' supervisor. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 174:6–11. The February 2007 letter placing Dr. Edwards on administrative leave during the OSP child abuse investigation instructed: "If you have any questions concerning your status during this paid administrative leave, ***please call your supervisor, Phil Cox***." Exhibit 54 to Janci Decl. (emphasis added). It was signed by Mary Lenz, manager of OYA employee services at the time. *Id*. When shown that letter, OYA admitted Cox was one of Dr. Edwards' supervisors. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 173:23–174:16 (asked whether OYA contests "that Phil Cox was one of the Dr. Edwards' supervisors during this period," she answered, "[i]t appears that, yes, he was . . . . [I]t does indicate that Phil Cox was the supervisor.").

OYA also testified that in February 2009, "Mr. Cox directed Dr. Adams to conduct the investigation" of the L.G. complaint. Exhibit 9, Jeske 30(b)(6) Dep., 164:12–14; *see also* Exhibit 17, Riggan Dep., 86:9–12 (former superintendent Riggan read the email chain the same way).

Cox was also a recipient of or participant in the many of the key notice events across Dr. Edwards' entire tenure. Exhibit 9, Jeske 30(b)(6) Dep., 117:3–16; Exhibit 8, Labarre-Bates 30(b)(6) Dep., 169:7–18; Exhibit 9, Jeske 30(b)(6) Dep., 146:14–21; Exhibit 20, Cox Dep., 121:15–18, 131:16–21; 135:10–136:11; 137:13–140:5. OYA also conceded that Cox "is an agent of OYA" and that "OYA knew what Mr. Cox knew." Exhibit 9, Jeske 30(b)(6) Dep., 221:2–10.

## VI. ADDITIONAL FACTS BEARING ON CONCEALMENT AND ESTOPPEL

First, OYA elected to handle child abuse allegations internally. The 2001 Zimmerman report documents that the agency was aware of "our responsibility as mandatory reporters" but that the "agency preferred to deal with a situation such as this internally." Exhibit 9, Jeske 30(b)(6) Dep., 120:12–16; Exhibit 42, Barber Dep., 111:23–112:5. This, despite that the agency's own written policy from 2000 required reporting child abuse allegations to law enforcement or child protective services and completing a YA26 form. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 38:16–41:22. OYA has conceded that handling complaints of child sexual abuse against Dr. Edwards internally "would be a violation of OYA's policy." Exhibit 9, Jeske 30(b)(6) Dep., 123:18–124:12.

Second, when outside authorities were notified, OYA withheld the prior complaint history from the authorities investigating. As previously mentioned, OYA did not disclose the 2001 youth complaints to Zimmerman during the 2002 OMB investigation; instead, it defended Dr. Edwards. It also did not disclose the prior allegations when it referred the J.S. matter to OSP in 2007, though its designee agreed that supplying them was part of PSO's liaison role and that any investigation "should have considered prior allegations against Dr. Edwards." *Id.* at 146:22–147:9, 157:1–14. There is no record of any such disclosures during any later contacts with law enforcement or DHS.

Third, OYA recharacterized sexual abuse allegations as "performance matters" and closed them as unfounded, with the result that no complaint was ever substantiated and Dr. Edwards was never disciplined. *See supra* Sections III.E–F, IV. Each complaining youth was told in substance that his report was not borne out; Riggan was directed to "close[] the loop" with youth C.E. by speaking "in very general terms about the allegation and the investigation and the follow-up." Exhibit 17, Riggan Dep., 115:3–11. OYA also represented to complaining youth that protective measures were in place when they were not. Riggan told C.E. in November 2009 that "in the future Dr. Edwards would have a nurse present for these types of exams," *id.* at 118:11–119:6, when Dr. Edwards had already refused the chaperoning plan, no documentation was required, and no monitoring mechanism was instituted. Exhibit 21, Adams Dep. Vol. II, 203:8–18, 267:13–23. Four years later (in 2013) the nurse supervisor confirmed that practice had only just been started. *Id.* at 262:18–266:14. Even then, it only involved a nurse merely "sitting in a chair outside of [Dr. Edwards'] office at the doorway." *Id.*

Fourth, the conduct occurred in a space no one could observe, and OYA created no record from which it could be reconstructed. Neither chaperone presence nor glove use was required to be documented, Exhibit 19, Adams Dep. Vol. I, 155:15–20, 160:5–11; chart documentation of chaperones was in fact "being omitted," Exhibit 55 to Janci Decl.; and Dr. Adams never audited his charts, never observed an examination, and never reported him to any external authority, Exhibit 21, Adams Dep. Vol. II, 283:17–284:25. Nor did the agency's records preserve what did occur. And the failure to discipline preserved Dr. Edwards' access to youth: OYA's designee agreed that a staff member not disciplined after an allegation "would still have access to youth," and that this "could potentially create a safety issue for all the youth at the facility." Exhibit 8, Labarre-Bates 30(b)(6) Dep., 119:5–19.

## MEMORANDUM

### I. PLAINTIFF J.K.C.'S CLAIMS ARE TIMELY

The Ninth Circuit has recently "highlight[ed] the importance of careful application of the statute of limitations in sexual assault cases." *St. Clair*, 154 F.4th at 1156. Here, a genuine issue of material fact exists as to the timeliness of the claims of Plaintiff J.K.C.[6]—both as to his federal civil rights claims and his Seventh Claim for Relief against OYA for direct battery against OYA. Those are the only claims at issue in Defendants' ***partial*** motion for summary judgment. In other words, even granting Defendants' motion in entirety would not reach J.K.C.'s claims for Negligence, Sexual Battery of a Child (*Respondeat Superior*), or Constructive Fraud.[7] Still, for the reasons set out below, Defendants' motion for summary judgment must be denied.

#### A. Plaintiff's Federal Civil Rights Claims Are Timely.

Plaintiffs have brought claims against the Individual (Supervisory) Defendants under 42 U.S.C. §1983 for violations of their civil rights (i.e. constitutional injuries), specifically,

---

[6]Although State Defendants initially moved for summary judgment against the claims of T.A.M., R.L.M., A.M.W. and E.C.R., those Plaintiffs' claims have since been resolved in their entirety. Defendants' motions as to T.A.M., R.L.M., A.M.W. and E.C.R. are therefore moot and should be denied.

[7] Although Defendants make one passing erroneous reference to its motion on statute of limitations grounds being aimed at "all claims," (Defendants' Motion for Partial Summary Judgment, ECF No. 65 (hereinafter "Defendants' MPSJ") at 1) that is contrary to the remainder of Defendants' motion (which makes no argument as to the untimeliness of Plaintiffs' other claims, including, for example, the Fifth Claim for Relief ("Sexual Battery of a Child (Respondeat Superior)") or Sixth Claim for Relief ("Constructive Fraud"). It is also contrary to Defendants' express representations at conferral, which included confirming that Defendants were not moving against any of Plaintiffs' state law claims. Janci Decl. at ¶ 3. Defendants have the initial burden on a summary judgment motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying …[the record evidence] which it believes demonstrate the absence of a genuine issue of material fact.") Here, Defendants have not carried their initial burden of production as to Plaintiffs' other claims for relief and Plaintiffs (as the nonmovant) have no obligation to produce evidence in support of those claims. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000) (internal citations omitted) ("[T]he moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. . . . ***If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial***. In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything") (emphasis added).

Plaintiffs' Second Claim for Relief ("Violation of the 14th Amendment—Supervisory Liability and Failure to Protect Adjudicated Youth") and Third Claim for Relief ("Supervisory Liability and Failure to Protect Convicted Youth – 8th Amendment Violation"). *See* Plaintiff's Second Amended Complaint, ECF No. 53 (hereinafter "SAC"), ¶¶ 139, 162. Defendants have moved for summary judgment in their favor on their First Affirmative Defense: that "Plaintiffs failed to commence the case within the statute of limitations." *See* Defendants' Answer to Plaintiffs' Second Amended Complaint, ECF No. 61 at ¶ 74.

### i. *Overview of Federal and State Law Implications in Determining Timeliness of Civil Rights Claims.*

Determining the timeliness of a federal civil rights claim involves interplay between federal and state law:

> [W]hether a claim under 42 U.S.C. § 1983 is timely depends on a combination of state and federal law that determines (1) the length of the applicable limitations period, (2) the accrual date of the claim, and (3) whether the limitations period was tolled. A combination of state and federal law influences this inquiry because although 42 U.S.C. § 1983 provides for a federal cause of action, "federal law looks to the law of the State in which the cause of action arose" in several respects.
>
> The first issue, the length of the statute of limitations, is determined by state law. "It is that which the State provides for personal-injury torts." *Id*. . . . The second issue, the accrual date, "is the date on which the statute of limitations begins to run." "[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law.". . . The third issue, whether the limitations period was tolled for a § 1983 action, is generally governed by state law."

*Wilson v. Hays*, 228 F. Supp. 3d 1100, 1107–08 (S.D. Cal. 2017) (internal citations omitted).

In civil rights cases arising from events in Oregon, district courts "borrow[] Oregon's residual two-year statute of limitations for personal injury actions. Or.Rev.Stat. § 12.110." *Bonneau v. Centennial Sch. Dist. No. 28J*, 666 F.3d 577, 580 (9th Cir. 2012).[8] Here, even

[8] Plaintiffs maintain that an expansion of law to allow the application of ORS 12.117 as the borrowed statute of limitations for these civil rights claims is warranted here. The central concerns—about "uncertainty" as to which

assuming the Court borrows Oregon's residual two-year statute of limitations for personal injury actions, there are still issues of fact as to the accrual and tolling of the statutes of limitations on Plaintiff's claims.

*a. Accrual of Civil Rights Claims (Generally) Requires a Plaintiff to Discover the Causal Role the Defendant Played in His Constitutional Injury.*

As to accrual, "the discovery rule has been observed as a matter of federal law." *Bibeau v. Pac. Nw. Rsch. Found. Inc.,* 188 F.3d 1105, 1108 (9th Cir. 1999) "[A] Section 1983 claim accrues 'not just when the plaintiff experiences the injury,' but 'when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury ***and the cause of that injury***.' This discovery rule incorporates 'some flexibility.'" *St. Clair v. Cnty. of Okanogan*, 154 F.4th 1154, 1160 (9th Cir. 2025) (internal citations omitted) (emphasis added). The Ninth Circuit's recognition that accrual requires discovery of the cause of the injury is well established. *See Bonneau* at 581 ("a claim accrues not just when the plaintiff experiences the injury but when the plaintiff knew or in the exercise reasonable diligence—should have known of the injury ***and the cause of that injury***").

It is also well established that, in claims involving multiple harm-causing actors, discovery of "the cause" of the constitutional injury means understanding the causal role that each named supervisory defendant played in the injury. Years before the Ninth Circuit's most recent discussion in *St. Clair*, the Oregon Supreme Court analyzed what was required for accrual of a sexually abused youth's federal civil rights claims against the Oregon Youth Authority in *J.M. v. Oregon Youth Authority*, 434 P.3d 402, 407–08 (Or. 2019). There, the Oregon Supreme

state statute of limitations is most analogous—is not present here. These are cases related to acts of child abuse (or "conduct knowingly allowing, permitting or encouraging child abuse") and Oregon's special extended statute of limitations for child abuse under ORS 12.117 is clearly the most analogous.

Court reiterated its prior analysis of accrual of civil rights claims in *T.R. v. Boy Scouts of America and City of The Dalles*, 181 P.3d 758 (Or. 2008):

> [The Oregon Supreme Court] considered in *T. R.* the question of when accrual began for the plaintiff's section 1983 action against a city for a city police officer's sexual abuse of the plaintiff. Contrary to defendant's argument, *T. R.'s* holding that ***a section 1983 claim accrues when a reasonably prudent plaintiff perceives both the injury*** ***<u>and the defendant's causal role</u>*** is consistent with the [US] Supreme Court's guidance in *Wallace* and *Manuel*.
>
> This court explained in *T. R.* that "the accrual rule that applies to determine when plaintiff's section 1983 claim accrued is a 'discovery' accrual rule." 344 Or. at 291, 181 P.3d 758. That rule—which the court explained is similar under Oregon law and generally applicable common law—provides that "***the statute of limitations does not begin to run until a reasonably prudent plaintiff perceives both the injury*** ***<u>and the role that the defendant has played in that injury</u>***." Id. at 291-92, 181 P.3d 758 (citation omitted). The **<u>*T.R.* court distinguished between the role of the perpetrator, who had been the immediate cause of the plaintiff's abuse, and the role of the city,</u>** which had failed to implement policies and procedures to prevent the abuse. *Id*. at 296, 181 P.3d 758. ***Furthermore, it determined that a reasonable jury could have concluded that the plaintiff reasonably did not suspect the city's role at the time of the abuse and, therefore, that the plaintiff's claim against the city did not accrue until later.*** *Id*. at 297, 181 P.3d 758.

*J.M.* at 407–08 (summarizing *T.R. v. BSA*) (emphasis added). The Oregon Supreme Court in *J.M.* also "surveyed federal circuit decisions applying the discovery rule and found the multiple circuits "follow a discovery accrual rule that is comparable to *T. R. [v. The City of the Dalles*]." *Id.* at 408. Based on its analysis of federal accrual law for civil rights claims, the Oregon Supreme Court in *J.M. v. Oregon Youth Authority* reversed the trial court's grant of summary judgment for the defendant, holding that "a rule that requires a plaintiff to bring a claim without any regard for the plaintiff's knowledge of whom to sue is neither functional nor flexible" and that "an action under section 1983 accrues when a plaintiff knows or reasonably should know of the injury and the defendant's role in causing the injury." *Id.* at 412. Although not controlling, the Oregon Supreme Court's analysis in *J.M. v. Oregon Youth Authority* and *T.R. v. City of The Dalles* is highly instructive here.

This Court has likewise held (consistent with *J.M.* and *T.R.*) that a plaintiff must discover the role of a particular defendant in causing his injury for the plaintiff's claim against that particular defendant to accrue. *See e.g. Doe v. Sargeant,* No. 6:16-CV-00517-MC, 2017 WL 3495418, at *1 (D. Or. Aug. 15, 2017) (McShane, J. ) (citing *T.R. v. Boy Scouts of Am.*, 344 Or. 282, 291–2 (2008) to find that "Oregon and the Ninth Circuit generally espouse that the Discovery Rule governs the start of the tolling period for a statute of limitations[,]" and "[t]his rule states that as soon as the plaintiff is aware, or should reasonably be aware, that an injury occurred, and ***knew or should have known that the defendant caused the injury***, the statute of limitations period begins to run.") (emphasis added).[9] Other Courts in this District have indicated the same.[10]

Under the accrual discovery rule, "the ***limitations period begins to run as to each defendant when the plaintiff discovers, or a reasonable person should have discovered, that defendant's causal role***." *T.R.* at 763 (emphasis added). Other Circuits have likewise held that accrual requires discovery of the particular defendant's causal role in causing constitutional injuries such as these. *Vasquez v. Davis*, 882 F.3d 1270, 1276 (10th Cir. 2018) (internal citations and quotation marks omitted) (in analyzing civil rights claims alleging violation of the plaintiff's 8th Amendment rights, the Tenth Circuit stated: "those claims accrued when [the plaintiff] knew

[9] *See also Moret v. Millsap,* No. 3:18-CV-00096-MK, 2021 WL 4786834, at *4 (D. Or. July 26, 2021) (KASUBHAI, J.) (emphasis added) ("The statute of limitations would not necessarily bar claims against Sgt. Ashenfelter or Commander Lenahan if plaintiff was unable to discover Sgt. Ashenfelter's or Commander Lenahan's role …before this case proceeded to discovery…. *T.R. v. Boy Scouts of Am.*, 344 Or. 282, 292, 181 P.3d 758 (2008) (in Oregon, "the limitations period begins to run as to each defendant **when the plaintiff discovers, or a reasonable person should have discovered, that defendant's causal role**")"), *report and recommendation adopted*, No. 3:18-CV-96-MK, 2021 WL 4786470 (D. Or. Oct. 13, 2021) (MCSHANE, J.) ("The Court finds no error and concludes the report is correct."), *aff'd sub nom. Moret v. Garrett*, No. 21-35886, 2023 WL 4703226 (9th Cir. July 24, 2023).

[10] *See, e.g., Doe v. Cnty. of Josephine,* No. 1:12-CV-2080-CL, 2015 WL 2412181, at *7 (D. Or. May 18, 2015), *aff'd on other grounds sub nom. Doe, 7 v. Josephine Cnty*., 697 F. App'x 567 (9th Cir. 2017) (AIKEN, J.) (accrual of civil rights claims requires discovery of "some injury caused by the abuse and the **causal connection between the County's conduct and their injuries**.") (emphasis added); *Smith v. Washington*, No. 05-CV-6301-BR, 2009 WL 10280594, at *2 (D. Or. Feb. 5, 2009) (BROWN, J.) (citing *T.R. v. BSA* as controlling for determining when 1983 claim accrues).

or had reason to know, ***separately for each of these [d]efendants*** . . . to be liable, that they had acted with deliberate indifference to a known risk to [the plaintiff's] medical needs, and that his or her deliberate indifference resulted in a delay in treatment that caused [the plaintiff] substantial harm") (emphasis added).

The rule that a plaintiff must have discovered the role of the particular defendant in causing his constitutional injury is also applied in analyzing *Monell* civil rights claims,[11] including by numerous courts within this District[12] and throughout the Ninth Circuit.[13]

In the face of this well-established authority, Defendants still reiterate their argument (previously rejected by this court)[14] that Dr. Edwards' victims' claims for violations of their civil rights by other OYA employees must have accrued either 1) at the time of the alleged injury—when the sexual abuse by Dr. Edwards occurred or 2) at the time those victims discovered that

---

[11] *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1157 (2d Cir. 1995) ("Since an actionable claim under § 1983 against a county or municipality depends on a harm stemming from the municipality's 'policy or custom,' ***a cause of action against the municipality does not necessarily accrue upon the occurrence of a harmful act, but only later when it is clear, or should be clear, that the harmful act is the consequence of a county 'policy or custom***.'"); *see also Birch v. City of N.Y.,* 675 F. App'x 43, 45 (2d Cir. 2017).

[12] *See, e.g., Matheny v. Clackamas Cnty.,* No. 3:10-CV-1574-BR, 2012 WL 171015, at *5 (D. Or. Jan. 20, 2012) (BROWN, J.) ("The Court finds the analysis of *Pinaud, Branch,* and *Temple* to be persuasive and adopts it. Accordingly, the Court concludes Plaintiff's cause of action against Clackamas County ***did not accrue until it was clear or should have been clear that a policy or custom of Clackamas County caused the wrongful act***."); *see also Doe v. City of Eugene,* No. 6:15-CV-00154-JR, 2016 WL 1385450, at *1 (D. Or. Apr. 6, 2016) (AIKEN, J.) ("[A] *Monell* claim accrues not when the plaintiff becomes aware of the underlying constitutional injury but when **"it was clear or should have been clear that a policy or custom of [the municipality] caused the wrongful act."**)

[13] "Many courts within the Ninth Circuit have followed [the Second Circuit's decision in] *Pinaud*. [Collection of cases omitted.] . . . . The reasoning is that a § 1983 claim accrues when a plaintiff knows or has reason to know of the injury that is the basis of the action and ***the cause of that injury***. A *Monell* claim is based on an injury that was caused by a governmental policy, custom, or practice. '***It follows that [a plaintiff's Monell claim accrues] when she knew or in the exercise of reasonable diligence should have known of not only her injury, but also the [government]'s alleged wrongful policies – the cause of her injury*** for her *Monell* claim.'" *Est. of Jackson v. City of Modesto*, No. 1:21-CV-0415 AWI EPG, 2021 WL 4819604, at *9–10 (E.D. Cal. Oct. 14, 2021) (internal citations omitted) (collecting cases and holding that "the Estate's *Monell* claims accrued when Jackson was not only aware of her injuries, but ***also when she knew or should have known that her injuries were caused by the City's customs, policies, or practices***").

[14] *See H.A.H. v. Or. Youth Auth.*, No. 3:25-CV-2266-MC, 2026 WL 1005350 (D. Or. Apr. 14, 2026) (denying defendants' motion to dismiss); *see also, S.K. v. Oregon*, No. 6:25-CV-939-MC, 2026 WL 1005372 (D. Or. Apr. 14, 2026) (same); *K.J. v. Oregon*, No. 6:25-CV-1973-MC, 2026 WL 1006010 (D. Or. Apr. 14, 2026) (same); *T.F. v. Oregon*, No. 6:25-CV-2166-MC, 2026 WL 1006018 (D. Or. Apr. 14, 2026) (same); *J.M. v. Or. Youth Auth.*, No. 3:25-CV-1866-MC, 2026 WL 1005097 (D. Or. Apr. 14, 2026) (same).

Dr. Edwards' conduct was abuse that injured them. Defendants' MPSJ at 6–8. This, despite that the Ninth Circuit (and, in fact, all circuits) clearly reject a categorial occurrence-accrual rule and recognize delayed accrual of these types of claims based on the victim's subjective discovery of the constitutional violation. *See J.M.* at 412 (in a sexual abuse case involving Oregon Youth Authority, after completing a federal circuit court review of the application of a "discovery rule" in the accrual of section 1983 claims, the Supreme Court of Oregon finds that "[n]o federal circuit court has derived from *Wallace* the strict occurrence-based rule that defendant proposes"). Even in *Bonneau*, the Ninth Circuit case heavily cited by Defendants, the Court acknowledges that determining the "question . . . [of] what . . . we mean by injury" requires some flexibility, and "that ***a 'claim accrues' not just when the plaintiff experiences the injury, but 'when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and the cause of that injury.*** '" 666 F.3d at 581 (quoting *Lukovsky v. City & Cnty. of San Francisco,* 535 F.3d 1044, 1050 (9th Cir. 2008)) (emphasis added).

In fact, this Court has already properly rejected Defendants' occurrence-accrual argument and set out the applicable law on timeliness of civil rights claims under 42 U.S.C. §1983 in these very cases:

> A Section 1983 claim accrues "when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury ***and the cause of that injury***" . . . Defendants argue that Plaintiffs' claims . . . accrued at the time of Plaintiffs' alleged abuse. Plaintiffs' Section 1983 claims, however, do not seek relief for the injury of Edwards's abuse. ***Plaintiffs' alleged injury is the violation of their 14th Amendment substantive due process rights.*** Plaintiffs' claims would, accordingly, accrue when Plaintiffs "knew or in the exercise of reasonable diligence should have known" ***of the violation of their rights and the cause of those violations.***

*J.M. v. Oregon Youth Auth.*, No. 3:25-CV-1866-MC, 2026 WL 1005097, at *3–4 (D. Or. Apr. 14, 2026) (emphasis added).

*b. Controlling Ninth Circuit Precedent is Clear That the Timing of the Accrual Civil Rights Claims Arising from Custodial Sexual Abuse Is Inherently More Complicated.*

As this Court is well aware, the Ninth Circuit has recently recognized that, in the context of civil rights claims based on sexual abuse, "'what [the plaintiff] knew and when [he or] she knew it are questions of fact' better left for a jury." *St. Clair* at 1160 (quoting *Simmons v. United States*, 805 F.2d 1363, 1368 (9th Cir. 1986). This Court summarized the significance and controlling nature of the Ninth Circuit's *St. Clair* decision in earlier decisions in the Dr. Edwards' cases:

> The **accrual of Section 1983 claims involving sexual abuse can be delayed by a plaintiff's vulnerability at the time of alleged incident, power imbalances between the plaintiff and defendant, and plaintiff's shame, humiliation, and guilt**. *St. Clair*, 154 F.4th at 1160. In *St. Clair*, the court considered a 12(b)(6) motion attacking the timeliness of a Section 1983 claim involving sexual abuse by a sheriff's deputy. *Id.* at 1157-58. Plaintiff alleged that the deputy repeatedly "took advantage of her addiction to methamphetamines and involvement in criminal activity to coerce her into . . . unwanted sexual conduct." *Id.* at 1156. Plaintiff alleged that due to her addiction, age, and coercion, "she only came to understand she had been harmed [years later] when she read a news article . . . detailing [the deputy's] inappropriate sexual conduct with other similarly situated women." *Id.* at 1157, 1160. The court held that the plaintiff alleged sufficient "evidence at the motion to dismiss stage that the delayed realization of her injuries justifies the delayed filing[.]"

*J.M.*, 2026 WL 1005097, at *3 (emphasis added).

The *St. Clair* decision distinguished *Bonneau v. Centennial School Dist. No. 28J* (one of the primary cases that State Defendants rely on in their motion), holding that the accrual of civil rights claims against a perpetrator based on sexual abuse can be delayed based on the unique effects of trauma, power imbalance, and psychiatric injury inherently involved in sexual abuse cases. The Ninth Circuit in *St. Clair* makes the important distinction that even if a plaintiff is aware of a power imbalance in a relationship itself, "**there is ample daylight between that**

**awareness and awareness that such authority is being wielded inappropriately**." *Id.* (emphasis added).

Since the Ninth Circuit Court's ruling in *St. Clair*, several judges in the District Court of Oregon have relied on its holding, finding that similarly situated plaintiffs sufficiently alleged delayed accrual of a claim to defeat motions to dismiss. In other similarly situated cases about Dr. Edwards' abuse of youth at MacLaren, this Court found that where several youth complained about or made grievances to staff about uncomfortable sexual contact with a doctor in an OYA facility, those reports did not equate to discovery of their constitutional legal claim. *See H.A.H. v. Or. Youth Auth.,* No. 3:25-CV-2266-MC, 2026 WL 1005350 (D. Or. Apr. 14, 2026) (denying defendants' motion to dismiss); *see also, S.K. v. Oregon*, No. 6:25-CV-939-MC, 2026 WL 1005372 (D. Or. Apr. 14, 2026) (same); *K.J. v. Oregon*, No. 6:25-CV-1973-MC, 2026 WL 1006010 (D. Or. Apr. 14, 2026) (same); *T.F. v. Oregon*, No. 6:25-CV-2166-MC, 2026 WL 1006018 (D. Or. Apr. 14, 2026) (same); *J.M. v. Or. Youth Auth.,* No. 3:25-CV-1866-MC, 2026 WL 1005097 (D. Or. Apr. 14, 2026) (same). Additionally, the Court found that OYA staff's failure to investigate their reports was part of the reason why the youth did not discover their claims until much later. *See H.A.H. v. Or. Youth Auth.* at *5.

The Ninth Circuit's holding in *St. Clair* continues, clarifies, and extends its previous holdings in *Simmons v. United States,* 805 F.2d 1363 (9th Cir. 1986)[15]and *Gregg v. Hawaii, Dep't of Pub. Safety*, 870 F.3d 883 (9th Cir. 2017)[16]*,* applying the same reasoning concerning

[15] In *Simmons*, the Ninth Circuit affirmed the timeliness of a claim by an adult plaintiff whose counselor had, years before, engaged her in a sexual relationship during treatment. 805 F.2d at 1367-68. The Ninth Circuit affirmed the district court's determination that the plaintiff first knew of the cause of her injury, not when the sexual contact with her counselor started, nor when it ended, but later, when another doctor informed her that her previous counselor's conduct caused her emotional injury. *Id.* at 1366-67. In other words, knowledge of the occurrence of the sexual contact was not the equivalent of knowledge of the emotional or psychological injuries that resulted from that sexual contact.

[16] In *Gregg*, the plaintiff was incarcerated and forced by the jail warden to comply with "public sexual shamings." 870 F.3d at 885. Although plaintiff at the time felt "humiliated, embarrassed, and violated" by these abusive

delayed accrual in sexual abuse cases. Additionally, while citing the legal standard from *Bonneau,* the Ninth Circuit distinguishes its holding in *St. Clair* by focusing on the effects of trauma, power imbalance, and psychiatric injury in sexual abuse cases. The facts in *St. Clair* are directly analogous to the facts in this case. The allegations here, as discussed in more detail below, illustrate that J.K.C. has sufficiently alleged sexual abuse within a relationship of significant power imbalance, and trauma from the abuse, resulting in late-discovered psychological injury. These allegations are sufficient to support delayed claim accrual.

In sum, taken together, the aforementioned case law establishes that the accrual of all civil rights claims is fact-intensive. It requires discovery of a constitutional violation (as opposed to just discovery of the immediate harm) ***as well as discovery of a particular defendant's role in causing that constitutional injury***. Moreover, "the limitations period begins to run as to each defendant when the plaintiff discovers, or a reasonable person should have discovered, that defendant's causal role." *T.R.* at 763 (emphasis added). In the context of civil rights claims arising from custodial sexual abuse of minors, the injury and accompanying dynamics make discovery of the constitutional injury and the defendants' causal role inherently more difficult for a victim to discover.

***ii. Application of the Tests for Accrual from Controlling Precedent to the Evidence Here Demonstrates Genuine Issues of Fact Exist as to the Timeliness of Plaintiff J.K.C'.s Claims.***

As the Court has previously recognized, such "***[f]actual inquiries determining precisely when a plaintiff became aware of their injury is generally a question for the jury***." *J.M.*, 2026 WL 1005097, at *3 (citing *St. Clair v. Cnty. of Okanogan*, 154 F.4th 1154, 1160 (9th Cir. 2025))

experiences and ultimately "request[ed] a transfer to a different correctional facility," she did not discover her injury until after her release when she received mental health treatment. *Id.* at 886. The Ninth Circuit found that issues of when plaintiff knew or should have known about her injury are "questions of fact." *Id.* at 889.

(emphasis added). Here, the evidence (discussed below) demonstrates that Plaintiff J.K.C.'s claims accrued less than two years before filing suit—based on delayed discovery of his constitutional injury and its causes—or at least a reasonable juror could so find. Defendants' motion for partial summary judgment must be denied.

*a. J.K.C. was Abused as an Isolated Teen at MacLaren with No Opportunity to Discover Defendants' Causal Role in His Abuse.*

J.K.C. was born in 1986 and arrived at MacLaren on or about May 20, 2002, at age 16. Exhibit 56 to Janci Decl., Declaration of J.K.C. (hereinafter "Exhibit 56, J.K.C. Decl."). ¶ 2; Exhibit 26, J.K.C. Dep., 10:8, 37:2–6. His probation officer delivered him to the facility. Exhibit 56, J.K.C. Decl., ¶ 3; Exhibit 26, J.K.C. Dep., 71:16–17. MacLaren was not a placement but "a holding period on [his] way to Tillamook Youth Accountability Camp." Exhibit 26, J.K.C. Dep., 66:2–11; Exhibit 56, J.K.C. Decl., ¶ 3. He knew none of the other youth before he arrived. Exhibit 56, J.K.C. Decl., ¶ 4; Exhibit 26, J.K.C. Dep., 66:21–23.

Shortly after arriving, he was taken to the health clinic for a medical intake examination. He did not choose to go, was offered no choice of provider, and understood the examination to be mandatory. J.K.C. Decl. ¶ 5; Exhibit 26, J.K.C. Dep., 73:11–74:11. He does not remember anyone else being in the room, and no one other than Dr. Edwards took part. Exhibit 56, J.K.C. Decl., ¶ 6; Exhibit 26, J.K.C. Dep., 75:14–17. Dr. Edwards grabbed and massaged his testicles with his ungloved, bare hands and retracted his foreskin while seated close in front of him; J.K.C. closed his eyes, looked away, and tried to get it over with. Exhibit 26, J.K.C. Dep., 76:22–77:10. Dr. Edwards massaged J.K.C.'s testicles for somewhere between one and five minutes. *Id.* at 79:7–16. Dr. Edwards said nothing while it was happening. *Id.* at 80:13–15. It was the only time Dr. Edwards ever examined or touched him. *Id.* at 77:15–18, 80:1–6.

These facts establish the *St. Clair* dynamics that were at play during the constitutional violations J.K.C. endured. In *St. Clair*, the Ninth Circuit identified two features of sexual abuse cases that contributed to delayed realization of harm: a relational power imbalance and sexual abuse as the tortious conduct. 154 F.4th at 1160. Both are present here. The *St. Clair* plaintiff (an adult) at least retained the theoretical freedom to walk away from her perpetrator. Here, J.K.C. was a child, confined in State custody, for a short stay, at a facility where he knew no one, and directed to submit to a medical examination by a single State-assigned physician for an examination he understood was mandatory. Exhibit 56, J.K.C. Decl., ¶ 5. He had no relationships, no history in the facility, and no vantage point from which to observe how OYA handled anything—let alone how it had handled prior complaints about Dr. Edwards from prior years (about which he had no knowledge). As the Ninth Circuit put it, even where a plaintiff perceives the authority relationship, "there is ample daylight between that awareness and awareness that such authority is being wielded inappropriately." *St. Clair* at 1160.

*b. While J.K.C. Was at Maclaren, the Facts Establishing Defendants' Culpability Sat Exclusively in the State's Control.*

By May 2002, OYA already held a substantial body of notice about Dr. Edwards—none of it disclosed to J.K.C., to any youth, or to the public. To briefly restate that evidence:

- **1990s – Various Youth Grievances, Abuse Reports, and Staff Awareness of the Nickname.** As set out above in Section III.A, OYA staffers were aware of numerous grievances and abuse allegations by youth, as well as the pervasive use of the nickname "Dr. Cold Fingers." Nurse Edith Johnk made multiple reports up the chain at MacLaren about these reports and concerns. See *supra* page 20.

- **March 2001 – January 2002 (Oregon Medical Board).** The Board opened an investigation on a complaint received March 2, 2001, alleging that Dr. Edwards "conducted inappropriate genital exams" on two young males "both of whom may be sexual abuse survivors," and that "[o]ther boys have objected to licensee's alleged touching of genitalia without gloves, possibly transmitting STDs and then sniffing his hand afterwards." January 2002 OMB Investigative Case Summary Report (Exhibit 34 to Janci Decl.); OMB Investigative Committee Report (Exhibit 57 to Janci Decl.) The Board received nineteen

patient names. (January 2002 OMB Investigative Case Summary Report (Exhibit 34 to Janci Decl.)); Exhibit 58 to Janci Decl., Deposition of Mei-Mei Wang (hereinafter, "Exhibit 58, Wang Dep."), 83:20–84:23.)

- **April 18, 2001—MacLaren's Superintendent Intervenes on Dr. Edwards' behalf.** Gary Lawhead had been Superintendent at MacLaren since 1997. Exhibit 16, Lawhead Dep., 131:24–132:4. He was copied on Dr. Edwards' April 18, 2001, response to the Board (Exhibit 59 to Janci Decl.) and sent the Board an unsolicited letter **praising** Dr. Edwards' "high level of medical care and professionalism." Exhibit 16, Lawhead Dep., 129:8–131:23; Exhibit 45 to Janci Decl.; Exhibit 36 to Janci Decl.; Exhibit 37 to Janci Decl. He never spoke with any complaining youth. Exhibit 16, Lawhead Dep., 130:5–17.

- **December 2001—OYA Staff Report Suspected Abuse to OYA Leadership).** In December of 2001, OYA staffer Joni Zimmerman reported to Cindi Liebe and Brian Florip that two youth had told her Dr. Edwards touched their genitals without gloves and threatened them with solitary confinement ("C.I.U.") or a disciplinary report if they did not cooperate. Exhibit 32 to Janci Decl.; *see also* Exhibit 9, Jeske 30(b)(6) Dep., 115:24–116:20. Although OYA (including Florip) understood that these were allegations that should have triggered a mandatory report to outside authorities of suspected child sexual abuse, OYA "***preferred to deal with a situation such as this internally"*** and kept it a secret. Exhibit 32 to Janci Decl. Consistent with OYA's stated intentions to "deal with [the] situation . . . internally," there is no evidence of any report to law enforcement, DHS, Oregon Medical Board, or any outside authority.

The chronology of these reports and responses relative to J.K.C.'s abuse is important. In the months before J.K.C. arrived at MacLaren, OYA leaders were on notice about multiple youth reporting coercive sexual touching by Dr. Edwards. MacLaren Superintendent Lawhead wrote to the Medical Board on May 1, 2001, defending Dr. Edwards against allegations of sexual abuse -- less than a year before J.K.C. arrived at MacLaren. Exhibit 35 to Janci Decl. In December of 2001, Defendant Florip elected to handle reports of suspected child sexual abuse by Edwards "internally" (i.e. secretly) without report to law enforcement or DHS (which OYA admits would violate its own policies). Exhibit 9, Jeske 30(b)(6) Dep., 123:18–124:12. Less than six months later, J.K.C. was committed to MacLaren on May 20, 2002, and was sent to Dr. Edwards for a mandatory intake examination. Exhibit 56, J.K.C. Decl. ¶¶ 2, 5; Exhibit 26, J.K.C. Dep., 37:2–6. Nothing about that history of multiple prior abuse complaints against Dr. Edwards that were

known to OYA was ever disclosed to J.K.C. or otherwise known (or knowable) to him. Exhibit 56, J.K.C. Decl., ¶¶ 7, 19.

*c. J.K.C. Did Not Perceive—And Could Not Reasonably Have Perceived—Any Individual Defendant's Causal Role.*

The ultimate question on this motion is whether Plaintiff had any reason to understand more than two years before bringing this lawsuit that the Individual (Supervisory) Defendants played a role causing him harm (i.e. in violating his constitutional rights). Accrual runs "as to each defendant when the plaintiff discovers, or a reasonable person should have discovered, that defendant's causal role." *T.R.* at 763; *accord J.M.*, 434 P.3d at 412; *Sargeant*, 2017 WL 3495418, at *1 (McShane, J.); *Moret*, 2021 WL 4786834, at *4.[17]

The record on that question is clearly in Plaintiff's favor. Until the middle of 2025, J.K.C. had no idea that others had raised a concern about Dr. Edwards to OYA staff, that OYA had received reports or complaints about Dr. Edwards before the examination J.K.C. experienced, or that anyone at OYA bore any responsibility for Dr. Edwards' conduct. He believed it was something Dr. Edwards did on his own. Exhibit 56, J.K.C. Decl., ¶ 15. Before mid-2025, he had never heard the names of the Individual Defendants and did not know that any of them held a position of authority over Dr. Edwards at MacLaren or within OYA. Exhibit 56, J.K.C. Decl., ¶ 17; *see also* Exhibit 26, J.K.C. Dep., 90:5–94:4. Plaintiff J.K.C. also testified he never told any of the Individual Defendants that Dr. Edwards abused him. *Id.* Counsel then asked whether J.K.C. was aware of "any of these individuals we've just talked about causing you harm?" He

[17] Defendants' reliance on *Doe v. Cnty. of Josephine*, No. 1:12-cv-2080-CL, 2015 WL 2412181 (D. Or. May 18, 2015), *aff'd on other grounds*, 697 F. App'x 567 (9th Cir. 2017), fails on the grounds this Court identified in *J.M.* and *H.A.H.* In *Doe*, the plaintiffs "admit[ted] that they knew that they had been abused by [their probation officer], ***and no plaintiff assert[ed] that he did not know or realize that [the officer's] abuse caused him injury at the time***." 2015 WL 2412181, at *2 (emphasis added). The *Doe* plaintiffs also knew who the county was and what it had done. Here, the facts on the accrual of J.K.C.'s claim are fundamentally different from *Doe* and much more similar to *St. Clair*.

answered: "No." Exhibit 26, J.K.C. Dep., 94:2–4. J.K.C.'s declaration testimony confirms the same, as well as the timing of his discovery (less than two years before filing suit): "Prior to first speaking with my lawyers in 2025, I did not know of any of these individuals, I never reported anything to them, and I was not aware any of them may have caused me harm." Exhibit 56, J.K.C. Decl., ¶ 17.

No one told J.K.C. otherwise while he was in custody. No one at MacLaren ever told him that other youth had complained about Dr. Edwards, or that Dr. Edwards had been investigated by OYA, by the Oregon Medical Board, by law enforcement, or by any other agency. Exhibit 56, J.K.C. Decl., ¶ 7.

After his examination, other boys on the unit referenced "Dr. Cold Fingers." Exhibit 56, J.K.C. Decl., ¶ 10; Exhibit 26, J.K.C. Dep., 83:4–18; 84:9–12. What they told him was that Dr. Edwards had touched them with his bare hands—"[n]othing in detail." Exhibit 56, J.K.C. Decl., ¶ 10; Exhibit 26, J.K.C. Dep., 87:5–9. He did not know their names, does not remember who they were, and never saw or spoke with any of them again after leaving MacLaren. Exhibit 56, J.K.C. Decl., ¶ 10; Exhibit 26, J.K.C. Dep., 83:20–21; 87:16–20. He did not tell them, or anyone, what had happened to him. Exhibit 56, J.K.C. Decl., ¶ 11; Exhibit 26, J.K.C. Dep., 84:16–19; 86:1–6.

Despite Defendants' efforts, that testimony cannot trigger accrual. J.K.C.'s testimony is clear: "Nothing those boys said told me that anyone had ever reported Dr. Edwards to OYA, that OYA had received complaints about him, or that anyone at OYA knew what he was doing and had allowed it to continue." Exhibit 56, J.K.C. Decl., ¶ 12. J.K.C. also never heard ***OYA staff*** use the nickname. *Id.* Awareness that a perpetrator may have other victims is ***not*** awareness that a

custodial agency was ***aware*** of such abuse or was deliberately indifferent to a known danger—that is exactly the distinction *T.R.* draws at 181 P.3d 765–66.

J.K.C.'s own account frames the nickname as a source of humiliation, not clarity: he was "shocked that other youth already knew," which was "degrading and shameful and embarrassing" and "made it harder for me to say anything about what had happened to me." Exhibit 56, J.K.C. Decl., ¶ 13; Exhibit 26, J.K.C. Dep., 83:16–18. Under *Gregg*, contemporaneous distress—even distress acute enough to prompt action—does not establish as a matter of law that a plaintiff knew her feelings "were actually injurious, and that they were caused by the [abuse]." 870 F.3d at 889. Those "are questions of fact." *Id.*

Finally, even after his release, J.K.C. received no information from OYA about Dr. Edwards, and no document from OYA, the Board, or any agency concerning complaints about him. Exhibit 56, J.K.C. Decl., ¶ 18.

The aforementioned evidence cannot be controverted by Defendants and establishes a genuine issue of material fact as to the timeliness of J.K.C.'s civil rights claims requiring denial of Defendants' motion.

*d. Defendants' Reliance on J.K.C.'s 2020 Testimony Proves the Wrong Proposition.*

Defendants will make much of a single exchange. When asked why he did not disclose the abuse during a 2020 behavioral health assessment, J.K.C. answered: "The same reason I don't tell anybody. . . . It's embarrassing and shameful." Exhibit 26, J.K.C. Dep., 59:13–60:5. Counsel then asked whether he "knew that [he]'d been sexually abused in 2020 and ma[d]e a choice that that wasn't something that [he] wanted to share," and he answered "yes." *Id.* at 60:9–12. When asked directly when he first realized he had been sexually abused, he said he did not recall. *Id.* at 60:6–8.

At best, that testimony establishes that by 2020, J.K.C. understood **what Dr. Edwards had done to him**. However, that establishes nothing about the claims Defendants are moving against, for three reasons. First, the injury in the Second and Third Claims for Relief is not Dr. Edwards' conduct. This Court has already said so in these cases:

> Plaintiffs' Section 1983 claims . . . ***do not seek relief for the injury of Edwards's abuse.*** Plaintiffs' alleged injury is the violation of their 14th Amendment substantive due process rights. Plaintiffs' claims would, accordingly, accrue when Plaintiffs 'knew or in the exercise of reasonable diligence should have known' of the violation of their rights and the cause of those violations.

*J.M.*, 2026 WL 1005097, at *4. Knowing in 2020 that a doctor had sexually abused him told J.K.C. nothing about whether OYA officials knew of the danger and knowingly left him exposed to it. Knowing in 2020 that a doctor had sexually abused him told him nothing about the Individual Defendants' deliberate indifference to a known danger or failure to protect him while in their custody.

Second, Defendants' argument ignores the accrual analysis expounded in *T.R.*, *J.M.,* and related cases discussed above. In *J.M..,* the Oregon Supreme Court (in analyzing a federal civil rights claim) distinguished "the role of the perpetrator, who had been the immediate cause of the plaintiff's abuse, [from] the role of the city, which had failed to implement policies and procedures to prevent the abuse," and held that a reasonable jury could find the plaintiff "reasonably did not suspect the city's role at the time of the abuse." 434 P.3d. at 407. Under Defendants' reading, every victim who comes to understand that he was assaulted is charged, that same day, with knowledge of every supervisory failure that permitted it. As the Oregon Supreme Court has noted, that "is neither functional nor flexible." *Id.* at 412. Nor is it the law in the Ninth Circuit.

Third, the 2020 exchange is affirmative evidence of the dynamics that *St. Clair* recognized often delay accrual of claims arising from sexual assault. J.K.C. sat with a licensed evaluator, was asked about trauma history, saw the line for "Sexual abuse, molestation and assault" left unchecked, and said nothing—because "it's embarrassing and shameful." Exhibit 26, J.K.C. Dep., 58:16–60:5. In fact, between the 2002 "examination" and 2025, J.K.C. told no one what Dr. Edwards did to him. He did not tell any OYA staff members at MacLaren, his mother (with whom he speaks every day and runs a business), his sister, or even his girlfriend. Exhibit 56, J.K.C. Decl. ¶ 13; Exhibit 26, J.K.C. Dep., 13:2–14; 23:18–19; 34:10; 83:1–3. He has testified to the reason for keeping this to himself: "It's embarrassing and shameful." Exhibit 26, J.K.C. Dep., 60:5; Exhibit 56, J.K.C. Decl. ¶ 13; *see also* Exhibit 26, J.K.C. Dep., 86:6.

J.K.C. has never sought out counseling. He would like to but testified, "I have not been able to bring myself to do so because I lack trust for people in a position of power." Exhibit 56, J.K.C. Decl., ¶ 20; Exhibit 26, J.K.C. Dep., 101:6–15. In other words, the one setting (i.e., mental health treatment) in which a professional was most likely to have surfaced these connections—as happened in *Simmons* and *Gregg*—was a setting J.K.C. could not bring himself to enter. *Simmons* at 1366-68; *Gregg* at 886, 889.

That is exactly the situation acknowledged by the court in *St. Clair*: "[m]any victims of sexual assault feel so upset, embarrassed, humiliated, and ashamed about the assault that they do not tell anyone that it occurred," and self-blame, shame, and guilt "rank among [the] most frequent barriers to reporting sexual violence." 154 F.4th at 1160 (quoting *Mousa* at 1027). A man who could not say the words out loud to a therapist in a private clinical setting could not be expected to investigate the secret internal records that he had no idea existed within the agency that had confined him.

At most, Defendants' questioning raises a dispute about what J.K.C. understood and when. That is a question of fact for the jury. *St. Clair* at 1160 ("'what [the plaintiff] knew and when [he] knew it are questions of fact' better left for a jury"); *Simmons* at 1368 ("it seems particularly inappropriate to determine as a matter of law what the plaintiff should have known").

*e. Reasonable Diligence Would Not Have Revealed to J.K.C. What the Defendants Kept Concealed.*

Whether a plaintiff reasonably should have discovered the requisite information to start the running of the statute of limitations is a question of fact that must be left to the jury. *St. Clair v. Cnty. of Okanogan*, 154 F.4th 1154, 1160 (9th Cir. 2025) ("Indeed, precisely 'what [the plaintiff] knew and when she knew it are questions of fact,' better left for a jury").

Any argument that Plaintiff ***should*** have discovered the facts necessary for his claim to accrue outside the limitations period also fails. Such an analysis requires the Court to determine whether Plaintiff had a "duty to investigate" the possibility that Individual Defendants may have caused him harm and, if so, whether a reasonable investigation under these circumstances would have revealed the facts necessary for his claim to accrue.

First, the fact-finder must determine if there is a duty to investigate by determining whether a reasonable youth who was abused while in custody should have known that there is enough chance that Individual Defendants violated his constitutional rights to require further investigation. The Ninth Circuit applies a two-step inquiry, both parts of which are heavily fact driven.

> A two-part analysis determines whether Plaintiffs reasonably should have known of their claim. … First, we consider whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury. Second, if the plaintiff was on inquiry notice, 'we must next determine whether [an

> inquiry] would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim.'

*O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (citations omitted)). In other words, even if a duty to investigate were found to exist, that will only start the running of a statute of limitations ***if*** the type of investigation that a reasonable child sexual abuse victim would undertake ***would have actually revealed*** the Individual Defendants' causal role in Plaintiff's constitutional injuries.

Other courts have further explained that this second consideration has two sub-parts: (a) "a plaintiff is not necessarily charged with employing experts to uncover facts that a reasonable person in plaintiff's circumstances could not uncover"; and (b), "[t]he party who asserts the statute of limitations defense must prove that an investigation would have disclosed those facts …." *T.R.*, 344 Or at 293–94. *See also Bibeau*, 188 F.3d at 1109 ("the record fails to irrefutably demonstrate that, had Bibeau consulted a doctor, he would have discovered his claims."); *id.* at 1109 n.3 (in fraud case, a court may grant summary judgment on a fraud-based theory only where "the uncontroverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered the fraud but failed to file a timely complaint" (quoting *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1417 (9th Cir. 1987))).

Finally, the Ninth Circuit has recognized—recently and expressly—that a victim of sexual abuse may not appreciate that he has been wronged, ***or by whom,*** until long after the abuse itself. In *St. Clair*, the court reversed dismissal on limitations grounds because "***individuals who suffer such harm may not*** become aware of or ***understand the causes of their injuries until years later***." 154 F.4th at 1156 (emphasis added).

As discussed below, Defendants have not proved—and cannot prove—that all reasonable jurors would find that Plaintiff was under a duty to investigate under the circumstances present

here. Nor can Defendants prove that the type of investigation that would be undertaken by a reasonable victim of child sexual abuse would have revealed: (a) that OYA leaders (including Individual Defendants) had extensive knowledge about multiple prior reports from youth of abuse by Dr. Edwards before Plaintiff was abused; and (b) that, nonetheless, Individual Defendants chose not to take action to address this known danger, thereby allowing Dr. Edwards violations to continue towards other youth, including Plaintiff. Like the Defendant City in *T.R.*, Defendants here cannot carry that burden. *T.R.,* 344 Or at 298 ("Even if a reasonable person would have made inquiry as to the city's role in 1996, we cannot conclude, as a matter of law, that an inquiry would have revealed facts indicating that a city policy may have caused plaintiff harm").

1. *J.K.C. Was Never Given Any Means of Reporting or Inquiring.*

J.K.C. does not recall being given any information about how to report abuse while in OYA custody and had never heard of the Prison Rape Elimination Act. Exhibit 56, J.K.C. Decl., ¶ 8; Exhibit 26, J.K.C. Dep., 69:25–72:9. He was not familiar with any grievance process at MacLaren, was never informed that youth could submit a written complaint or concern, does not recall seeing a complaint box on his unit, and was never told how to report something like a doctor inappropriately touching him. Exhibit 56, J.K.C. Decl., ¶ 9; Exhibit 26, J.K.C. Dep., 87:21—88:8. He filed no grievance and made no report to law enforcement. Exhibit 56, J.K.C. Decl., ¶ 10; Exhibit 26, J.K.C. Dep., 88:14–16, 88:24–89:1.

2. *The Records That Would Have Revealed OYA's Notice Were Confidential.*

- **The Medical Board file was kept confidential.** The 2001–02 Board investigation is the most probative contemporaneous evidence of notice, and it was closed to the public by statute and practice. The Board's investigator testified that the material was "so confidential" that her paper notes were shredded promptly after the file was summarized.

Exhibit 58, Wang Dep., 92:9–93:8. Counsel for the Board and the State objected on confidentiality grounds even during her 2026 deposition. *Id.* at 102:6–17. Plaintiffs only obtained these records by subpoena in this litigation, and even Dr. Adams (Dr. Edwards' longtime direct supervisor) had not seen them or heard about them before her deposition in 2026. Exhibit 19, Adams Dep. Vol. I, 121:22–123:3.

- **OYA's investigative records were kept confidential.** OYA's Rule 30(b)(6) designee confirmed that staff-misconduct investigations were to be "impartial, objective, ***confidential*** and expeditious"; that there was no central repository of investigative information between 1995 and 2006; and that personnel outcomes were maintained separately from investigative files. Exhibit 9, Jeske 30(b)(6) Dep., 46:1–47:20; 61:15–62:22.

- **There is no evidence that OYA made any outside reports, referrals or disclosures of abuse reports about Dr. Edwards before 2004.** OYA's designee could identify no instance in which PSO substantiated or founded any allegation by any youth against Dr. Edwards. Exhibit 9, Jeske 30(b)(6) Dep., 192:25–193:22. Many complaints were downgraded to "performance" matters and routed to Human Resources. *Id.* at 161:14–162:16. The "performance issues" related to Dr. Edwards sexual abuse of youth were never even expressly referenced in 20 years of written performance reviews. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 206:20–207:16. As discussed above, as to the abuse reports OYA learned which occurred before J.K.C.'s abuse in 2002, OYA made no reports to law enforcement, no reports to DHS, agency leadership did not initiate any referral to the Medical Board (and in fact defended Dr. Edwards to the Medical Board and called the complainants credibility into question). OYA also did not interview the other youth identified as having had the same experience.

J.K.C. never tried to obtain records about Dr. Edwards or about OYA "[b]ecause [he] did not know that any complaints, reports, or investigations about Dr. Edwards had occurred," and so he "had no reason to look for records about him and no way to know there were any records to ask for." Exhibit 56, J.K.C. Decl., ¶ 19. Diligence is measured against what a reasonable person in the plaintiff's position had reason to suspect. A 16-year-old who was told nothing, and who as an adult received nothing indicating that his perpetrator's superiors were on prior notice, had no occasion to suspect a records trail existed.

///

///

///

3. *OYA's Own Supervisors Were Not Aware of Their Colleagues (Now Co-Defendants') Prior Knowledge of Abuse Complaints About Dr. Edwards (Or Their Responses).*

J.K.C.'s inability to discover the Individual Defendants' causal role through an investigation is further supported by evidence that even Dr. Edwards' most direct supervisors were not informed about some of these prior reports between the late 1990s and 2002. For example:

- Dr. Marcia Adams, who clinically supervised Dr. Edwards from 2007 forward, was never told of the 2001 Medical Board investigation, Zimmerman's 2001 report to Florip or the December 2006 PSO report, and she had never seen the February 2007 PSO report. Exhibit 19, Adams Dep. Vol. I, 121:5–17; 137:10–138:9; 139:4–5. When asked whether this type of information would have helped her do her job as Dr. Edwards' clinical supervisor, she said yes. *Id.* at 122:25–123:3.

- Similarly, Philip Cox, the Health Services Administrator, only learned of the Board investigation from Dr. Edwards himself, never confirmed the outcome with the Board, and never learned of the allegation that Dr. Edwards sniffed his hands after gloveless genital contact until his deposition in this case. Exhibit 20, Cox Dep., 91:17–92:17; 77:25–78:17.

If OYA's own officials—charged with supervising Dr. Edwards and with access to OYA's internal files—were unaware of these early prior abuse reports against Dr. Edwards (and failures by OYA leaders to properly respond), then no reasonable juror can expect that a 16-year-old passing through MacLaren should have known or understood otherwise. That is consistent with the reasoning this Court applied in *H.A.H.*, where it held that OYA staff's failure to investigate youth reports was itself part of why the youth did not discover their claims until decades later. *H.A.H. v. Oregon Youth Auth.*, No. 3:25-CV-2266-MC, 2026 WL 1005350, *5 (D. Or. Apr. 14, 2026).

In light of the decades of minimized and ignored reports of abuse by Dr. Edwards, Defendants cannot seriously contend that Plaintiff on his own could have discovered that Defendants were previously aware of reports and chose to allow Dr. Edwards' violations to

continue. Furthermore, where the facts bearing on the defendant's culpability are held by the defendant, the discovery rule exists precisely to prevent the limitations period from running against a plaintiff who has no practical means of learning them. *See O'Connor*, 311 F.3d at 1156 (quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979) (recognizing the barrier to knowledge of causation when "the facts about causation [are] in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain").

In light of the above, and on the record here, Defendants cannot carry their burden of demonstrating that Plaintiff J.K.C. had a duty to investigate earlier—let alone that such an investigation would have revealed what Defendants carefully kept hidden.

#### *iii. In the Alternative, the Limitations Period Is Equitably Tolled and Defendants Are Estopped from Asserting the Statute of Limitations.*

Even if a jury could find earlier accrual of J.K.C.'s claims, factual questions on equitable tolling and equitable estoppel would independently preclude summary judgment. Here, Plaintiff has alleged from the outset that "[a]ny limitations period applicable to Plaintiffs' claims are equitably tolled or Defendants are otherwise equitably estopped from attacking Plaintiffs' claims on timeliness grounds (including, on information and belief, based on Defendant's fraudulent concealment)." Complaint, ECF No. 1, ¶ 121. As discussed below, the applicable law and the evidence detailed herein (along with the reasonable inferences to be drawn therefrom) support denial of summary judgment on Defendants' affirmative defense of statute of limitations.

The Ninth Circuit has repeatedly held that any potential equitable estoppel or tolling presents *factual question*. *See Wong as Tr. of Anaplex Corp. Emp. Stock Ownership Plan v. Flynn-Kerper*, 999 F.3d 1205, 1211 (9th Cir. 2021) ("Thus, applying equitable estoppel to Wong's claim would raise questions about Wong's knowledge and intent . . . . All of these are factual issues."); *see also Simmons* at 1368 (knowledge is an issue of fact); *Nat'l Union Fire Ins.*

*v. Argonaut Ins.*, 701 F.2d 95, 97 (9th Cir. 1983) (intent is an issue of fact); *Atkins, Kroll (Guam), Ltd. v. Cabrera*, 295 F.2d 21, 23 (9th Cir. 1961) (reliance is an issue of fact).

Federal case law on the accrual of civil rights claims looks to the forum state's substantive law on tolling. *Wilson* at 1107–08 (internal citations omitted) ("The third issue, whether the limitations period was tolled for a § 1983 action, is generally governed by state law."). Accordingly, Oregon state law on equitable tolling and estoppel supply the tests for the court to apply here. Equitable tolling and estoppel are separate bases for denial of Defendants' motion, and Plaintiff will discuss each separately below.

*a. Equitable Tolling.*

Under Oregon law, the statute of limitations is equitably tolled when a defendant conceals material facts in order to prevent the discovery of his or her wrongdoing:

> [O]ne who wrongfully conceals material facts and thereby prevents discovery of his wrong or of the fact that a cause of action has accrued against him is not permitted to assert the statute of limitations as a bar to an action against him, thus taking advantage of his own wrong, until the expiration of the full statutory period from the time when the facts were discovered or should, with reasonable diligence, have been discovered.

*Chaney v. Fields Chevrolet*, 503 P.2d 1239, 1241 (Or. 1972) (quoting Annotation, "What constitutes concealment which will prevent running of statute of limitations," 173 ALR 576 at 578 (1948)).

In order to defeat a statute of limitations challenge on equitable tolling grounds, a plaintiff must allege facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief. "Silence or passive conduct of the defendant is not deemed fraudulent, ***unless the relationship of the parties imposes a duty upon the defendant to make disclosure***."

*Rutledge v. Boston Woven Hose & Rubber Co*., 576 F.2d 248, 250 (9th Cir. 1978) (emphasis added).

Here, the evidence supports such a finding. The State Defendants falsely represented to Plaintiff that Dr. Edwards was not a risk to him and would act in his best interests. They made these false representations not with words, but with their actions retaining Dr. Edwards despite multiple prior abuse allegations and continuing his unrestricted access youth—including assigning Dr. Edwards to be Plaintiff's doctor at MacLaren. OYA sent J.K.C. to Dr. Edwards after numerous grievances and abuse reports in the 1990s, more than a year after its own superintendent wrote to the Oregon Medical Board unsolicited to vouch for him, less than six months after Zimmerman's report to Florip was kept secret ("handled internally"), and only a few months after the Oregon Medical Board's investigation into Dr. Edwards concluded. Exhibit 32 to Janci Decl., Exhibit 34 to Janci Decl., and Exhibit 35 to Janci Decl. Still, Defendants told J.K.C. nothing about any of that material information it had about Dr. Edwards. Exhibit 56, J.K.C. Decl., ¶ 7.

The State Defendants' representations were false because, at the time, the State Defendants knew that Dr. Edwards had previously been reported for improper sexual touching of other incarcerated youth under the guise of medical examinations (including through coercion and threats). By virtue of their fiduciary obligations to Plaintiffs, the State Defendants were obligated to disclose to him known risks of harm and to protect him from those risks.

State Defendants' conduct in concealing the truth about Dr. Edwards was also consistent with its larger practice of a "culture of silence." As OYA abuse investigator Jason Barber testified:

> Q. And was that -- was part of the concern as you were setting up the PSO that a code of silence at Oregon Youth Authority had contributed to the Boyles situation which was an impetus for the creation of the PSO?
>
> A. I believe so.
>
> Q. Okay. And throughout your tenure at OYA, was trying to eliminate or work against the code of silence something that you had to continue to undertake in your role?
>
> A. Yes.
>
> Q. And was that a dynamic that remained present in some form or another throughout your work with PSO, ***the code of silence at OYA***?
>
> A. Yeah.

Exhibit 42, Barber Dep. at 61:17–62:6 (emphasis added). *See also* Exhibit 4 to Janci Decl., Declaration of James Farmer at ¶ 16 ("I have reason to believe that OYA management's lack of accountability for staff at MacLaren was part of a wider culture of non-reporting and avoidance of scandal, based on other cases involving sexual misconduct by other OYA staff towards OYA youth."); Exhibit 60 to Janci Decl., (OYA employees discussing a "'Good Ole Boy' network that nurtured its own" within OYA culture, a fear of retaliation for making complaints to reporting misconduct, and a lack of enforcement of policies by management).

A reasonable person who was in the custody of OYA, like Plaintiff, would have no reason to suspect that prior reports were made to Defendants. Reliance and materiality are established by Plaintiff's declaration: "If OYA or any of the Individual Defendants had told me that they had received prior reports or complaints about Dr. Edwards before he examined me, I would have refused to be alone with Dr. Edwards and resisted any genital touching by him." *See* Exhibit 56, J.K.C. Decl., ¶ 21.

The State Defendants concealed from Plaintiff their knowledge of Dr. Edwards' past misconduct and the risk that he posed to Plaintiff from the time of his assignment as Dr.

Edwards' patient until their concealment was exposed in 2025. Throughout that time frame, Plaintiff could reasonably believe that State Defendants, having vested Dr. Edwards with power and authority over Plaintiff, were ignorant of his abuse and would continue to support and credit Dr. Edwards' actions regardless of what Plaintiff told them.

Plaintiff's beliefs were reasonable under the circumstances, as was his absence of further inquiry of State Defendants. *See Mt. Hood Stages, Inc. v. Greyhound Corp.*, 555 F.2d 687, 698 (9th Cir. 1977) (finding proper jury's determination of fraudulent concealment and noting that even suspicion of wrongdoing "will not substitute for knowledge of facts from which fraud could reasonably be inferred.") (internal citation omitted). Here, Plaintiff had no reason to suspect prior knowledge or failures to protect by the Individual Defendants. Exhibit 56, J.K.C. Decl., ¶¶ 14–19.

The State Defendants continued to conceal Dr. Edwards' wrongdoing until, at the earliest, March of 2025, when certain of their actions were made public for the first time through media reports of other victims pursuing accountability from State Defendants through civil lawsuits. Exhibit 56, J.K.C. Decl., ¶ 15–16. Because of the fear, shame and embarrassment instilled in him by Dr. Edwards' abuse, the concealment of the Individual Defendants' prior knowledge and failures to protect youth (including Plaintiff), and based on Plaintiff's experiences in the justice system as a whole, Plaintiff had no reason to inquire earlier.

Even if the court were to conclude that it was the State Defendants' *in*action that resulted in Plaintiff's abuse, that would be sufficient to toll the statute of limitations because of their special relationship with Plaintiff. A special relationship exists between a child in OYA custody and OYA, his legal guardian. *Fazzolari v. Portland Sch. Dist. No. 1J*, 734 P.2d 1326 (1987) (special relationship exists between a school and a student required to attend). This

is because, as the Ninth Circuit has stated:

> A special relationship arises when "one party has authorized the other to exercise independent judgment in his or her behalf" and, as a result, the party owing the fiduciary duty must take care of certain affairs belonging to the other. *Conway v. Pacific Univ.,* 324 Or 231, 924 P.2d 818, 824 (1996). What makes a relationship special is not its name, but the roles assumed by the parties. *See Strader v. Grange Mut. Ins. Co.,* 179 Or App 329, 39 P.3d 903, 906 (2002).

*Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1023 (9th Cir. 2002). Here, Plaintiff was in OYA custody by court order, and OYA was mandated by state law to care for him. ORS 420A.010.[18] State Defendants did not dispute these obligations towards youth in custody during their depositions. *See, e.g.*, Exhibit 61 to Janci Decl., Deposition of Defendant Daniel Berger (hereinafter, "Exhibit 61, Berger Dep."), 70:19–24 ("part of OYA's responsibility . . . is to take care of the basic needs of the youth who are in their care," including medical care). And there can be no reasonable dispute, therefore, that Plaintiff and OYA were in a special relationship imposing greater duties upon OYA for Plaintiff's welfare. *See also Buchler v. Oregon Corr. Div.*, 853 P.2d 798, 800–01 (Or. 1993) (defendant's status as custodian of a prisoner raised his duty of care) and *Christensen v. Epley,* 585 P.2d 416 (Or. App. 1978), *affirmed by an equally divided court* 601 P.2d 1216 (Or. 1979) (special relationship between custodian and prisoner).

Not only was it State Defendants' duty to inform Plaintiff that Dr. Edwards posed a risk to him, but it was State Defendants' duty to protect Plaintiffs from that risk. By instead doing nothing and keeping such information secret (i.e. avoiding mandatory reporting of the 2001

---

[18] ORS 420A.010 provides, in salient part:

(1) The Oregon Youth Authority . . . shall: . . .

(d) Exercise custody and supervision over those youth offenders committed to the youth authority by order of the juvenile court and persons placed in the physical custody of the youth authority under ORS 137.124 or other statute until the time that a lawful release authority authorizes release or terminates the commitment or placement;

(e) Provide adequate food, clothing, health and medical care, sanitation and security for confined youth offenders and others in youth authority custody;

(f) Provide youth offenders and others in youth authority custody with opportunities for self-improvement and work; . . .

Zimmerman report and "handling it internally"), State Defendants not only failed to protect Plaintiff, but also prevented Plaintiff from discovering their wrongdoing, thereby tolling the statute of limitations until after their wrongdoing came to light in March 2025, following Dr. Edwards' death and public filing of lawsuits by some of his victims. *See also Martinelli v. Bridgeport Roman Cath. Dio.*, 196 F.3d 409 (2nd Cir. 1999) (factual scenario existed involving Diocese of Bridgeport that supported fraudulent concealment tolling argument).

The actions of the State Defendants in concealing their knowledge that Dr. Edwards was a risk to MacLaren's minor incarcerated youth tolled the statute of limitations until their concealment began to be exposed in March of 2025.

*b. Equitable Estoppel.*

While similar, Plaintiff's equitable estoppel argument is distinct because:

> Estoppel precludes a defendant from asserting the statute of limitations when the defendant's actions have wrongfully, fraudulently, or inequitably caused a plaintiff to delay commencing legal action until the relevant statute of limitations has expired, or when the defendant has done anything that would tend to lull the plaintiff into inaction.

54 *C.J.S.* Limitations of Action § 40.

Oregon courts also recognize that equitable estoppel may apply where a fiduciary relationship is exploited. *Torch v. Windsor Surry Co.*, No. 3:17-CV-00918-AA, 2019 WL 6709379, *3 (D. Or. Dec. 9, 2019) (citing *Philpott v. A.H. Robbins Co., Inc.*, 710 F.2d 1422, 1425 (9th Cir. 1983)) (recognizing that Oregon courts apply equitable estoppel where "there has been fraud on the part of a fiduciary in concealing material facts evincing a cause of action"). "The presence of a fiduciary relationship . . . . bears heavily on the issue of due diligence" in questions of whether a defendant is equitably estopped from asserting a statute of limitations defense. *MAT, Inc. v. Am. Tower Asset Sub, LLC,* 493 P.3d 14, 23 (Or. App. 2021).

Equitable estoppel applies in this case to prevent the State Defendants from benefiting from their own wrongdoing by asserting the statute of limitations as a defense:

> The doctrine of estoppel has long been accepted as one of the bulwarks of equity in Anglo-American jurisprudence. Estoppel to plead the statute of limitations is often invoked on the broad general ground that parties may not take advantage of their own wrongs. As a general rule, a defendant will be estopped from setting up a statute-of-limitations defense when its own prior representations or conduct have caused the Plaintiff to run afoul of the statute and it is equitable to hold the defendant responsible for that result.

*Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365, 1371–72 (9th Cir. 1985). To invoke the doctrine of equitable estoppel, there must:

> (1) be a false representation; (2), it must be made with knowledge of the facts; (3) the other party must have been ignorant of the truth; (4) it must have been made with the intention that it should be acted upon by the other party; and (5) the other party must have been induced to act upon it.

*Lyden v. Goldberg*, 490 P.2d 181, 182 (Or. 1971); *see generally*, Alan Rosenfeld, *The Statute of Limitations Barrier in Childhood Sexual Abuse Cases: The Equitable Estoppel Remedy,* 12 Harv. Women's L.J. 206, 211–12 (1989). The evidence demonstrating State Defendants' false representations regarding Dr. Edwards' safety, Plaintiff's ignorance of the hidden danger he posed, and his reliance made by the State Defendants are set forth, *supra* in section on Equitable Tolling, and are not repeated here.

Other courts have found that equitable estoppel may apply to prevent the application of the statute of limitations in cases involving sexual abuse of youth in youth correctional contexts. *See, e.g. Duncan v. Or. Youth Auth.*, No. 05-1921-KI, 2007 WL 789433 at *11 (D. Or. Mar. 14, 2007) (finding in a sexual abuse case against Oregon Youth Authority that "a factual issue exists on whether equitable estoppel should apply, preventing summary dismissal of the § 1983 claims [against perpetrator] for statute of limitations reasons"). *See also Fla. Dep't. Health & Rehab. v. S.A.P.*, 835 So.2d 1091, 1100 (Fla. 2002) ("The law of this State does not bestow upon the

department a special boon to betray the children in its charge, to flagrantly flout the law, to conceal its misdeeds, and then to invoke [the statute of limitations] as a shield for its actions”).

The evidence supporting the elements of estoppel is the same as that for equitable tolling, is set out above, and incorporated by reference again here. The viability of the application of equitable estoppel is particularly compelling where, as here, the State Defendants were in a fiduciary relationship with Plaintiff that obligated them to protect him and provide him with material facts pertinent to his well-being. *Philpott* at 1425 (“Oregon courts have applied estoppel [ ] where there has been fraud on the part of a fiduciary in concealing material facts evincing a cause of action.”); *see generally* Allan E. Korpela, *Fiduciary or Confidential Relationship as Affecting Estoppel to Plead Statute of Limitations*, 45 A.L.R. 3d 630 (Originally published 1972). Whether State Defendants’ conduct ***tolls*** the limitation period, or ***estops*** Defendants from invoking it, presents a genuine issue of fact that must be decided by a jury. These factual issues independently require denial of Defendants’ motion for summary judgment.

**B. Plaintiff J.K.C.’s Seventh Claim for Relief Is Timely.**

Plaintiff’s seventh claim for relief is a claim for battery directly against OYA (in contrast to a vicarious liability claim). The Seventh Claim for Relief is premised on a “pattern of sexual abuse of numerous adjudicated youths had been repeatedly reported to (and otherwise came to the attention of) OYA staff and supervisors for years . . . referred to as the ‘Repeated Notice.’” SAC at ¶ 193. This claim for relief posits that by refusing to take corrective action, control, investigate, implement safety protections, and similar conduct—“despite the Repeated Notice about Dr. Edwards”—OYA “gave substantial assistance or encouragement to Dr. Edwards to perpetuate the sexual abuse of adjudicated youth, including Plaintiffs.” *Id.* at ¶ 194. The cause of action alleges that in so doing, OYA acted with intent to cause further harmful or offensive

touching or …[i]n the alternative, OYA acted with substantial certainty" that such batteries would occur in the future. *Id.* at ¶ 195.

On this theory, for the same reasons set out above, Plaintiff's Seventh Claim for Relief is timely because Plaintiff did not know (and could not have discovered) that OYA leaders were aware of the "Repeated Notice" about Dr. Edwards prior to his own abuse.

Defendant's reliance on the timeliness analysis from *Moore v. Portland Public Schools*, 537 P.3d 544 (Or. 2023) is baffling. In *Moore*, eight adult paraeducators sued their employer, Portland Public Schools ("PPS"), for battery and other claims based on allegations of assault by students. *Id*. at 548-49. Some of the episodes of assault fell outside of the 180-day notice period while others did not. *Id*. at 557. The *Moore* plaintiffs argued that all instances of assault were part of a single "continuing tort" and therefore, so long as the last assault claim was timely, all assaults claims were timely. *Id.* The *Moore* court rejected this argument, holding that each assault was a stand-alone incident under the OTCA and therefore must be analyzed on its own merits as to timeliness. *Id.*

Here, the timeliness of Plaintiff's battery claim is not premised on a theory of "continuing tort" as there is no episode that occurred within 180 days or two-years of filing suit. Instead, Plaintiff's battery claim is timely for the same reasons cited and argued throughout: that Plaintiff J.K.C. was not aware until 2025 that OYA leaders had received prior reports about Dr. Edwards. Exhibit 56, J.K.C. Decl. at ¶¶ 14–19. This evidence supports a finding of delayed accrual of J.K.C.'s Seventh Claim for Relief until 2025.

In the alternative, Defendant OYA's aforementioned concealment supports the application of equitable estoppel and equitable tolling for the reasons set forth above and summary judgment must likewise be denied as to this claim.

## II. PLAINTIFFS HAVE MET THEIR BURDEN FOR FEDERAL CLAIMS AGAINST INDIVIDUAL DEFENDANTS (HUMPHREYS, THOMPSON, BERGER, AND COX)

Defendants Hill, Humphreys, Thompson, Berger, and Cox have moved for partial summary judgement against all Plaintiffs' federal civil rights claims, claiming that Plaintiffs "cannot meet their burden for federal claims against supervisory defendants" based on a theory of supervisory liability under the 8th and 14th Amendments. Defendants' MPSJ at 17.

### A. Legal Standard.

As stated above, in order for Defendants to prevail on a motion for summary judgment against these Defendants, the Court must determine that there is no genuine issue of fact for the jury while viewing "the evidence and all inferences therefrom in the light most favorable to the non-moving party and may not weigh the evidence or make credibility determinations." *Hauk v. J.P. Morgan Chase Bank USA*, 552 F.3d 1114, 1117–18 (9th Cir. 2009). Additionally, the party bringing the motion "bears the initial responsibility of informing the district court of the basis for its motion," and the court should only consider what argument have specifically been raised by Defendants in their Motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986).

Plaintiffs' Second and Third Claims for Relief seek recovery pursuant to 42 U.S.C. §1983 for civil rights violations. The Second Claim for Relief is a claim for "Violation of the 14th Amendment—Supervisory Liability and Failure to Protect Adjudicated Youth," and the Third Claim for Relief is a claim for an "8th Amendment Violation" premised on "Supervisory Liability and Failure to Protect Convicted Youth." Plaintiffs have admitted that: (a) those plaintiffs who were adjudicated at the time of the abuse only have 14th Amendment claims; and (b) those plaintiffs who were convicted of crimes as adults, despite their minority, but were still

held in the custody of OYA at the time of the abuse, only have 8th Amendment claims.[19] While Defendants and Plaintiffs agree on this matter of the law, Plaintiffs disagree that the legal analysis for "Supervisory Liability" claims and "Failure to Protect" Claims are identical. Because of the factual complexity in this matter given the number of Plaintiffs, Defendants, and legal claims at issue, Plaintiffs will first set out the full legal landscape for each type of federal claim alleged here. Then they will apply the facts to each specific Defendant moving for summary judgment against Plaintiffs' civil rights claims.

***i. Supervisory Liability.***

A supervisor may be liable to a plaintiff under 42 U.S.C. §1983 for his subordinate's unconstitutional actions, not under a vicarious liability theory, but based on his own culpable conduct. *See Starr v. Baca*, 652 F.3d 1202, 1206–08 (9th Cir. 2011). The first step in determining whether this supervisory liability applies is to determine whether the individual defendant had supervisory authority over the wrongdoer—here, Dr. Edwards. If so, then the court may apply the supervisory liability legal standard to determine a violation of a plaintiff's constitutional rights. The Ninth Circuit has found that "[a] showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's [constitutional] rights is sufficient to demonstrate the involvement—and the liability—of that supervisor." *Starr* at 1206–07. There are three ways that a supervisor can be "deliberately indifferent "and thus liable to Plaintiffs under 42 U.S.C. §1983:

1. "for his own culpable action or inaction in the training, supervision, or control of his subordinates;"

[19] *See R.G. v. Koller*, 415 F Supp 2d 1129, 1152 (D Haw 2006) (finding that the Fourteenth Amendment Due Process standard applies to juvenile detainees who had been adjudicated delinquent and had not been convicted of crimes).

2. "for his acquiescence in the constitutional deprivation;" or

3. "for conduct that showed a reckless or callous indifference to the rights of others."

*Id.* at 1207–08 (citing *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.1998)); *see also Hyde v. City of Willcox*, 23 F.4th 863, 874 (9th Cir. 2022).

The Ninth Circuit court has also clarified that the finding of "deliberate indifference" "requires an objective risk of harm and a subjective awareness of that harm." *Henry A. v. Willden*, 678 F.3d 991, 1001 (9th Cir. 2012) (quoting *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010) (internal citations omitted). Specifically, it requires (1) "a showing of an objectively substantial risk of harm"; and (2) "a showing that the officials were subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm existed" and either of the following: (a) "the official actually drew that inference" ***OR*** (b) "that a reasonable official would have been compelled to draw that inference." *Id*. Importantly, "the subjective component may be ***inferred from the fact that the risk of harm is obvious***." *Id.* (emphasis added).

Once a breach has been established, a plaintiff must show a "sufficient causal connection" between the supervisor's breach and the plaintiff's injury. *Starr* at 1207. "'The requisite causal connection can be established . . . by setting in motion a series of acts by others,' or by 'knowingly ***refus[ing] to terminate a series of acts by others***, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury,'" *Id.* at 1207–08 (internal citations removed) (emphasis added).

The Ninth Circuit Court summarizes this standard well in another case against individual Oregon Youth Authority defendants: "Deliberate indifference to a known, or so obvious as to

imply knowledge of, danger, by a supervisor who participated in creating the danger, is enough." *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996).

***ii. Failure to Protect.***

Alternatively, if the court finds that any defendant did not have supervisory authority over Dr. Edwards, it must then still proceed with the "failure to protect" legal analysis to determine a violation of Plaintiffs' 8th or 14th amendment rights.[20] This standard is applied slightly differently between 8th amendment and 14th amendment claims.

*a. 8th Amendment.*

Under the 8th Amendment, a prison official violates his duty to protect inmates when 1) his act or omission objectively causes "a substantial risk of serious harm," and 2) he is subjectively aware of that risk and acts with "deliberate indifference to inmate health or safety." *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833, 834, 839–40 (1994)). "In other words, 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer* at 837).

The Ninth Circuit emphasized that while deliberate indifference is "something more than mere negligence," it is "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Cortez* at 1050 (quoting *Farmer* at 835). In fact, **"[a] prison official's deliberate indifference may be established through an 'inference from**

[20] While most of the case law developed on this cause of action stems from cases where plaintiffs are asserting a right to be protected from violence at the hands of other prisoners, the legal standards do not require the injury to be caused by a fellow prisoner in order for a plaintiff to bring this claim against a prison official. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (finding that the Eight Amendment imposes duties on prison officials to "take reasonable measures to guarantee the safety of the inmates.")

**circumstantial evidence**' or '**from the very fact that the risk was obvious**.'" *Id.* (quoting *Farmer* at 842) (emphasis added).

*b. 14th Amendment.*

For a 14th Amendment Claim for failure to protect, the requirements are similar, but under the 14th Amendment, the plaintiff "need not prove those subjective elements about the officer's actual awareness of the level of risk." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). Rather, detainees asserting due process claims for failure to protect[21] must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.* The court then goes on to lay out the elements of a "Fourteenth Amendment failure-to-protect claim against an individual officer":

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id*. In other words, the Court must ask "whether there was 'a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff suffered.'" *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019) (quoting *Castro* at 1070).

**B. Application.**

***i. Defendant Richard Hill.***

[21] This case refers to pretrial detainees' Fourteenth Amendment claims, but as stated above, adjudicated youth have the same rights as pretrial detainees because they have not been convicted of a crime.

Plaintiffs agree to dismiss all claims against Richard Hill.

***ii. Defendant Darrin Humphreys.***

Because of prior agreement with Defendants, the remaining Plaintiff who is bringing claims against Defendant Humphreys is N.T.N.

*a. Supervisory Liability*

Defendants do not argue that Defendant Humphreys had supervisory authority over Dr. Edwards, only that

> [t]here are no direct allegations of wrongful conduct by Humphreys and no specific allegation of any report to Humphreys of conduct by Dr. Edwards which would show that Humphreys was subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm to plaintiffs' [sic] N.T.N. and/or S.S.L. existed.

Defendants' MPSJ at 21.

First, Plaintiffs note that this argument applies the wrong standard for a Motion for Summary Judgment, presumably relying on a "sufficiency of the pleadings" argument, rather than referencing "the pleadings, the discovery and disclosure materials on file, and any affidavits [which] show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law" as required under Fed. R. Civ. P. 56(c).

Parties are agreed that the superintendent of MacLaren had supervisory authority over Dr. Edwards during 2007 when Defendant Humphreys was in that role. OYA's Rule 30(b)(6) designee on organizational structure testified without qualification that the MacLaren superintendent was "where the buck stops" with respect to "hiring, supervising, [and] monitoring the medical personnel at MacLaren," with a program director in between. Exhibit 15, Cox 30(b)(6) Dep., 26:18–27:14; *see also* Exhibit 8, Labarre-Bates 30(b)(6) Dep., 131:19–132:1 (stating that from 1995 through 2007, Dr. Edwards's supervisory chain of command "flowed . . .

to the superintendent of MacLaren"). Cox confirmed that Dr. Edwards "would have reported to the program director and—and through the program director to the superintendent," and that this structure remained in place "[u]ntil 2009," or possibly 2008. Exhibit 15, Cox 30(b)(6) Dep., 28:11–20.

Because Defendant Humphreys had supervisory authority over Dr. Edwards, the court may proceed with the supervisory liability analysis to determine if he was deliberately indifferent due to "an objective risk of harm and [his] subjective awareness of that harm." *Henry A.* at 1001 (quoting *Tamas* at 844 (9th Cir. 2010)) (internal citations omitted).

Here, the objectively substantial risk of harm is the sexual abuse that Plaintiffs suffered by Dr. Edwards. Defendants do not raise any arguments that this risk is insufficiently substantial, only that Humphreys was not "subjectively aware of facts from which an inference could be drawn that a substantial risk of serious harm to plaintiffs' [sic] N.T.N. and/or S.S.L. existed." Defendants' MPSJ at 21. Therefore, Plaintiffs turn to evidence which shows Defendant Humphreys' subjective awareness.

In February 2007, PSO began to investigate a former OYA youth's report that he had been inappropriately touched by Dr. Edwards during his intake at MacLaren. *See* Exhibit 62 to Janci Decl. On February 22, 2007, the former OYA youth was interviewed by PSO and told the investigator that Dr. Edwards "pushed a couple of times on his stomach and then without warning reached his hand under his sweat pants and grabbed his penis" while they were alone in the doctor's office with the door closed. *Id*. When Dr. Edwards grabbed his penis, the youth started to "freak out," and Dr. Edwards let him go. *Id.* The youth clarified that Dr. Edwards never mentioned to him that he needed to do a testicular or groin exam, that he never wore gloves, and that he never gave the youth an option to wear gloves if the youth preferred it. *Id.* The youth also

shared that other youth had told him that they had similar experiences with Dr. Edwards and "that is why he is known around the facility as Dr. Cold Fingers." *Id.* OYA's Medical Director Marcia Adams has agreed that grabbing a boy's penis in this way "was not consistent with the type of genital exam [which] was standard at OYA." Exhibit 19, Adams Dep. Vol. I, 139:15–18. OYA leaders understood this conduct involved an allegation of child sexual abuse, as evidenced by their reporting the matter to Oregon State Police. Exhibit 63 to Janci Decl.

After this youth interview, the PSO report indicated that Director Jester and Assistant Director in charge of Facility Operations, Brian Florip, met with the PSO investigator and "agreed that Dr. Edwards should be placed on administrative leave" and that "Brian will work out details with Mary Lenz and Darrin Humphreys." Exhibit 62 to Janci Decl. Then a few weeks later, after Dr. Edwards was interviewed by the police, a Marion County Deputy District Attorney determined that there was not enough prosecutable evidence, and Dr. Edwards should return to work. *Id.* The detective who interviewed Dr. Edwards emailed Defendant Humphreys directly on March 15, 2007, to alert him of the District Attorney's decision not to prosecute. Exhibit 64 to Janci Decl. Then on March 19, 2007, the PSO Final Disposition Letter was hand delivered to "Darrin Humphreys assistant at MacLaren in order to hand to Dr. upon his return to work." Exhibit 62 to Janci Decl. There is no evidence that Defendant Humphreys took any action at this point despite that: (1) agency policy required an administrative investigation separate and apart from any law enforcement investigation; and (2) that OYA leaders knew that their employment decisions should be based on a lower (preponderance) standard of proof. *See* Exhibit 9, Jeske 30(b)(6) Dep., 21:13–22:18, 153:7–18.

This evidence shows that Defendant Humphreys had a subjective knowledge of specific allegations of sexual abuse by Dr. Edwards. He was deliberately indifferent because of his

inaction in supervising and controlling Dr. Edwards, his subordinate. By receiving the report that Dr. Edwards had grabbed a youth's penis without medical necessity and failing to do any follow up after the police declined to prosecute, failing to order a separate internal investigation at the lower preponderance standard, failing to require use of a chaperone, failed to place any additional supervision on Dr. Edwards or write a letter of reprimand to place on his file, a reasonable juror could find that Defendant Humphreys was acquiescing in the continued constitutional deprivation of youth who continued to see Dr. Edwards and be abused by him for the next 10 years. This conduct in the face of so great a risk—the risk of sexual abuse—to other youth within his care as MacLaren Superintendent was reckless, callous, and deliberately indifferent to the safety and constitutional rights of the youth.

Viewing the evidence and all inferences in light most favorable to Plaintiffs, there is a genuine issue of fact as to whether Defendant Humphreys was subjectively aware of these facts from which an inference could be drawn that a substantial risk of serious harm existed. Knowing about an incident where a doctor under his supervision at his facility grabbed a youth's penis without any justification is sufficient to show that a reasonable official would have been compelled to draw such an inference. In fact, "the subjective component may be inferred" when "the risk of harm is obvious," as it is here.

There is sufficient evidence to find a genuine issue of fact as to Defendant Humphreys' subjective knowledge of facts that would lead him to draw the inference that because Dr. Edwards was a risk to one youth, he would continue to be a risk to other youth if not stopped, corrected, or properly supervised. Defendant Humphreys did none of these things. Therefore, Defendants fail to meet the summary judgment standard for their motion as to Defendant Humphreys.

***iii. Defendant Isidro Thompson.***

Because of prior agreement with Defendants, the remaining Plaintiff who is bringing claims against Defendant Thompson is N.T.N.

*a. Supervisory Liability.*

Defendants argue that, although Defendant Thompson was a superintendent at MacLaren, he "had no actual supervisory authority over either defendant Baumgartner or Dr. Edwards." Defendants' MPSJ at 22.[22] Plaintiffs do not agree that Defendant Thompson had no supervisory authority over Dr. Edwards; there is a genuine issue of fact on this point.

OYA restructured in 2009 and "created the Health Services Division consolidating all direct medical care under Medical Director [Marcia Adams]." Defendants claim that, after that restructuring, Dr. Adams became the sole supervisor of Dr. Edwards, and the MacLaren Superintendents therefore had no supervisory authority over him from that point on. Defendants' MPSJ at 22. However, just because Dr. Marcia Adams had supervisory authority over Dr. Edwards does not preclude the inference that the MacLaren Superintendents still retained some level of concurrent supervisory authority over Dr. Edwards as well. Defendant Thompson's own testimony supports such an inference.

Defendant Thompson testified that in his role as Superintendent at MacLaren it was his responsibility to keep youth at MacLaren safe and protect them from sex abuse. Exhibit 65 to Janci Decl., Deposition of Defendant Isidro Thompson (hereinafter, "Exhibit 65, Thompson Dep."), 53:13–21. He agreed that his responsibility included enforcing the rules that prohibit sexual abuse of youth and holding people accountable who break those rules. *Id.* at 54:1–9. He

[22] The issue of whether Defendant Thompson had supervisory authority over Defendant Baumgartner is moot because the only Plaintiff who brought claims against Defendant Baumgartner, E.C.R., has since settled all his claims.

testified that he was involved in delivering any disciplinary action from Human Resources to MacLaren employees, and he had the authority to push back on HR's disciplinary determinations for MacLaren employees if he disagreed. *Id.* at 59:5–60:4. Defendant Thompson agreed that because the supervisor for the medical staff at MacLaren did not work daily at the facility, that he, as superintendent, would have been responsible for "direct monitoring, eyes on the ground" of the MacLaren clinic employees. *Id.* at 68:7–18.

When Defendant Thompson was specifically asked why it was important to notify the superintendent when a MacLaren employee violated PREA, he reasserted that as the superintendent, "the responsibility for ensuring the safety of youth" and "the responsibility for ensuring a safe and secure environment at the facility falls on the superintendent." Exhibit 65, Thompson Dep., 74:4–10, 75:6–10. He also admitted that as Superintendent of MacLaren, he had "general enforcement authority" of MacLaren's policies including the 2010 "Preventing Responding to, and Monitoring Offender Sex Abuse" Policy, which applied the PREA standards. *Id.* at 90:1–7; *see also* Exhibit 66 to Janci Decl. Similarly, OYA testified that "the agency's stance on PREA or any allegations of abuse [is] that it is the superintendent's responsibility to ensure that those follow-up actions occur." Exhibit 9, Jeske 30(b)(6) Dep., 67:20–24. Dr. Adams even described her own authority over Dr. Edwards as "partial" because "there was still some kind of overlap with the facility side as far as supervision." Exhibit 21, Adams Dep. Vol. II, 201:13–18.

The inferences that can be drawn from this evidence are that while Dr. Adams may have been Dr. Edwards' direct supervisor during the time that Defendant Thompson was Superintendent at MacLaren, that did not strip him of all supervisory authority over Dr. Edwards. As a MacLaren employee working within the facility over which Defendant Thompson had

control and responsibility, he maintained some level of supervisory authority over Dr. Edwards or at least there is a genuine issue of fact as to that question.

This dual chain of command (with concurrent supervisory responsibilities) is typical in the correctional health care setting, according to Dr. Staples-Horne[23], an expert in juvenile corrections health care. She states that there is a "*clinical* chain of command" which supervises medical staff for clinical purposes. Exhibit 67 to Janci Decl., Declaration of Expert Dr. Staples-Horne, ¶ 7. Then, a there is an "*administrative* chain of command that leads to the Facility Director or Supervisor" for administrative matters such as "adherence to policies." *Id.* Based on Dr. Staples-Horne's review of the evidence in this case, she testified that:

> it is my professional opinion (held to reasonable degree of professional and medical certainty) that within OYA, even during Dr. Adams' tenure, both Dr. Adams and MacLaren facility leadership (including Superintendents) – in addition to OYA agency leadership (such as agency Directors and Assistant Directors) – were in Dr. Edwards' supervisory chain of command (either clinical or administrative) and had the authority to take responsive action upon learning of information indicating that Dr. Edwards posed a risk of sexual abuse of minors in OYA custody.

*Id.* at ¶ 9.

This expert testimony is consistent with Defendant Thompson's own description of his role and responsibilities as MacLaren Superintendent. It is also consistent with the extensive, uncontested evidence demonstrating that Superintendents at MacLaren were at times in the supervisory chain of command over Dr. Edwards. *See e.g.* Exhibit 8, Labarre-Bates 30(b)(6) Dep., 131:19–132:1; Exhibit 15, Cox 30(b)(6) Dep., 28:11–20. Together, the evidence is

---

[23] Dr. Staples-Horne is a trained and licensed medical doctor and serves as the Medical Director for the State of Georgia's Department of Juvenile Justice, a post she has held for more than 30 years. Dr. Staples-Horne has extensive experience administering and overseeing the provision of medical services to youth in correctional settings. She has also done significant research, writing, and presenting on issues related to juvenile correctional facilities. Exhibit 67 to Janci Decl., Declaration of Expert Dr. Staples-Horne, ¶¶ 1–2.

sufficient to create a genuine issue of fact as to Defendant Thompson's supervisory authority over Dr. Edwards.

If Defendant Thompson exercised supervisory authority over Dr. Edwards, then the court may apply the supervisory liability legal analysis here. Because Defendants have made no argument contesting that Defendant Thompson was deliberately indifferent under the supervisory liability framework, only that he was not a supervisor of Dr. Edwards, Plaintiffs will not address that framework further.

*b. Failure to Protect.*

Even if the court were to find that Defendant Thompson did not have any supervisory authority over Dr. Edwards as MacLaren Superintendent, that finding would not be determinative of Plaintiff N.T.N.'s (who was convicted) failure to protect claims against Defendant Thompson under the 8th Amendment.

Under the 8th Amendment, a prison official violates his duty to protect inmates when 1) his act or omission objectively causes "a substantial risk of serious harm," and 2) he is subjectively aware of that risk and acts with "deliberate indifference to inmate health or safety." *Cortez* at 1050 (quoting *Farmer* at 833, 834, 839–40). And a "prison official's deliberate indifference may be established through an '**inference from circumstantial evidence**' or '**from the very fact that the risk was obvious**.'" *Id.* (quoting *Farmer* at 842) (emphasis added).

Defendant Thompson's failure to take action to stop Dr. Edwards' abuse, whether through discipline, additional monitoring, stricter policy enforcement, or otherwise, objectively caused the substantial risk to other youth, including Plaintiffs, of being sexually abused. The evidence supports that he was subjectively aware of that risk and was deliberately indifferent to the youth's safety because the risk was obvious.

On August 29, 2012, Defendant Thompson, then MacLaren Superintendent, received an email from a PSO investigator containing a youth allegation that "he received a physical in March of 2012 from Dr. Edwards in which the Doctor did not use gloves" and stated that "he touched [his] balls with no gloves." Exhibit 68 to Janci Decl. OYA leaders understood that that the youth was reporting that he "feels violated by the doctor[.]" Exhibit 69 to Janci Decl. When asked about this youth's allegations at his deposition, Defendant Thompson said that he did not have "any recollection of doing anything with this complaint" and did not know "whether Dr. Edwards was disciplined, either formally or informally, in any way because of this." Exhibit 65, Thompson Dep., 119:14–20. Other record evidence establishes that Dr. Edwards was never the subject of any discipline or corrective action. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 198:18–199:6. Taken with all inferences in favor of Plaintiffs, this evidence supports a subjective awareness of an allegation of sexual abuse by Dr. Edwards and a failure to act in protection of the youth at MacLaren, evincing a deliberate indifference toward the rights of Plaintiffs.

Then, on July 22, 2013, Defendant Thompson received another email from a PSO investigator containing an allegation from the mother of a youth at MacLaren, stating that "no matter what you go see Dr. Edwards for, he always does a prostate check with you." Exhibit 70 to Janci Decl. A few days earlier, Joseph O'Leary, the Deputy Director of OYA at the time, had received this complaint directly from the mother on the phone and "talked with Sid about the situation." Exhibit 71 to Janci Decl. When he was asked about this report in his Deposition, Defendant Thompson agreed that he "was made aware" of it, but that he did not know how this complaint against Dr. Edwards was resolved. Exhibit 65, Thompson Dep., 121:21–24, 126:19–22.

Defendant Thompson received more than one complaint about Dr. Edwards' sexual abuse toward MacLaren youth and failed to act in any way to protect the youth from further abuse. This is sufficient evidence to support an inference of deliberate indifference for Plaintiff N.T.N.'s failure to protect claim to survive Defendants' summary judgment motion. Therefore, under the supervisory liability claim analysis, as well as N.T.N.'s 8th Amendment failure to protect claim, Defendants' motion for summary judgment fails as to Defendant Thompson.

***iv. Defendant Daniel Berger.***

Because of prior agreement with Defendants, the only remaining Plaintiff who is bringing claims against Defendant Berger is N.T.N.

*a. Supervisory Liability.*

As with Defendant Thompson, Defendants only argue in their Motion for Summary Judgment that Plaintiffs cannot meet their burden of proof against Defendant Berger because he "had no actual supervisory authority over Dr. Edwards." Defendants' MPSJ at 22. Similarly, Plaintiffs respond that there is sufficient evidence to support a finding that Defendant Berger did exercise some level of supervisory authority over Dr. Edwards while he was Superintendent at MacLaren, despite Dr. Adams being his clinical supervisor.

Defendant Berger admitted in his deposition that it was his job as Superintendent at MacLaren to protect youth from sexual abuse, even if the perpetrator of that abuse is not someone that he directly supervises—as long as the perpetrator is inside the "secure perimeter" of MacLaren. Exhibit 61, Berger Dep., 58:18–25. He also testified that "as superintendent I'm responsible for the day-to-day operations of MacLaren," which "includes safety of youth" and "protecting youth from sexual abuse by staff." *Id.* at 74:13–25. Defendant Berger also mentioned that if there was staff misconduct at MacLaren, as Superintendent he would contact HR or PSO

and "help them in their investigative processes." *Id.* at 78:13–18. And if there was a staff member who he felt was a "threat to youth safety but wasn't a part of [his] direct reporting chain," he had the ability to go to their direct supervisor or his own supervisor and share his concerns. *Id.* at 82:17–83:3, 83:21–84:1.

When Defendant Berger was asked about his responsibility as Superintendent as to PREA compliance, he testified that he would follow up on PREA compliance, pay close attention to investigations, and "mak[e] sure people are supervising and people are getting the training they need." Exhibit 61, Berger Dep., 93:7–94:7. He stated that if there was an issue with supervision in the medical clinic, he could "speak to [his] security manager to address the issue, connect with the nurses or whoever made the complaints and figure out that the problem is" as well as "talk to the supervisor . . . to address any issues on that side." *Id.* at 95:7–19. He also admitted that even though he did not directly supervise Dr. Edwards, if he was concerned about youth safety with Dr. Edwards, he could have "ask[ed] what precautions are being made to ensure youth are safe," including following up on how Dr. Edwards was being supervised, if he was using a chaperone, if a GLC could serve as a chaperone or if there was any plan for additional supervision. *Id.* at 190:16–23.

Similar to Defendant Thompson, there is sufficient evidence that Defendant Berger carried at least some supervisory authority over Dr. Edwards, whether that was through enforcing the PREA policy or his general responsibility to protect youth in MacLaren from sexual abuse. Taken in conjunction with Dr. Staples-Horne's expert testimony that facilities like MacLaren have two separate chains of command for medical staff, there is sufficient evidence to create a genuine issue of fact for a jury that Defendant Berger had some supervisory authority over Dr. Edwards. The same analysis applied with respect to Defendant Thompson applies here.

This evidence is fatal to Defendants' "no supervisory responsibility" motion for summary judgment against Defendant Berger.

*b. Failure to Protect.*

Whether Defendant Berger had supervisory authority over Dr. Edwards does not control Plaintiff N.T.N.'s failure to protect claim under the 8th Amendment. Just as N.T.N.'s failure to protect claim survives against Defendant Thompson, similarly it survives against Defendant Berger.

Defendant Berger received three separate reports of Dr. Edwards' sexual abuse of youth during his time as MacLaren Superintendent and failed to take action sufficient to prevent the substantial risk of sexual abuse that Dr. Edwards posed to other youth in MacLaren. That evidence is summarized below.

On October 3, 2013, Defendant Berger was copied on an email chain discussing several allegations, including one against Dr. Edwards stating that he was "conducting unnecessary prostate checks on youth." Exhibit 72 to Janci Decl. On the very same day, Defendant Berger was notified of another PSO investigation against Dr. Edwards. Exhibit 73 to Janci Decl. As the investigation into this event continued, Defendant Berger was sent the investigation report from PSO which stated that a youth had complains that Dr. Edwards grabbed his hips from behind him while checking his back for acne in a way that "weirded [him] out." *Id.* OYA leaders understood these allegations related to "Sexual Behavior" and "Inappropriate touching by medical staff on youth." Exhibit 74 to Janci Decl. When asked about whether he remembered receiving an email from the PSO investigator about this allegation, Defendant Berger did not have a specific memory of it but had no reason to believe that he did not actually receive it. Exhibit 61, Berger Dep., 174:21–175:5.

When confronted with these two allegations against Dr. Edwards which were close in time, Defendant Berger testified that the "two complaints in short order" was concerning to him at the time of the deposition, and a normal response would be to ask what was "going on in the clinic with Dr. Edwards," "who's on top of this," and "are they supervising him." Exhibit 61, Berger Dep., 179:5–20. Yet, he did not remember if he took any action to follow up on these complaints in 2013. *Id.* at 179:21–24.

Defendant Berger received another complaint on September 1, 2016, that "Dr. Edwards pressed his genitals against [a youth] 3 different times when giving [him] an eye exam" and that he "held/cupped the youth's butt for a minute while talking to him." Exhibit 75 to Janci Decl. When asked about this complaint, he testified that he did not take any other action in response to this complaint besides forwarding the email to PSO, despite stating that this pattern of abuse by Dr. Edwards was concerning to him. Exhibit 61, Berger Dep., 186:1–187:22. Berger received all of these reports—and chose to take no action—before Dr. Edwards abused N.T.N. in 2017.

Under the 8th Amendment failure to protect analysis, the court must determine whether Defendant Berger's acts or omissions objectively caused a substantial risk of serious harm and whether he was subjectively aware of that risk and acted with deliberate indifference. Defendant Berger received at least three documented reports of youth allegations of sexual abuse by Dr. Edwards. Yet, the evidence shows he took no substantive action to follow up on those reports to ensure youth safety. Defendant Berger himself testified that he could have made sure Dr. Edwards was being properly supervised in compliance with PREA, he could have contacted HR, or made a plan with his own security manager for monitoring the clinic.

Defendant Berger's failure to take action to stop Dr. Edwards' abuse through any of these means, objectively caused the substantial risk to other youth, including Plaintiff N.T.N., of being

sexually abused. The evidence supports that he was subjectively aware of that risk and was deliberately indifferent to the youth's safety because the risk was obvious.

***v. Defendant Philip Cox.***

All Plaintiffs are bringing claims against Defendant Cox, who served as the Health Services Administrator and various other roles between 1999-2016. Defendants contest that Cox had any supervisory authority over Dr. Edwards in any of his roles with OYA. *See* Defendants' MPSJ at 22–23. Defendants claim that "Plaintiffs misinterpret the evidence in the record to support their claims." *Id.* at 23. However, Plaintiff's reasonable interpretation of the evidence must be adopted for purposes of deciding this motion: the court must construe "all inferences . . . in the light most favorable to the [Plaintiffs] and may not weigh the evidence or make credibility determinations." *Hauk* at 1117–18.

*a. Supervisory Liability.*

Defendants admit that Defendant Cox was a "Health Services Administrator from 1999–2007." Defendants' MPSJ at 22. Evidence of Defendant Cox's supervisory authority over Dr. Edwards is clearest in a 2007 letter from Mary Lenz, an HR manager from OYA Employee Services, to Dr. Edwards, confirming his placement on administrative leave during an Oregon State Police investigation regarding allegations of child sexual abuse. *See* Exhibit 54 to Janci Decl. In this letter, Ms. Lenz writes: "If you have any questions concerning your status during this paid administrative leave, ***please call your supervisor, Phil Cox***." *Id.* (emphasis added).

When Mary Lenz was asked about this letter in her deposition, she stated that she had no reason to doubt that Cox was Dr. Edwards' supervisor, and it "doesn't surprise [her] that his name is there." Exhibit 76 to Janci Decl., Deposition of Mary Lenz, 80:16–24. Additionally, Jason Barber, who was the manager of PSO when it was initiated in 2006 testified that

Defendant Cox was "over the medical doctors that [OYA] had." Exhibit 42, Barber Dep., 32:15–19. Even OYA's own witness designated as the agency's voice on Dr. Edwards' supervision and personnel history testified that Phil Cox was Dr. Edwards' supervisor for at least some time. Exhibit 8, Labarre-Bates 30(b)(6) Dep., 174:6–16. This evidence alone is sufficient to defeat Defendants' motion.

Dr. Adams also testified that for several years after she was hired by OYA in 2007, Defendant Cox, who was the Assistant Director of the Program Office at the time, supervised her. Exhibit 19, Adams Dep. Vol. I, 44:16–22. She testified that "[i]f it was determined that [a medical staffer] could not provide appropriate care" Adams would "report[] to Phil Cox," "make a recommendation to Mr. Cox about what should happen with that staffer," and "it would ultimately be Mr. Cox's authority or decision about what to do," likely "in conjunction with" the superintendent and HR. *Id.* at 57:5–58:2. Given Defendants' assertion that Dr. Adams was hired in October 2007 as "the supervising physician/medical director at OYA," thus becoming Dr. Edwards' supervisor, Defendant Cox would still be in Dr. Edwards' supervisory chain of command, as his supervisor's supervisor. *See* Defendants' MPSJ at 22.

Defendant Brian Florip testified that Defendant Cox was "in charge of medical practice" around the time in 2007 that Dr. Edwards was placed on administrative leave. Exhibit 77 to Janci Decl., Deposition of Brian Florip, 129:12–130:6, *see also* 124:15–16 ("Phil Cox [was] supervising medical practice."). Defendant Cox was also copied on an email on March 16, 2007, asking if Dr. Edwards should be taken off of administrative leave. Exhibit 44 to Janci Decl.

In addition to all of this direct evidence of Defendant Cox's supervisory authority over Dr. Edwards, there is even more evidence that supports inferences that Defendant Cox had some supervisory authority over Dr. Edwards. For example, in December of 2006, when an OYA staff

member named Joni Zimmerman initiated a complaint about "ongoing concerns regarding Dr. Edwards performing testicular exams on male youth at MacLaren without using gloves," Jason Barber, "[s]poke with Phil Cox," who informed him of a history of complaints against Dr. Edwards, including an Oregon Medical Board investigation in 2001, and that it was "Dr. Edwards' contention that he could give a more thorough exam without having the latex gloves interfere with his sense of touch." Exhibit 40 to Janci Decl. The report goes on to document that Defendant Cox and Brian Florip were planning to "have a meeting with Dr. Edwards coming up soon and they will talk with the Dr. about this issue coming up again and brain storm about ways to resolve it." *Id.* Mr. Cox told Mr. Barber that he would "document his conversation with Dr. Edwards" and send it to Mr. Barber. *Id.* Considering that when the PSO investigator (Barber) was faced with concern, he spoke to Defendant Cox, and then Defendant Cox was the person in OYA leadership who set a meeting with Dr. Edwards about the complaint, the evidence clearly supports an inference Defendant Cox had some supervisory authority over Dr. Edwards.

Similarly, in 2003, when a MacLaren clinic nurse filed a hostile work environment grievance against Dr. Edwards, the nurse contacted the "Medical Administrator, Phil Cox" who then interviewed the nurses in the clinic in response. Exhibit 78 to Janci Decl. In 2009, Defendant Cox was copied on an email from Monica Moran in the PSO office about a youth's complaints against Dr. Edwards, and he responded to the email directing that "[i]t is appropriate for Dr. Adams to take the lead on this." Exhibit 48 to Janci Decl. This is consistent with Dr. Adams' testimony that Defendant Cox was her supervisor, and therefore in Dr. Edwards' chain of command during that time period.

Taken together and drawing all the inferences from this evidence in the light most favorable to Plaintiffs, the evidence is sufficient to show that Defendant Cox did have some

supervisory authority over Dr. Edwards. Defendants' motion for partial summary judgment on Plaintiffs' supervisory liability claims against Cox must therefore be denied.

*b. Failure to Protect.*

Even if the Court were to find that despite the evidence presented, Defendant Cox never had any supervisory liability over Dr. Edwards, Plaintiffs' federal claims against him would still survive under a failure to protect analysis. As asserted above, while the legal standard for 8th amendment and 14th amendment failure to protect claims, neither requires Plaintiffs to prove that Defendant Cox was Dr. Edwards' supervisor, only that he had a duty to protect the youth and failed to do so. The adjudicated Plaintiffs have 14th Amendment failure to protect claims against Defendant Cox.

For a 14th Amendment Claim for failure to protect, Plaintiffs must prove that:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro* at 1071.

The evidence viewed in the light most favorable to Plaintiffs supports a finding that Defendant Cox knew that Dr. Edwards had a history of sexual abuse of youth from as early as 2001 but continued to allow youth to be treated by Dr. Edwards which placed other youth at substantial risk of suffering similar sexual abuse, without taking reasonable measures to abate that risk.

Defendant Cox knew that Dr. Edwards was investigated by the Oregon Medical Board in 2001 "related to his practices in conducting genital exams of boys," but he never took any action to follow up with the Oregon Medical Board about the types of violations alleged against Dr. Edwards or to confirm the outcome of that investigation. Exhibit 20, Cox Dep., 76:6–78:17, 155:7–11; *see also* Exhibit 40 to Janci Decl. ("Mr. Cox stated that there had actually been a complaint filed against Dr. Edwards to the State Board of Medical Examiners back in 2001," and that investigation had to do with the doctor "wear[ing] gloves during a testicular exam.").

Despite this knowledge, there is no evidence that Defendant Cox took any measures to protect youth by ensuring chaperones were required in the room when Dr. Edwards saw youth, or requiring Dr. Edwards to wear gloves during all examinations, or discussing with the MacLaren Superintendent about ways to provide better supervision of Dr. Edwards. During this time period, Defendant Cox led health services work groups at OYA, including Dr. Edwards, to discuss the provision of health services at the OYA facilities, but never discussed the issues of "whether gloves should be worn during genital exams of youth," or "the use of chaperones during medical visits" at these meetings. Exhibit 20, Cox Dep., 52:7–53:4, 93:2–13, 120:21–25.

As mentioned above, Defendant Cox learned of additional youth complaints against Dr. Edwards in December 2006, where youth were wondering if Dr. Edwards' intrusive genital exams would qualify as sex abuse. Exhibit 40 to Janci Decl. Despite Defendant Cox telling Jason Barber that he would have a meeting with Dr. Edwards about this and document that conversation, there is no evidence this meeting actually happened. Defendant Cox testified that he did not remember having a meeting with Dr. Edwards about this, and there is no documentation of such a meeting. Exhibit 20, Cox Dep., 93:23–94:8.

In January 2007, Jason Barber alerted Mr. Cox of another allegation of a "male youth being touched by Dr. Edwards without gloves" which he described as "a bit disturbing." Exhibit 79 to Janci Decl. While Defendant Cox did meet with Dr. Edwards in response to this allegation, he did not take any action to protect youth from Dr. Edwards. Rather, Defendant Cox relied on Dr. Edwards' explanation and dismissal of the allegations as untrue. Exhibit 80 to Janci Decl. He testified that he did not know if he did any independent research to confirm that Dr. Edwards' reasoning for not wearing gloves during genital exams was a legitimate explanation. Exhibit 20, Cox Dep., 99:23–100:24.

In March of 2007, Defendant Cox was copied on an email concerning the police interview of Dr. Edwards in relation to a youth complaint, asking whether Dr. Edwards should be taken off administrative leave, given the District Attorney's determination that there was insufficient evidence to prosecute. Exhibit 44 to Janci Decl. When asked about whether OYA undertook an administrative or employment investigation or action against Dr. Edwards in response to this event, Defendant Cox testified that he did not remember that occurring, despite admitting that such an investigation could be done, even if law enforcement determines there is not enough evidence to prosecute a crime. Exhibit 20, Cox Dep., 114:5–115:10.

Again, in February of 2009, Defendant Cox received an email from Monica Moran at the PSO about a youth's allegations against Dr. Edwards because "Dr. Edwards conducted a testicular exam without wearing gloves" and that "multiple youth [said] that he did the same to them and his nickname is 'Dr. Coldfingers.'" Exhibit 46 to Janci Decl. When asked about this document, Defendant Cox testified that he did not recall taking any action in response besides referring it to Dr. Adams to handle. Exhibit 20, Cox Dep., 124:3–11.

Even in 2016, nearly 15 years after Cox first started learning of complaints about Dr. Edwards, Defendant Cox was still receiving notice of complaints by youth about Dr. Edwards' inappropriate behavior toward youth, and he was still disbelieving youth. In September 2016, Dr. Adams forwarded Defendant Cox an allegation she received about Dr. Edwards "press[ing] his genitals against [a youth] 3 different times when giving [him] an eye exam" as well as holding the youth's buttocks for a minute. Exhibit 81 to Janci Decl. In response to Dr. Adams' email and before any investigation had been undertaken, Defendant Cox agreed that he did not find the youth's allegation plausible. *Id.* This attitude after 15 years of hearing youth's allegations of sexual abuse by Dr. Edwards is the epitome of deliberate indifference.

The evidence shows that Defendant Cox directly knew about at least 6 allegations against Dr. Edwards over the span of 15 years and continually believed Dr. Edwards and disbelieved youth. He failed to protect the youth at MacLaren from the substantial risk of future abuse by Dr. Edwards by failing to take any reasonable steps to increase supervision of Dr. Edwards, enforce gloving or chaperone requirements, or even pro-actively share with Dr. Edwards' other supervisors about his long history of allegations. Exhibit 20, Cox Dep., 127:12–17, 129:19–25, 187:19–24.

This level of deliberate indifference is sufficient to show a failure to protect claim either under the 14th or 8th amendment because Defendant Cox was subjectively aware of so many facts from which he could draw this inference that Dr. Edwards was abusing boys at MacLaren and the risk that he would continue doing so was obvious.

Therefore, construing all the evidence in light most favorable to Plaintiffs, all federal claims (Supervisory Liability and Failure to Protect) against Defendant Cox should survive Defendants' Motion for Summary Judgment.

## CONCLUSION

As set out above, viewed in the light most favorable to Plaintiffs, the record—including depositions, documents, declarations, and other materials (and all reasonable inferences to be drawn therefrom)—demonstrate that there are genuine issues of material fact on all claims for each plaintiff. Accordingly, pursuant to FRPC 56, Defendants' Motion for Partial Summary Judgment should be denied in its entirety (with the exception of the stipulated dismissal of Defendant Richard Hill). This case should proceed to trial as scheduled.

DATED: September 11, 2026.

**CREW JANCI ATTORNEYS**

/s/ Peter Janci
Peter Janci, OSB No. 074249
Kendall M. H. Spinella, OSB No. 214446
Matan Goodblatt, OSB No. 224060
CREW JANCI ATTORNEYS
9755 SW Barnes Road, Suite 430
Portland, OR 97225
Tel: 503-306-0224
peter@crewjanci.com
kendall@crewjanci.com
matan@crewjanci.com

/s/ Paul C. Galm
Paul C. Galm, OSB No. 002600
GALM LAW
50 SW Pine Street, #403
Portland, OR 97204
Tel: 503-641-6000
paul@paulgalmlaw.com

*Of Attorneys for Plaintiffs*